UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| **BRAMAN MOTORS, INC., d/b/a BRAMAN BMW, for itself and in the name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its use and benefit, and** | **Case No. 17-cv-23360-DPG** |
| **PALM BEACH IMPORTS, INC., d/b/a BRAMAN MOTORCARS, for itself and in the name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its use and benefit, and** | |
| **The DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES of the State of Florida, for the use and benefit of Braman Motors, Inc. and Palm Beach Imports, Inc.,** | |
| Plaintiffs, | |
| v. | |
| **BMW OF NORTH AMERICA, LLC,** | |
| Defendant. | |

## AMENDED COMPLAINT

Plaintiffs Braman Motors, Inc., d/b/a Braman BMW ("Braman Miami"), and Palm Beach

Imports, Inc., d/b/a Braman BMW West Palm Beach ("Braman WPB") (collectively "Plaintiffs"

or "Braman"), bring this Complaint separately and together for themselves, and in the name of the

Florida Department of Highway Safety and Motor Vehicles ("FLHSMV" or "the Department") for

Braman's use and benefit (at various times Braman, for itself and in the name of the Department

for Braman's use and benefit, are referenced collectively herein as "Plaintiffs"), against Defendant BMW of North America, LLC ("BMW"), allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs Braman Miami and Braman WPB are BMW motor vehicle dealers located in Miami and West Palm Beach, Florida, respectively.  Braman brings this Complaint because of BMW's unlawful actions against Braman and all other BMW dealerships nationwide— actions borne out of BMW's corporate desire to have complete control over day-to-day dealership operations and decision-making traditionally understood and agreed to be left in the purview of franchised dealers, and borne out of BMW's need to get rid of thousands of unsold BMW vehicles clogging ports across the country.

2.      Needing to deal with an overflow of unsold vehicles from foreign markets toward the end of 2015, BMW engaged in wrongful, illegal, and unreasonable acts that harmed Braman. BMW desired to artificially inflate sales of new vehicles and to dump unwanted BMW vehicles upon BMW's American network of dealerships that BMW's German corporate parent had been unable to sell in other parts of the world.  BMW's wrongful, coercive practice of requiring Braman to "punch" retail delivery reports violates Florida law, the parties' Dealer Agreement, and Braman's common-law rights.  This punching scheme damages Braman by raising inventory costs and requiring Braman to accept additional inventory that Braman did not order and does not want.

3.      Next, seeking to exert heretofore unheard-of control over its franchised dealers, as well as needing the long term ability to dump surplus vehicles onto those dealers' lots, BMW has also forced modifications to the franchise agreement upon its dealerships, including Braman, that fundamentally altered the dealer/manufacturer relationship and what it means to be a BMW dealer.

4.     Through unilateral changes to BMW's bonus program, called the "Added-Value Program" ("AVP"), BMW has among other things: (1) with little warning and without the requisite statutory notice, arbitrarily modified the entire dealer relationship by tying new vehicle pricing to Braman's total used BMW vehicle sales, when the franchise agreement speaks almost exclusively of new vehicle sales, service, and parts; (2) with little warning and without the requisite statutory notice, forced Braman (through coercive incentives on new vehicle sales) to create entirely new positions at its dealerships ("BMW Geniuses") who can answer rudimentary product questions but cannot complete a sale or be the customer's end-to-end point of contact, thereby creating customer dissatisfaction and causing lost sales as well as increasing dealer costs; (3) created a brand new and unusual method of tracking the quantity of service customers a dealership has and then tying incentive monies to that quantitative element instead of the quality of the service the dealership provides; and (4) in a move rife with privacy concerns and a high chance of error, created a brand new and unusual method of tracking customer loyalty that penalizes Braman if customers defect to other brands (regardless of the customer's purpose for the defection).  BMW's actions have violated Florida law, the parties' Dealer Agreements, and Braman's common law rights.

5.     In addition, BMW demanded real-time access to Braman's most critical asset—its database of customer information, sales leads and service records—and threatened to cut Braman off from financial incentives Braman needs to stay competitive.  BMW's economic coercion to force Braman into signing data sharing agreements violates multiple provisions of Florida law and BMW's duty of good faith and fair dealing.

6.     Braman therefore brings this action against BMW for violations of Fla. Stat. §§ 320.60–320.70 (the "Florida Dealer Act"), for breach of contract, and for breach of the implied covenant of good faith and fair dealing.

3

7.      As described more fully below, Braman, like all BMW franchisees, is a party to a Dealer Agreement with BMW, and is subject to various requirements in order to qualify for AVP funds, which account for a substantial part of Braman's annual revenue.

8.      The metrics, conditions, and funding under BMW's AVP change frequently and are left completely to BMW's discretion.

9.      To receive the full AVP and the lowest acquisition prices on new vehicles, Braman is required, among other things, to attain whatever benchmarks BMW sets, regardless of whether those benchmarks comport with the nature of the franchise agreement, or whether they take into account Braman's market.

10.     BMW has arbitrarily modified Braman's Dealer Agreement in four unreasonable ways: with two changes applied by BMW in 2016, and two more changes that will go into effect October 1, 2017.  The first two AVP changes, which were made without the requisite statutory notice: (1) add a used BMW vehicle sales requirement, and (2) require Braman to hire BMW Geniuses.  The most-recent AVP changes discard qualitative customer service surveys in favor of (1) a new service tracking algorithm focused on the quantity of service customers Braman has and (2) a new customer loyalty tracking algorithm.

11.     In early 2016, BMW issued its "Added Value Program Guide," setting forth each component of AVP and what Braman must do in order to receive the highest amount of trading margin on each new BMW vehicle it sells.

12.     First, BMW arbitrarily and on short notice changed AVP, for the first time, to require that Braman sell a certain number of used BMW vehicles in order to receive the lowest pricing on new BMW vehicles. The Dealer Agreement speaks almost exclusively of new vehicle

sales and original parts and service, which aligns closely with BMW's goal of producing and selling vehicles.  The Dealer Agreement mentions used vehicle sales briefly and in passing.

13.     Second, BMW arbitrarily and on short notice changed AVP, for the first time, to force each Plaintiff to employ at least seven full-time "BMW Geniuses" to answer questions about BMW products.  BMW purportedly used Apple's "Genius Bar" as the template for its "BMW Geniuses," who strictly answer questions about BMW vehicles.  Unfortunately, BMW ignored that Braman, like other BMW dealers, already has product "Geniuses"—scores of sales and service professionals, trained at great expense to the dealership, who have answered customers' questions for years.

14.     BMW prohibits BMW Geniuses from handling sales from beginning to end and engaging in other activities that sales and service personnel typically do.  In practice, the BMW Geniuses add little value to the dealership, as only one or two at a time are being utilized in their primary function.  In short, BMW is forcing dealers like Braman to hire employees it neither wants nor needs.

15.     In order to offset the added expense of these underutilized employees, Braman has its BMW Genius staff at each store perform other functions, such as prepping vehicles for delivery and taking customers on test drives. Unfortunately, this additional work is not enough to absorb the added expense of employing BMW Geniuses.

16.     BMW's prohibition on BMW Geniuses handling sales from beginning-to-end causes customer dissatisfaction and lost sales.  Customers become frustrated when they deal with a BMW Genius as part of their initial interaction, but then, per BMW's requirements, are handed off to a salesperson to complete the sale. If Braman refuses to maintain this arbitrary and

unnecessary staffing requirement, BMW penalizes Braman and every single new BMW vehicle costs Braman more.

17. Third, on June 10, 2017, BMW arbitrarily changed the AVP again. For the first time, BMW would track service performance in an unprecedented manner. Traditionally, BMW tracked Braman's service performance through customer surveys that resulted in an aggregate score, called a Customer Service Index, or "CSI." CSI purports to measure the quality of Braman's service and repair of BMW vehicles. If Braman achieved a certain aggregate CSI, it would receive the so-called "bonus" money, which BMW paid as a percentage of MSRP on each new vehicle Braman sells.

18. Now, instead of rewarding dealers for the quality of their service, BMW takes that quality as a given and ties the incentive to a new formulation of quantity that penalizes a dealer for factors beyond the dealer's control. In a metric called "Service Effectiveness," BMW purports to measure, as a percentage, the number of active service customers Braman has in relation to the number of BMW vehicles in operation in Braman's Primary Market Area ("PMA"). But, as discussed below, this calculation can be easily skewed by local market characteristics that the formula does not take into account. It also automatically penalizes Braman for customers whose BMW vehicles may be performing adequately and do not need repair.

19. Fourth, BMW arbitrarily changed AVP, to track sales performance and customer loyalty in an unusual and unheard of manner that may also violate customers' privacy. It also seems destined to be more unreliable than reliable.

20. Traditionally, BMW tracked the quality of Braman's sales experience through an aggregate score generated from customer surveys, known as SSI. Achieving a certain SSI score earned Braman a so-called "bonus" under AVP. Now, after making SSI performance a threshold

to gain access to the program, BMW has decided to impose a ginned-up a formula for determining how many returning customers Braman is getting by using tracking tools that would make even an average consumer concerned that Big Brother BMW is watching.

21.     Using a third-party vendor, Experian, to access customer credit information and correlate data from the Florida Highway Safety and Motor Vehicles ("FLHSMV"), including registration information and customer addresses, BMW will track whether *any* of Braman's previous BMW customers (from any time) have returned to the market within the last year to purchase another BMW from Braman, or instead have purchased a BMW or another brand of vehicle somewhere else.

22.     Besides the privacy concerns (which include tracking change of address information, vehicle registration, and discrete purchases by individual customers from competitors), the formula is bound to be filled with errors.

23.     To start, to determine whether the customer is the same, the third-party vendor relies upon last name and address information—but there is no guarantee that the name and address will be entered identically by the competing dealer, by the FLHSMV, or by the Post Office. This is especially concerning in South Florida, where multiple spelling variations of non-Anglicized last names are prevalent.

24.     A Braman customer that moves and then purchases another vehicle from or services a BMW vehicle at Braman may not be counted as a returning customer.  An individual in the same household with vastly different needs or spending power (such as college-age children or live-in grandparents) who buys somewhere else will be counted against Braman. Every defect in data gathering or processing penalizes Braman and raises the cost of new vehicles.

25.     None of BMW's changes to AVP are likely to result in Braman selling more new BMWs, but instead serve to reinforce BMW's vice grip over the business interests and operations of every dealer in its network.

26.     Next, BMW has engaged in a nationwide deceptive practice of coercing dealers to report vehicles sold (by "punching" [i.e. electronically registering] a Retail Delivery Report, or "RDR"), when in fact those vehicles sit unsold on dealers' lots.

27.     Punching RDRs results in logistical, legal, and financial headaches for consumers and dealers.   Dealers are coerced to punch unsold vehicles in order to inflate BMW's sales numbers.

28.     This scheme places Braman in a proverbial catch-22:  Unpunched vehicles have an inventory book cost that is higher because BMW generally gives dealers dramatic incentives to purchase additional vehicles and to "punch" the vehicle still in inventory (sometimes $1000 or more per vehicle). But if Braman punches vehicles, Braman becomes flooded with inventory it has trouble selling.   To make matters worse, BMW's allocation system counts punched, but still inventoried vehicles, as "sold" vehicles for future allocations calculations, thus indicating it should send Braman even more unpopular models.   BMW's coercive tactics regarding the punching of vehicles significantly and unfairly affects a dealer's allocation of vehicles, a dealer's acquisition cost of new vehicles, and how a dealer's performance is measured by BMW.

29.     By the end of 2015, BMW's tactics regarding punching resulted in Braman having so many punched but unsold vehicles that BMW simply delivered new BMW deliveries on public streets surrounding Braman.   There was nowhere else to put the vehicles that BMW had over-produced.

30.     Finally and most recently, BMW has demanded as a condition of eligibility for AVP funds that Braman sign Data Sharing Agreements with BMW, which gives BMW broad access to Braman's internal database of customer leads, sales information and service write-ups in real time. BMW has threatened to cut Braman off from portions of certain bonus elements that Braman might otherwise earn if Braman refuses to sign the Data Sharing Agreement, including incentives earned under its new Service Effectiveness metric that is scheduled to go into effect later this year.

31.     Upon information and belief, BMW wants access to Braman's databases in real time in order to adequately operate portions of its new, unilateral bonus program.

32.     BMW's demand came on the very day BMW claimed was the deadline for Braman to sign, even though BMW's representatives previously had assured Braman's representatives there would be no financial penalty for failure to sign the Data Sharing Agreements.  In effect, BMW is using the threat of withholding AVP funds as leverage to obtain broad and unfettered access to Braman's customer lists.  BMW's demands for access to Braman's customer database directly violate Florida law, which prohibits distributors like BMW from requiring direct or indirect access to Braman's internal databases.

33.     Where available, Braman seeks treble damages and attorneys' fees under state law for BMW's self-serving, heavy-handed misconduct.

## PARTIES

34.     Plaintiff Braman Miami is a corporation organized and existing under the laws of the State of Florida, with a principal place of business in Miami, Florida. Braman Miami is a licensed and authorized BMW dealer.  Braman Miami is a "motor vehicle dealer" as defined in the Florida Dealer Act.

35.     Plaintiff Braman WPB is a corporation organized and existing under the laws of the State of Florida, with a principal place of business in West Palm Beach, Florida. Braman WPB is a licensed and authorized BMW dealer.  Braman WPB is a "motor vehicle dealer" as defined in the Florida Dealer Act.

36.     BMW is a Delaware limited liability company, with its principal place of business in Woodcliff Lake, New Jersey.  The sole member of BMW is BMW (US) Holding Corporation, a Delaware company with a principal place of business in Woodcliff Lake, New Jersey..

37.     BMW purchases BMW vehicles from its German corporate parent. BMW then imports and sells these vehicles to franchised BMW dealers throughout the United States, including Braman. BMW is a "distributor" and "licensee" under the Florida Dealer Act.

## JURISDICTION AND VENUE

38.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

39.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts giving rise to the claims occurred in this jurisdiction.

## FACTUAL ALLEGATIONS

40.     BMW's actions described herein are part of an intentional strategy, taking place industry-wide, to put more coercive power in the hands of motor vehicle manufacturers to the detriment of the dealer body.[1]

---

[1] Jamie LaReau, "Dealers Fear Losing Control As Factory Incentives Burgeon," Automotive News,   http://www.autonews.com/article/20170410/RETAIL07/304109970/factory-incentives-hurting-dealers (last visited July 19, 2017).

41.     Base trading margin on new vehicle sales used to be sufficient to support a dealer's new vehicle sales operations.  For decades, dealers (including Braman) relied upon these margins for profits in their sales operations.  No longer.  Now, manufacturers have markedly reduced the trading margin and replaced it with so-called "bonus"-based programs where the dealer must "earn" back the margin percentages in order to lower new vehicle wholesale pricing by hitting performance targets unilaterally and arbitrarily set by the manufacturer.

42.     Because, in reality, a new vehicle dealer can have a profitable sales operation only if so-called "bonus" program targets are met and the additional funds are received, manufacturers like BMW now have wielded even greater coercive power than in the past—power  to control the operations of dealerships and shift costs and risks to the dealer after the Dealer Agreement has been entered into, thereby detrimentally affecting the dealer's investments.

43.     BMW, like many other manufacturers, uses this unlawful leverage to serve ends that, through other direct means, would be illegal under the Florida Dealer Act. BMW is attempting to circumvent the law under the guise of "incentivizing" supposedly uniform franchise behavior.

44.     Few BMW dealerships remain profitable or competitive without the conditional margin-replacement funds paid by BMW. BMW's ability to set so-called "incentive targets" and manipulate and change and calculate those targets at its own whim and for its own purpose is strictly limited by both Florida statutes and BMW's obligation to act fairly and in good faith.

## A.     The Dealer Agreement

45.     Plaintiffs are BMW franchisees and are each a party to a Dealer Agreement with BMW.

46.     The Dealer Agreement incorporates several other documents by reference, including a set of Standard Provisions.

11

47.     The Standard Provisions impose several affirmative obligations upon BMW, including an obligation to help Braman's operations:

> BMW NA will assist Dealer in Dealer's BMW Operations through such means and upon such terms and conditions as BMW NA considers necessary and appropriate….

Standard Provisions at Paragraph 2(b).

48.     The Standard Provisions also require BMW to "sell and deliver BMW Products to Dealer in accordance with this Agreement and the ability of the Dealer to store, display, sell and service BMW Products." *Id*. at Paragraph 2(a).

49.     "BMW Products" are defined as "BMW Vehicles and Original BMW Parts." *Id*. at Paragraph 1(d). "BMW Vehicles" are defined as "<u>new</u> passenger cars manufactured by [BMWAG] or one of its manufacturing subsidiaries, sold by BMW NA, and bearing the trademarks of BMW." *Id*. at Paragraph 1(e) (emphasis added).

50.     BMW has breached these contractual obligations.

51.     While most of the Standard Provisions deal with new vehicle sales and service, in Paragraph 4(g), Dealer promises to "use its best efforts to maintain in presentable condition a properly illuminated used car display area in which used BMW Vehicles will be prominently displayed."

52.     In Paragraph 5, Plaintiffs promised to "actively and effectively promote the sale of the full line" of new BMWs, and to "achieve the best possible sales performance obtainable" for new BMWs, which will be evaluated on the basis of "reasonable and equitable criteria." *Id*. at Paragraph 4(a) & 4(b).  There are no obligations to actively and effectively promote the sale of used vehicles or to achieve the best possible used vehicle sales performance.

53.     In the event of termination of the Dealer, BMW promises to repurchase all new vehicle inventory and original BMW Parts. *Id.* at Paragraph 14(b)(1) & (b)(2). Dealer's used vehicle inventory is not mentioned.

**B.      The Added Value Program (AVP)**

54.     BMW has imposed a "bonus" program called AVP ("Added Value Program"), under which BMW's former gross sales trading margins were replaced by a conditions-based program, whereby BMW dealers can lower their new vehicle wholesale costs only by meeting certain standards and objectives arbitrarily and unilaterally set by BMW.

55.     Thus, BMW "incentivizes" its dealers to perform certain actions and to hit certain metrics under the AVP by offering up to 5% of MSRP in "bonus" money for every new vehicle sold.

56.     Receipt of the AVP bonus money has the effect of lowering the price a dealer pays for its new vehicle inventory.

57.     The overarching structure of the AVP has resulted in a detrimental modification of Braman's BMW franchise, which modification was imposed by BMW without complying with Florida law, including the failure to provide statutory notice under the Florida Dealer Act before implementing the modification.

58.     More specifically, prior to the introduction of the AVP, Braman's BMW franchise, like all BMW franchises, was structured around the base trading margin of new vehicle sales— *i.e.*, the difference between the wholesale price set by BMW for dealer purchases and the Manufacturer's Suggested Retail Price ("MSRP") set by BMW for retail consumers.

59.     BMW unilaterally changed the entire structure of Braman's business by markedly reducing the dealer's gross trading margin below levels sufficient to sustain Braman's new vehicle

sales business, and replaced that trading margin with "back-end" dealer "bonuses" that were tied directly to requirements, conditions, and criteria that BMW alone sets, changes, and evaluates.

60.     Without receiving the funds by absolute adherence to BMW's requirements, conditions, and criteria, it is virtually impossible for Braman to remain competitive. In short, so-called "bonuses" which now must be earned by compliance with BMW's program requirements in reality are not "bonuses" at all because they are paid with money that used to be the dealer's without any conditions attached—*i.e.*, gross trading margin.

61.     By tying the reduction trading margin to the bonus money,   the cost the dealer pays for its inventory is directly affected. A dealer has no choice but to try to attain the "bonus" and, therefore, BMW effectively has turned the incentivized conduct into a requirement of the franchise. The "AVP" is not "voluntary" as BMW would have its dealers and this court believe. These new requirements alter the core business structure and operations of a BMW dealer and constitute a modification of the franchise which is regulated by the Florida Dealer Act.

62.     In January 2016 BMW published the "Added Value Program Guide," which set forth each component of AVP and what Braman must do to receive the most money on each BMW it sells.  BMW again modified and changed the Added Value Program Guide and its components in June 2017.

63.     BMW implemented each of these changes without complying with the Florida Dealer Act's specific notice requirements mandating manufacturers provide notice of any franchise modification at least ninety (90) days prior to its implementation to both the dealer and the DMV.

64.     Four of AVP's components are at issue in this case: (1) the new vehicle payments that are tied to used BMW vehicle sales ("the TPO Component"), (2) the BMW Genius condition ("the Genius Component"), (3) a "service effectiveness" metric that penalizes dealers for factors

that are beyond any control of the dealer ("the Service Effectiveness Component"), and (4) a "dealer sales loyalty" metric that penalizes dealers for factors beyond any control of the dealer ("the Dealer Sales Loyalty Component").

### i.    TPO Component (0.5% MSRP)

65.    On January 5, 2016, BMW announced a change to AVP, effective April 1, 2016 (only 87 days later), which would tie a payment equal to 0.5% MSRP on every new vehicle sold to the number of used BMW vehicles the dealer sold (Total Pre-Owned or "TPO") even though the franchised agreement is silent as to any specific number.

66.    If a dealer fails to sell the certain number of used BMW vehicles, required by BMW, the cost to the dealership of each new vehicle that quarter would be higher.

67.    To add insult to injury, the new TPO targets were unexplained by BMW and no insight was given as to how they were set.

### ii.    BMW Genius Component (1.0% MSRP)

68.    On January 5, 2016, BMW announced a change to AVP for 2016 (which commenced on April 1, 2016, only 87 days later) tying a payment equal to 1.0% MSRP on every new vehicle sold to a dealer's employing a set number of BMW Geniuses.

69.    BMW unilaterally sets the number of BMW Geniuses a dealer must have in order to receive the 1% margin payment.  BMW has unilaterally prescribed set the number of BMW Geniuses Braman must have in order to receive the 1% margin payment.

70.    If a dealer fails to employ sufficient numbers of BMW Geniuses, the cost to the dealership of each new vehicle would be higher. In other words, BMW is forcing its dealers to hire employees they neither want nor need. The franchise agreement is silent with respect to geniuses.

71.     It costs Braman Miami almost $350,000 and Braman WPB almost $250,000 per year to staff BMW Geniuses at each site, which includes the Geniuses' salary, any benefits they receive, and funding BMW-mandated training.

72.     While BMW Geniuses interact initially with both new and returning customers, BMW Geniuses are neither trained nor authorized to continue interacting with those customers should the customer wish to purchase a vehicle or negotiate a deal. This is left to the sales staff. The friction in having to deal with multiple points of contact at a dealership can and has led to customer dissatisfaction and lost sales.

### iii.     *Service Effectiveness Component (1.75% MSRP)*

73.     On June 10, 2017, BMW announced a change to AVP, effective October 1, 2017, which will tie a payment equal to 1.75% MSRP on every new vehicle sold to a new and unusual method of tracking service customers in Braman's Primary Market Area ("PMA").

74.     In previous iterations of the AVP, BMW measured Braman's service business using CSI, (Customer Satisfaction Index), which was an aggregated score based upon customer surveys which inquired about Braman's quality of service work and customer care.

75.     BMW will now supplant this qualitative metric with a quantitative one—one that also happens to be completely divorced from reality with how customers service their vehicles.

76.     Under the new "Service Effectiveness" metric, BMW will score Braman on a percentage calculated by the total number of active service customers it has within its PMA divided by the total number of BMWs "in Operation" in the PMA.

77.     The metric discounts customers that may "pump in" to Braman's PMA—i.e., customers that perhaps work in Braman's PMA but don't live there, and so choose to get their

vehicles serviced in another dealer's PMA. The metric discounts these "pump in" customers by adding them to both the numerator and denominator of the equation.

78.     Of course, this metric completely ignores local conditions that may cause higher than normal "pump outs"—i.e., reasons why customers who register their vehicles in a given PMA may choose to service their vehicle outside the PMA, unrelated to the dealer's quality of service. Such conditions may include: (1) the PMA borders a commuting destination, where units registered within the PMA are more likely to be serviced at the destination than at home, or (2) while the units may be located within a dealer's PMA, another dealer is easier to get to, whether by distance or traffic patterns.

79.     The Service Effectiveness Component also penalizes Braman for customers whose BMWs may be functioning properly and who choose not to perform routine maintenance and/or who do not drive often.

80.     Finally, BMW radically changed a "gatekeeper/qualifier" to the Service Effectiveness Component to now require Braman to obtain email addresses from at least 85% of all service customers that come in for repairs and submit these emails to BMW in order to qualify for margin tied to the Service Effectiveness Component. The franchise agreement is silent with respect to email collections.

81.     Even assuming Braman otherwise meets its Service Effectiveness target, BMW could withhold margin if Braman does not obtain email addresses from at least 85% of all service customers.  Obtaining only 84% of service customers' email addressed would result in Braman not receiving any margin tied to Service Effectiveness.

82.     This is a dramatic departure from how BMW used to handle obtaining emails from service customers.

17

83.     Under the old program, only New and Certified Pre-Owned (CPO) customers counted toward attainment of BMW's goals for email capture; meaning, owners of new and recent model year BMWs would have to provide their email addresses for Braman to qualify for a portion of the incentive program.

84.     Now this has been changed to include all service customers, whether that customer is an elderly grandmother still driving a 1997 BMW with no computer in her home, or a Honda owner stopping by Braman Miami for an emergency tire repair.

85.     Increasing the email capture metric to require Braman to obtain email addresses from at least 85% of all service customers unfairly penalizes Braman as it is more likely to include customers that may not have, or are unwilling to give, an email address to Braman.

86.     Moreover, an arbitrary email capture rate is not an effective measurement of how satisfied the public is with Braman's service.

87.     Should Braman fail to meet BMW's arbitrary Service Effectiveness Component, Braman will lose (margin on) its new BMW inventory, which in turn will result in higher vehicle cost, higher customer prices, lost sales and lost profits.

### iv      *Sales Loyalty Component (1.75% MSRP)*

88.     On June 10, 2017, BMW announced a change to AVP, effective October 1, 2017, which will tie a payment equal to 1.75% MSRP on every new vehicle sold to a new and unprecedented method of tracking returning sales customers in Braman's PMA.

89.     Traditionally, BMW tracked the quality of Braman's sales experience through an aggregate score generated from customer surveys, known as SSI (Sales Satisfaction Index). Achieving a certain SSI score earned Braman a so-called "bonus" under AVP.

90.     Now, opting to emphasize quantity over quality, BMW has created a formula for determining how many returning customers Braman is getting, by using tracking tools that, <u>inter alia</u>, raise privacy concerns.

91.     Using customer credit information of a third-party credit reporting company, Experian, and the correlation and analysis of data from the FLHSMV, including registration information and customer addresses, BMW will be tracking whether *any* of Braman's previous BMW customers (from any time) have returned to the market within the last year to purchase another BMW from Braman, or instead have purchased any brand of any type of vehicle anywhere else.

92.     Besides the privacy concerns (which include tracking change of address information, vehicle registration, and discrete purchases by individual customers from competitors), the formula is bound to be filled with errors. To start, to determine whether the customer is the same person on the vehicle's list, the third-party vendor relies upon last name and address information—but there is no guarantee that the name and address will be entered identically by the competing dealer, by the FLHSMV, or by the Post Office, especially in southern Florida, where multiple spelling variations of non-Anglicized last names are more prevalent.

93.     A Braman customer who moves and then purchases another vehicle from Braman may not be counted as a returning customer. An individual in the same household with the same last name (such as college-age children) that buys somewhere else will be counted against Braman. Every defect in data gathering or processing will make it more likely that Braman cannot hit whatever arbitrary target for customer loyalty BMW sets.

94.     Moreover, Braman will have no way of checking for these possible defects in the process. Experian, the third-party vendor, will not release customer lists that BMW is using to

punish Braman, out of privacy concerns. If Experian has messed up and there are "Return to Market" events counted against Braman that were not actually disloyal customers (such as the misspelled name or failure to update a moved address), Braman will have no way to hold Experian and BMW accountable.

95.     Braman will also be penalized if one individual in the same household buys multiple vehicles for the entire family, but has different needs for different vehicles. For example, a parent of a growing family that once bought a BMW from Braman for commuting, but now buys a minivan for the family, will count against Braman, despite the fact that BMW does not make minivans.

96.     Indeed, BMW's own materials on the Sales Loyalty Component confirm that a customer that once purchased a BMW sports car, a Z4, will be deemed "disloyal" if that same customer leases a Ford F-150, a pickup truck, even though BMW does not offer any pickup trucks or comparable vehicles.

97.     Should Braman fail to meet BMW's arbitrary Sales Loyalty Component, Braman will not receive the associated bonus payment and therefore, will be charged higher costs for its new BMW inventory, which in turn will result in higher customer prices, lost sales and lost profits.

**C.     BMW Engages In Deceptive Practice of "Punching" RDRs**

98.     Due to thousands of new vehicles piling up at U.S. ports because of declining global demand, BMW engaged in a nationwide deceptive practice of coercing dealers to report vehicles as sold (by "punching" a Retail Delivery Report, or "RDR"), when in fact those vehicles sit unsold on dealers' lots.

99.     Punching RDRs of unsold vehicles creates logistical, legal, and financial problems for both consumer and dealers.

100.     BMW has created fictional "punching" categories for this activity. Vehicles punched as "sales demo" immediately have their warranties begin to run; a fact customers fail to understand until they bring their vehicles in for service during the gap between when the customer believes the warranty will expire and when it actually expired. This results in customers being irate with the dealership right around the time they may be considering purchasing another vehicle.

101.     Vehicles punched as "Spec 8" do not have their warranties begin to run, but the manner in which the RDR is punched may result in the end consumer being left off of critical recall lists.

102.     Whether punched as "sales demo" or "Spec 8," all punched vehicles cause headaches for dealers. BMW coerces dealers to purchase and punch more vehicles than dealers need or can sell in order to inflate BMW's sales numbers. Ultimately, the dealer will have to dispose of the punched vehicles, alongside its new and used inventory.

103.     Dealers, therefore, face a dilemma: one on hand, unpunched vehicles bear a higher inventory cost, as BMW gives dealers significant incentives to punch inventory (sometimes $1000 or more per vehicle). But on the other hand, maintaining an excessive inventory costs dealerships a lot of money in floorplan financing and overhead, and may require dealerships to sell them at a loss in order to purge itself of the unwanted/unneeded vehicles. Further still, BMW counts punched vehicles as "sales" immediately in its allocation system, thereby sending <u>more</u> unpopular models to beleaguered dealers like Braman.

104.     Punching was so rampant that, by the end of 2015, Braman Miami received multiple parking tickets and citations from the City of Miami.  Braman had so many punched and unsold vehicles that BMW dropped new deliveries on public streets.  There was nowhere else to put them.

105.     After that, much to the consternation of BMW, Braman refused to punch any unsold vehicles, and Braman suffered dearly for it. For the better part of the last year and a half, Braman has refused to artificially punch vehicles. Braman has lost substantial incentive money for its refusal to comply with BMW's deceptive scheme.

**D.     The Data Sharing Agreement**

106.     On June 17, 2016, BMW first presented Data Sharing Agreements for Braman's two BMW locations. The Data Sharing Agreements require Braman to give BMW real-time access to its Customer Relationship Management database ("CRM") and its Dealership Management System ("DMS").

107.     In subsequent conversations between representatives for Braman and BMW, BMW assured Braman that there would be no financial penalty if Braman refused to sign the Data Sharing Agreements.

108.     Then suddenly, on November 30, 2016 at 2:18 pm, representatives from BMW sent representatives from Braman an email stating that "If the Nov 30 deadline for data sharing agreements is not met for a Center, they will not be eligible for their Tier 2 or Tier 3 parts bonus categories."

109.     A little less than ten hours before BMW's deadline was the first time BMW tied a financial penalty to Braman refusing to sign the Data Sharing Agreements.  The message was clear—either sign the agreements or forfeit incentives critical to profitability.

110.     Upon information and belief, the signing of the Data Sharing Agreement is also a prerequisite to receive the financially lucrative Service Effectiveness bonus, discussed above.

111.     As discussed below, BMW's tactics and coercion in attempting to get Braman to sign the Data Sharing Agreements violate multiple provisions of Florida law.

E. **The Florida Dealer Act: Coercion, Promotional Discrimination, and Loaner Cost Reimbursement**

112.    The Florida Dealer Act provides robust and broad protection to dealers against potentially coercive behavior from manufacturers.

113.    The Dealer Act overrides the broad power and discretion that manufacturers <u>have given themselves</u> in their franchise agreements. Its manifest purpose is to protect automobile dealers from abuse and overreaching by manufacturers:

> It is the intent of the Legislature to protect the public health, safety, and welfare of the citizens of this state by regulating the licensing of motor vehicle dealers and manufacturers, maintaining competition, providing consumer protection and fair trade….

Fla. Stat. § 320.605.

114.    The Legislature has amended the Dealer Act several times to address continuing abuses by manufacturers against dealers and ever-evolving business practices.

115.    The Dealer Act prohibits numerous unfair business practices by manufacturers. *See generally* Dealer Act Fla. Stat. § 320.64:

> A licensee is prohibited from committing the following acts:
>
> (5) The applicant or licensee has coerced or attempted to coerce any motor vehicle dealer into accepting delivery of any motor vehicle or vehicles or parts or accessories therefor or any other commodities which have not been ordered by the dealer.
>
> (6) The applicant or licensee has coerced or attempted to coerce any motor vehicle dealer to enter into any agreement with the licensee.
>
> (34) The applicant or licensee, after the effective date of this subsection, has included in any franchise agreement with a motor vehicle dealer a mandatory obligation or requirement of the motor vehicle dealer to purchase, sell, or lease, or offer for purchase, sale or lease, any quantity of used motor vehicles.
>
> (41)  The applicant or licensee has established, implemented, or enforced criteria for measuring the sales or service performance of any of its franchised motor vehicle dealers in this state which have

23

a material or adverse effect on any motor vehicle dealer and which:
(1) are unfair, unreasonable, arbitrary, or inequitable.

116.    Further, under Fla. Stat. § 320.641, BMW is prohibited from modifying the

franchise agreement without 90-days' notice and proper justification for the change:

> *Fla. Stat. § 320.641. Discontinuations, cancellations, nonrenewals, modifications, and replacement of franchise agreements.*
>
> (1)(a) An applicant or licensee shall give written notice to the motor vehicle dealer and the department of the licensee's intention to discontinue, cancel, or fail to renew a franchise agreement or of the licensee's intention to modify a franchise or replace a franchise with a succeeding franchise, which modification or replacement will adversely alter the rights or obligations of a motor vehicle dealer under an existing franchise agreement or will substantially impair the sales, service obligations, or investment of the motor vehicle dealer, at least 90 days before the effective date thereof, together with the specific grounds for such action.
>
> (b) The failure by the licensee to comply with the 90-day notice period and procedure prescribed herein shall render voidable, at the option of the motor vehicle dealer, any discontinuation, cancellation, nonrenewal, modification, or replacement of any franchise agreement. Designation of a franchise agreement at a specific location as a "nondesignated point" shall be deemed an evasion of this section and constitutes an unfair cancellation.

117.    Under Fla. Stat. § 320.646, BMW is prohibited from requiring Braman to provide

direct access to Braman's database or from avoiding its obligation to indemnify Braman for any

liability arising from Braman's provision of customer data to BMW:

> *Fla. Stat. § 320.646. Consumer data protection.*
>
> (2) Notwithstanding the provisions of any franchise agreement, with respect to consumer data a licensee or a third party acting on behalf of a licensee:
>
> (c) May not require that a motor vehicle dealer grant the licensee or a third party direct or indirect access to the dealer's data management system to obtain consumer data. A licensee must permit a motor vehicle dealer to furnish consumer data in a widely accepted file format, such as comma delimited, and through a third-party vendor selected by the motor vehicle dealer. However, a licensee may access or obtain consumer data directly from a motor vehicle dealer's data management system with the express consent

24

of the dealer. The consent must be in the form of a written document that is separate from the parties' franchise agreement, is executed by the motor vehicle dealer, and may be withdrawn by the dealer upon 30 days' written notice to the licensee.

(d)   Must indemnify the motor vehicle dealer for any third-party claims asserted against or damages incurred by the motor vehicle dealer to the extent caused by access to, use of, or disclosure of consumer data in violation of this section by the licensee, a third party acting on behalf of the licensee, or a third party to whom the licensee has provided consumer data.

118.   Under Fla. Stat. § 320.696, BMW is prohibited from recovering or attempting to recover any costs associated with providing retail compensation to Braman for warranty parts and labor sales and is prohibited from attempting to influence the prices for which Braman sells parts or labor in retail customer repairs:

*Fla. Stat. § 320.696. Warranty Responsibility.*

(6) A licensee shall not recover or attempt to recover, directly or indirectly, any of its costs for compensating a motor vehicle dealer under this section.

(7) A licensee shall not require, influence, or attempt to influence a motor vehicle dealer to implement or change the prices for which it sells parts or labor in retail customer repairs.  A licensee shall not implement or continue a policy, procedure, or program to any of its dealers in this state for compensation under this section which is inconsistent with this section.

119.   BMW has breached the Florida Dealer Act in multiple ways.

120.   Under Fla. Stat. § 320.64(5), BMW has illegally coerced or attempted to coerce Plaintiffs to accept more inventory than Plaintiffs wants or needs by: (i) requiring Plaintiffs to punch RDRs and initiate turn-and-earn allocations Plaintiffs would not otherwise initiate, and (ii) creating artificial and economically unreasonable sales targets of both new and used vehicles through unilateral modifications to the AVP.

121.     Under Fla. Stat. § 320.64(6), BMW has illegally coerced or attempted to coerce Braman into entering into the Data Sharing Agreements with BMW, by using artificial high-pressure tactics (such as the last-minute announcement of the loss of bonus money) and economic coercion.

122.     Under Fla. Stat. § 320.64(34), BMW has illegally modified the franchise agreements between BMW and Braman to effectively require Braman to sell a certain number of used BMW vehicles by economically coercing Braman and threatening to unlawfully increase the price of new BMW vehicles.

123.     Under Fla. Stat. § 320.64(41)(a), BMW has illegally established criteria for measuring Braman's sales performance that is unfair, unreasonable, arbitrary or inequitable and has a material or adverse effect on Braman.

124.     Under Fla. Stat § 320.64(41)(a), BMW has illegally established criteria for measuring Braman's service performance that is unfair, unreasonable, arbitrary or inequitable and has a material or adverse effect on Braman.

125.     Under Fla. Stat. § 320.641, BMW has unlawfully modified the basic franchise agreement between Plaintiffs and BMW by reducing the trading margin on all vehicles below an amount sufficient to sustain the business and instead replacing that margin with effectively coercive but euphemistically titled "bonuses" subject to the continuous vagaries and whims of BMW's corporate decision-making.

126.     Also under Fla. Stat. § 320.641, BMW has unlawfully modified the basic franchise agreement between Plaintiffs and BMW by requiring Plaintiffs to sell certain numbers of used BMW vehicles or else pay higher prices for new vehicles from BMW, when the franchise

agreement between Plaintiffs and BMW discusses sales of new vehicles only, and only requires Plaintiffs to use "best efforts" to have a used vehicle showroom.

127.    Under Fla. Stat. § 320.646, BMW has unlawfully required that Braman give BMW or a third-party vendor direct or indirect access to its dealer management system, through an agreement that unlawfully requires Braman to indemnify BMW for granting that access.

128.    Under Fla. Stat. § 320.696(6), BMW has unlawfully attempted to recover its costs for compensating Braman under Florida law for warranty parts and labor sales.

129.    Under Fla. Stat. § 320.696(7), BMW has unlawfully attempted to influence the price at which Braman sells labor and parts to retail customers.

130.    BMW has also violated Fla. Stat. § 320.696(7) by implementing a program for warranty parts and labor reimbursement that is inconsistent with the Florida Dealer Act.

131.    Among other things, the Florida Dealer Act authorizes a motor vehicle dealer to obtain injunctive relief against licensees such as Audi for violations of the Act.  Under Fla. Stat. § 320.695:

> In addition to the remedies provided in this chapter, and notwithstanding the existence of any adequate remedy at law, the department [FLHSMV], or any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer, is authorized to make application to any circuit court of the state for the grant, upon a hearing and for cause shown, of a temporary or permanent injunction, or both, restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70, or from failing or refusing to comply with the requirements of this law . . . .  Such injunction shall be issued without bond.  A single act in violation of the provisions of ss. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction.

## COUNT ONE
## <u>Violation of the Florida Dealer Act, Fla. Stat. § 320.64(5)</u>

132.    Plaintiffs repeat and re-allege paragraphs 1–131 as if fully set forth herein.

133.    This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.64(5).

134.    BMW has coerced Braman to punch RDRs for new vehicles that have not been sold to consumers in order to artificially and deceptively inflate BMW's sales numbers.

135.    The coercion has come in the form of artificially high sales targets and deep discounts on new vehicles, both of which Braman must take advantage of to stay competitive.

136.    Failure by Braman to hit its sales objective results in the loss of the BMW AVP bonus monies across <u>all</u> new vehicles sold by Braman in a given quarter.

137.    Braman is therefore faced with the choice of losing a per-vehicle credit it needs to stay competitive in the marketplace and to remain profitable, or punching the RDRs of vehicles Braman has not sold and which cost Braman money to keep in inventory.

138.    This constitutes coercion or attempted coercion by BMW in violation of Fla. Stat. § 320.64(5).

139.    Plaintiffs have been damaged (1) by the additional costs of the punched vehicles remaining in Braman's inventory and leading to excessive overhead while Braman acceded to BMW's coercion; (2) loss of per-vehicle credits necessary to stay competitive while Braman have refused to give in to BMW's coercion.

140.    BMW has also coerced or attempted to coerce Braman into accepting additional inventory it does not want and for which it makes no economic sense to purchase, in order to meet the artificial and economically unreasonable sales targets of both new and used vehicles BMW has set through unilateral modifications to the AVP.

141.    Braman seeks a preliminary and permanent injunction, preventing BMW from continuing to coerce Braman into purchasing unwanted vehicles through either fraudulent punching schemes or economically unreasonable sales targets for new and used vehicles.

142.    Braman has been damaged by BMW's coercive behavior in an amount to be determined at trial.

WHEREFORE, Braman demands entry of a judgment against BMW: (1) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, against BMW's coercive conduct, prohibiting BMW from continuing to coerce Braman into purchasing unwanted vehicles through either fraudulent punching schemes or economically unreasonable sales targets for new and used vehicles; (2) for treble damages, attorneys' fees and costs; and (3) for such other relief this Court deems just and equitable.

## COUNT II
### Violation of the Florida Dealer Act, Fla. Stat. § 320.64(6)

143.    Plaintiffs repeat and reallege paragraphs 1–131 as if fully set forth herein.

144.    This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.64(6).

145.    BMW has demanded that Braman sign Data Sharing Agreements that give BMW real-time access to Braman's DMS and CRM. BMW will financially penalize Braman should it fail to sign the Data Sharing Agreements.

146.    This constitutes attempted coercion to force Braman to make an agreement with BMW in violation of Fla. Stat. § 320.64(6).

147.    Braman seeks a preliminary and permanent injunction against BMW's unlawful behavior; namely, Braman seeks an order: (i) prohibiting BMW from taking any retaliatory action

against Braman for Braman's failure to sign the data sharing agreement, and (ii) preventing BMW from reinstituting any such data sharing agreement in the future.

148.    Braman has also been damaged by BMW's unlawful behavior in an amount to be determined at trial.

WHEREFORE, Braman demands entry of a judgment against BMW: (1) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, requiring BMW to restore the previous status quo through an order: (i) prohibiting BMW from taking any retaliatory action against Braman for Braman's failure to sign the data sharing agreement, (ii) preventing BMW from reinstituting any such data sharing agreement in the future; (2) for treble damages, attorneys' fees and costs; and (3) for such other relief this Court deems just and equitable.

## COUNT III
### Violation of the Florida Dealer Act, Fla. Stat. § 320.64(34)

149.    Plaintiffs repeat and reallege paragraphs 1–131 as if fully set forth herein.

150.    This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.64(34).

151.    BMW has effectively created a "mandatory requirement or obligation" upon Braman to sell a certain number of used BMW vehicles by threatening to increase new vehicle pricing if Braman does not meet those targets.

152.    This constitutes an unlawful used vehicle sales requirement in violation of Fla. Stat. § 320.64(34).

153.    Braman seeks a preliminary and permanent injunction against BMW's unlawful behavior; namely, Braman seeks an order: (i) voiding the TPO Bonus program as an unlawful requirement that Braman sell any quantity of used BMW vehicles, and (ii) preventing BMW from

reinstituting any used BMW vehicle purchase, sale or lease requirement in any form, including future bonus, incentive, or holdback programs.

154.    Braman has also been damaged by BMW's unlawful behavior in an amount to be determined at trial.

WHEREFORE, Braman demands entry of a judgment against BMW: (1) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, requiring BMW to restore the previous status quo through an order: (i) the TPO Bonus program as an unlawful requirement that Braman sell any quantity of used vehicles, (ii) preventing BMW from reinstituting any used vehicle purchase, sale or lease requirement in any form, including future bonus, incentive, or holdback programs; (2) for treble damages, attorneys' fees and costs; and (3) for such other relief this Court deems just and equitable.

## COUNT IV
## Violation of the Florida Dealer Act, Fla. Stat. § 320.64(41)(a) – Sales Loyalty

155.    Plaintiffs repeat and reallege paragraphs 1–131 as if fully set forth herein.

156.    This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.64(41)(a) for implementing criteria for measuring Plaintiffs' sales performance that has a material or adverse effect on Plaintiffs and is unfair, unreasonable, arbitrary or inequitable.

157.    Sales Loyalty is criteria established, implemented or enforced by BMW to measure Plaintiffs' sales performance.

158.    Sales Loyalty measures Plaintiffs' sales performance by tracking Plaintiffs' sales to previous customers and penalizing Plaintiffs if their sales to prior customers fall below certain benchmarks.

159.   BMW calculates Sales Loyalty by dividing "Loyal Events" by the number of "Return to Market Events" that occur over the past rolling 12 months.

160.   "Loyal Events" are "previous customers who still own a new or certified pre-owned BMW vehicle and return to market in the past 12 months to purchase another new or certified vehicle" from the dealer.

161.   "Return to Market Events" are "previous customers who still own a new or certified pre-owned BMW vehicle and returned to market during the past 12 months to purchase any new or certified pre-owned vehicle."

162.   Plaintiffs' Sales Loyalty is compared against "peer groups" based on the amount of sales a peer dealer has in Plaintiffs' markets.

163.   If Plaintiffs' Sales Loyalty falls below the benchmarks calculated using the peer groups, Plaintiffs forfeit margin equal to 1.75%.  On a $60,000 BMW, the Plaintiffs would lose $1050 in margin.

164.   Falling below Plaintiffs' Sales Loyalty benchmarks has a material and adverse effect on Plaintiffs by, among other things, making them less price-competitive versus other dealers.

165.   Sales Loyalty is unfair, unreasonable, arbitrary or inequitable namely because, among other things, its inputs (Loyal Events and Return to Market Events) are almost entirely outside of Plaintiffs' control.

166.   For example, if a customer, who purchased a BMW 3 series coupe when he was single, gets married and becomes a father of triplets, this customer would likely wish to trade his smaller BMW coupe in for a vehicle that can accommodate the size of his family.

167.    BMW does not offer a minivan for sale, and therefore, this hypothetical customer's purchase of a Chrysler Pacifica (a minivan) would count against Plaintiffs as a "Return to Market Event" and put their margin at risk.

168.    Indeed, BMW's own materials regarding Sales Loyalty confirm that the sale of an F-150 pickup truck to a Braman customer would count against Braman's Sales Loyalty metric, despite the fact that BMW does not offer any pickup trucks in its vehicle lineup.

169.    By way of another example, Sales Loyalty is also unfair, unreasonable, arbitrary or inequitable because it completely ignores other factors that are sound indicators of sales performance.

170.    If Plaintiffs sold 500 vehicles in a given period, and then increased their sales to 1000 vehicles but none of these vehicles were sold to the original 500 purchasers, then Plaintiffs' margin would be at risk of forfeiture.  In this scenario, BMW's sales performance measurement completely ignores that Plaintiffs *doubled* their sales and actually *penalizes* them for otherwise strong performance by taking away margin.

171.    BMW's Sales Loyalty lowers Braman's margin on new vehicles if they do not meet BMW's unfair, unreasonable, arbitrary or inequitable sales performance standards.

172.    As a result, Plaintiffs have been harmed by BMW's violation of Fla. Stat. § 320.64(41)(a) in an amount to be determined at trial.

WHEREFORE, Braman demands entry of a judgment against BMW: (1) for treble damages, attorneys' fees and costs; and (2) for such other relief this Court deems just and equitable.

## COUNT V
## Violation of the Florida Dealer Act, Fla. Stat. § 320.64(41)(a) – Service Effectiveness

173.    Plaintiffs repeat and reallege paragraphs 1–131 as if fully set forth herein.

174.   This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.64(41)(a) for implementing criteria for measuring Plaintiffs' service performance that has a material or adverse effect on Plaintiffs and is unfair, unreasonable, arbitrary or inequitable.

175.   Service Effectiveness is criteria established, implemented or enforced by BMW to measure Plaintiffs' service performance.

176.   Service Effectiveness is measured by the following formula:

$$\text{Service Effectiveness} = \frac{(\text{\# of Active Service Customers in PMA} + \text{\# of Pump in Customers})}{(\text{\# of Units in Operation in PMA} + \text{\# of Pump in Customers})}$$

177.   "Service Effectiveness" is defined as "a quantitative metric driven by the number of unique VINs that service at a dealership within a 15 month time period for [customer pay] and or Warranty work."

178.   An "Active Customer" is a person who has returned to a given dealership at least once in the past 15 months for a [customer pay] or Warranty vehicle service repair order that has generated revenue."

179.   A "Pump In Customer" is a "person who has visited a dealer for service, either [customer pay] or Warranty, but is not registered to that particular [dealer's] PMA."

180.   A "PMA" or "Primary Market Area" is "the area within a defined market designated for a particular [dealer] upon which the data calculations are based and for which the [dealer] has responsibility."

181.   "Units in Operation" or "UIO" is "a working order vehicle registered by the state and sold by your dealership or other BMW dealerships."

34

182. Plaintiffs' Service Effectiveness is compared against "peer groups" based on the amount of sales a peer dealer has in Plaintiffs' markets.

183. If Plaintiffs' Service Effectiveness falls below the benchmarks calculated using the peer groups, Plaintiffs forfeit margin equal to 1.75%. On a $60,000 BMW, the Plaintiffs would lose $1050 in margin.

184. Falling below Plaintiffs' Service Effectiveness benchmarks has a material and adverse effect on Plaintiffs by, among other things, making them less price-competitive versus other dealers.

185. Service Effectiveness is unfair, unreasonable, arbitrary or inequitable namely because it completely ignores actual customer satisfaction in favor of metrics BMW has created from whole cloth.

186. For example, Service Effectiveness ignores customer loyalty (i.e. whether the same customer returns to the same dealership for multiple services over a period of time) and any type of survey-based system utilized to quantify customer satisfaction.

187. This metric also penalizes dealers, like Braman, who sell vehicles outside of their market.

188. Convenience is important to consumers, who are often unwilling to drive many miles to service their vehicle.

189. Customers who purchase vehicles from Braman but reside outside of Braman's PMA are more likely to take their vehicles to the local BMW dealer near their work or residence rather than to drive back to Braman for service.

190.    Even if a customer resides in Braman's PMA, it may be more convenient for them to have their vehicle serviced elsewhere based on the proximity of a competing BMW dealer or independent repair shop to their place of work or residence.

191.    This phenomena is more acute in the "maintenance and light repair" market such as tire replacement, oil and filter changes, fluid changes, and brake services.

192.    These customers are sensitive to factors such as cost, the amount of time it takes to have these simple services performed, and whether the service facility is close by.

193.    Under Service Effectiveness, Braman gets *no* credit for its Pump in Sales to other markets but instead is penalized for these sales since these customers are less likely to return to Braman for service on their vehicles.

194.    BMW's Service Effectiveness lowers Braman's margin on new vehicles if they do not meet BMW's unfair, unreasonable, arbitrary or inequitable service performance standards.

195.    As a result, Plaintiffs have been harmed by BMW's violation of Fla. Stat. § 320.64(41)(a) in an amount to be determined at trial.

WHEREFORE, Braman demands entry of a judgment against BMW: (1) for treble damages, attorneys' fees and costs; and (2) for such other relief this Court deems just and equitable.

## COUNT VI
## Violation of the Florida Dealer Act, Fla. Stat. § 320.641

196.    Plaintiffs repeat and reallege paragraphs 1–131 as if fully set forth herein.

197.    This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.641.

198.    BMW notified Plaintiffs just 87 days prior to a major change to their business relationship that, for the first time, BMW would be tracking used BMW vehicle sales and raising prices on new vehicles if Braman did not hit those targets.

36

199.    Nothing in the Franchise Agreement or the Standard Provisions thereto would let Plaintiffs know that BMW intended to fundamentally alter the margins on new vehicles by reducing said margins in favor of incentives tied to used BMW vehicle sales.

200.    BMW's change to AVP for TPO Bonus on 87 days' notice constitutes an unfair modification to the franchise agreement, in violation of Fla. Stat. § 320.641.

201.    BMW also notified Plaintiffs just 87 days prior to a major change to their business relationship that, for the first time, BMW would be tying 1.5% of MSRP of every new vehicle to the hiring of seven full-time BMW Geniuses for both Braman Miami and Braman WPB.

202.    Nothing in the Franchise Agreement or the Standard Provisions thereto would let Plaintiffs know that BMW intended to fundamentally alter Plaintiffs' margins on new vehicles by forcing them to create an additional layer of employees to handle customers' questions and do little else.

203.    BMW's change to AVP for BMW Geniuses on 87 days' notice also constitutes an unfair modification to the franchise agreement, in violation of Fla. Stat. § 320.641.

204.    BMW also recently notified Braman that, for the first time, BMW will track service by a new methodology called Service Effectiveness, which requires dealers to convert as many current BMW owners into Braman service customers as possible, regardless of whether those BMW customers have issues that need service.

205.    Nothing in the Franchise Agreement or the Standard Provisions thereto would let Braman know that it should be focused on the quantity of service customers instead of the quality of service.

206.    BMW's change to AVP for Service Effectiveness also constitutes an unfair modification to the franchise agreement, in violation of Fla. Stat. § 320.641.

207.     BMW also recently notified Braman that, for the first time, BMW will track customer loyalty by an invasive, third-party tracking system that is prone to error and punishes Braman for any purchases made by customers for alternative purposes (such as minivans or pickup trucks).

208.     Nothing in the Franchise Agreement or the Standard Provisions thereto would let Plaintiffs know that it would have to compete with other brand manufacturers in vehicle segments that BMW does not offer.

209.     BMW's change to AVP for Customer Loyalty also constitutes an unfair modification to the franchise agreement, in violation of Fla. Stat. § 320.641.

210.     BMW's unnecessary and unreasonable changes to the franchise agreement, which penalize Plaintiffs on new vehicle pricing, hurt Braman's bottom line and ability to compete, and will result in lost sales, lost service business, and lost profits.

211.     Braman seeks a preliminary and permanent injunction against BMW's unlawful modification of Braman's franchise; namely, Braman seeks an order: (i) voiding the Added Value Program as an unlawful modification, (ii) requiring BMW to reinstitute the trading margin and structure enjoyed by Braman before BMW's unlawful modification, and (iii) preventing BMW from modifying Braman's dealer agreement further without complying with Fla. Stat. § 320.641.

212.     Braman has been damaged by BMW's unfair modifications in an amount to be determined at trial.

WHEREFORE, Braman demands entry of a judgment against BMW: (1) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, requiring BMW to restore the previous status quo through an order: (i) voiding the Added Value Program as an unlawful modification, (ii)

requiring BMW to reinstitute the trading margin and structure enjoyed by Braman before BMW's unlawful modification, and (iii) preventing BMW from modifying Braman's dealer agreement further without complying with Fla. Stat. § 320.641; (2) for treble damages, attorneys' fees and costs; and (3) for such other relief this Court deems just and equitable.

## COUNT VII
### Violation of the Florida Dealer Act, Fla. Stat. § 320.646

213.    Plaintiffs repeat and reallege paragraphs 1–131 as if fully set forth herein.

214.    This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.646.

215.    BMW has required, under threat of financial penalty, that Braman grant BMW direct or indirect access to Braman's DMS so that BMW may obtain customer data stored there.

216.    Moreover, the agreement BMW wants to force Braman to sign would require Braman to indemnify BMW for any resulting problems.

217.    BMW's conduct violates Fla. Stat. § 320.646.

218.    Braman seeks a preliminary and permanent injunction against BMW's unlawful requirement; namely, Braman seeks an order: (i) prohibiting BMW from requiring Braman to sign the data sharing agreement or otherwise taking any retaliatory action against Braman for Braman's failure to sign the agreement, and (ii) preventing BMW from reinstituting any such data sharing agreement in the future.

219.    Braman has been damaged by BMW's unlawful requirement in an amount to be determined at trial.

WHEREFORE, Braman demands entry of a judgment against BMW: (1) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, through an order: (i) prohibiting BMW

from requiring Braman to sign the data sharing agreement or otherwise taking any retaliatory action against Braman for Braman's failure to sign the agreement, and (ii) preventing BMW from reinstituting any such data sharing agreement in the future (2) for treble damages, attorneys' fees and costs; and (3) for such other relief this Court deems just and equitable.

## COUNT VIII
## Violation of the Florida Dealer Act, Fla. Stat. § 320.696(6)

220. Plaintiffs repeat and reallege paragraphs 1–131 as if fully set forth herein.

221. This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.696(6).

222. Under Florida law, BMW is required to pay Braman retail rates on warranty labor and parts sales. *See* Fla. Stat. §§ 320.696(1), (2), (3) and (4).

223. Stated otherwise, Florida law does not permit BMW to pay less for warranty parts and labor than what the public pays Braman at retail for parts and labor.

224. An "Active Customer" is a "person who has returned to a given dealership at least once in the past 15 months for a *[customer pay] or warranty* vehicle service repair order that has generated revenue." (emphasis added).

225. By definition, an Active Customer is a person who has returned to Braman for warranty work that generated revenue.

226. By measuring Braman's ability to conquest Active Service Customers in its PMA and financially penalizing Braman if it falls below its Service Effectiveness benchmark, BMW is recovering its costs for reimbursing Braman at retail rates for warranty parts and service.

227. If Braman does not meet its Service Effectiveness, it forfeits 1.75% in margin. On a BMW that has a MSRP of $60,000, the loss in margin equals $1050.

40

228.    The forfeiture of $1050 is a form of a warranty reimbursement surcharge prohibited by Florida law on each Active Customer who obtained labor or parts under warranty from Braman.

229.    Under Fla. Stat. § 320.696(6), BMW is prohibited from recovering, directly or indirectly, any of its costs for compensating Braman at retail rates.

230.    BMW's conduct violates Fla. Stat. § 320.696(6).

231.    Braman has been damaged by BMW's unlawful attempt to recover BMW's costs associated for compensating Braman under Florida law in an amount to be determined at trial.

WHEREFORE, Braman demands entry of a judgment against BMW: (1) for treble damages, attorneys' fees and costs; and (2) for such other relief this Court deems just and equitable.

## COUNT IX
### Violation of the Florida Dealer Act, Fla. Stat. § 320.696(7)

232.    Plaintiffs repeat and reallege paragraphs 1–131 as if fully set forth herein.

233.    This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.696(7).

234.    Under Fla. Stat. § 320.696(7), a manufacturer "shall not require, influence or attempt to influence a motor vehicle dealer to implement or change the prices for which it sells parts or labor in retail customer repairs."

235.    In addition to the above, Fla. Stat. § 320.696(7) prohibits manufacturers from "implement[ing] or continu[ing] a policy, procedure or program to any of its dealers in this state for compensation under this section which is inconsistent with this section."

236.    Through Service Effectiveness, BMW is attempting to influence the prices Braman charges for retail parts and labor sales, which, if successful, would drive down Braman's warranty labor and parts rates.

237.     In order to achieve Service Effectiveness and preserve the 1.75% margin associated with this measurement, Braman will have to reduce its prices for labor and parts to capture sales to customers who either work and/or reside outside of Braman's PMA or work and/or reside in the outskirts of Braman's PMA.

238.     Under Florida law, Braman's warranty parts and labor reimbursement is calculated using the same rates it charges to retail customers for "customer pay" labor and parts.

239.     If Braman does not meet its Service Effectiveness, it forfeits 1.75% in margin.  On a BMW that has a MSRP of $60,000, the loss in margin equals $1050.

240.     BMW therefore is forcing Braman to choose between lowering its retail rates on labor and parts sales with the hope that it will be Service Effective or forfeit its margin tied to Service Effectiveness.

241.     Even if Braman lowers its retail rates and captures more "customer pay" sales and is Service Effective, its warranty parts and labor rates will be reduced.

242.     Service Effectiveness is an unlawful attempt by BMW to influence Braman's retail labor and parts rates in direct violation of Fla. Stat §320.696(7).

243.     BMW has also violated Fla. Stat. § 320.696(7) by implementing a compensation policy that is inconsistent with its obligations under Florida law.

244.     Under Florida law, BMW is required to reimburse Braman for its warranty labor and parts sales at the rates Braman receives at retail.

245.     The concept is simple; Braman repairs a vehicle under warranty and at no charge to the customer, and BMW compensates Braman for the work at the same rate it charges customers for repairs out-of-pocket.

246.    Under Service Effectiveness, however, BMW has tied payment for warranty work to the vehicle's margin, a concept completely at odds with the plain language of Fla. Stat. § 320.696.

247.    An "Active Customer" is a "person who has returned to a given dealership at least once in the past 15 months for a *[customer pay] or warranty* vehicle service repair order that has generated revenue."  (emphasis added).

248.    By definition, an Active Customer is a person who has returned to Braman for warranty work that generated revenue.

249.    The more Active Customers a dealership has, the higher its Service Effectiveness will be.

250.    If Braman achieves Service Effectiveness, it will receive additional margin equal to 1.75% of the vehicle's MSRP.

251.    As applied to Active Customers who had warranty work performed on their vehicles, the additional payment of 1.75% is additional warranty labor and/or parts compensation for dealers who are Service Effective.

252.    Conversely, withholding 1.75% in margin from dealers who are not Service Effective even though the dealer had Active Customers who had warranty worked performed on their vehicle is a per se rate reduction in the dealer's warranty reimbursement rate.

253.    The payment (or lack thereof) of additional margin based on warranty labor and parts sales is inconsistent with the Florida Dealer Act and its clear mandate to compensate dealers at retail rates for warranty labor and parts sales.

254.    BMW's establishment of warranty reimbursement inconsistent with the Florida Dealer Act is a separate and independent violation under Fla. Stat. 320.696(7).

255.    Braman has been damaged by BMW's violations of Fla. Stat. § 320.696(7)  in amounts to be determined at trial.

WHEREFORE, Braman demands entry of a judgment against BMW: (1) for treble damages, attorneys' fees and costs; and (2) for such other relief this Court deems just and equitable.

## COUNT X
## Breach of Dealer Agreement

256.    Plaintiffs repeat and reallege paragraphs 1–131 as if fully set forth herein.

257.    This is an action for damages under the common law for BMW's breach of the Dealer Agreement.

258.    The Dealer Agreement incorporates by reference Standard Provisions therein, and is a valid and enforceable contract between Plaintiffs and BMW.

259.    Plaintiffs has fully performed its obligations under the Dealer Agreement and is not in breach thereof.

260.    Under the Standard Provisions, which have been expressly incorporated into and made a part of the Dealer Agreement, BMW expressly agreed to:

> assist Dealer in Dealer's BMW Operations through such means and upon such terms and conditions as BMW NA considers necessary and appropriate.

Section 2(b).

261.    BMW has breached the foregoing express provisions of the Dealer Agreement by, among other things: (1) inflating the cost of new vehicles due to lack of used BMW vehicle sales not contemplated by the Dealer Agreement, and (2) coercing Braman to punch RDRs.

262.    The amount of damages that Plaintiffs has sustained to date, and will sustain in the future, as a result of BMW's breaches will be proven at trial.

WHEREFORE, Plaintiffs demands entry of a judgment against BMW for damages, costs, and for such other relief this Court deems just and equitable.

**COUNT XI**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

263.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

264.    This is an action for damages under the common law for BMW's breach of the implied covenant of good faith and fair dealing.

265.    The Dealer Agreement incorporates by reference Standard Provisions therein, and is a valid and enforceable contract between Plaintiffs and BMW.

266.    Plaintiffs has fully performed its obligations under the Dealer Agreement and is not in breach thereof.

267.    Under the Standard Provisions, which have been expressly incorporated into and made a part of the Dealer Agreement, BMW expressly agreed to:

> assist Dealer in Dealer's BMW Operations through such means and upon such terms and conditions as BMW NA considers necessary and appropriate.

Section 2(b).

268.    BMW has breached the implied covenant of good faith and fair dealing in the Dealer Agreement by, among other things: (1) inflating the cost of new vehicles due to used BMW vehicle sales not contemplated by the Dealer Agreement, (2) requiring Braman to hire an unnecessary amount of employees to provide an unnecessary service, (3) forcing Braman to increase the quantity of service customers by any means necessary, including at the sacrifice of quality, (4) requiring Braman to compete against other brands in vehicle segments that BMW does

not offer, (5) requiring that Braman sign a data sharing agreement with unlawful provisions, and (6) coercing Braman to punch RDRs.

269.    The amount of damages that Plaintiffs has sustained to date, and will sustain in the future, as a result of the conduct alleged herein in connection with this cause of action will be proven at trial.

WHEREFORE, Plaintiffs demands entry of a judgment against BMW for damages, costs, and for such other relief this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demands trial by jury in this action of all issues so triable.

Dated: October 20, 2017

Respectfully submitted,

**COLSON HICKS EIDSON, P.A**
255 Alhambra Circle
Coral Gables, FL 33134
Tel: (305) 476-7000

By:   *Roberto Martínez*
Roberto Martínez
Florida Bar # 305596
bob@colson.com
Lindsey Lazopoulos Friedman
Florida Bar # 091792
lindsey@colson.com

*Attorneys for Plaintiffs*

Of Counsel:

Russell P. McRory
Michael P. McMahan
Charles A. Gallaer (Florida Bar # 117729)
Arent Fox LLP
1675 Broadway

New York, NY 10019
Tel: (212) 484-3942
Fax: (212) 484-3990
russell.mcrory@arentfox.com
michael.mcmahan@arentfox.com
charles.gallaer@arentfox.com


David S. Leibowitz
General Counsel
Braman Management Association
2060 Biscayne Blvd, Second Floor
Miami, FL 33137
davidl@bramanmanagement.com