### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

| | |
|---|---|
| **BRAMAN MOTORS, INC**., d/b/a **BRAMAN BMW,** for itself and in the name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its use and benefit, and<br><br>**PALM BEACH IMPORTS, INC.,** d/b/a **BRAMAN MOTORCARS,** for itself and in the name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its use and benefit, and<br><br>**The DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES** of the State of Florida, for the use and benefit of Braman Motors, Inc. and Palm Beach Imports, Inc.,<br><br>Plaintiffs,<br><br>v.<br><br>**BMW OF NORTH AMERICA, LLC,** and **BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT,**<br><br>Defendants. | Case No. 17-cv-23360-DPG |

### PLAINTIFFS' MOTION FOR SANCTIONS AND
### INCORPORATED MEMORANDUM OF LAW

Roberto Martínez
COLSON HICKS EIDSON, P.A.
255 Alhambra Circle, PH
Coral Gables, FL 33134
Tel: (305) 476-7000

Russell P. McRory (*Pro Hac Vice*)
Michael P. McMahan (*Pro Hac Vice*)
Charles A. Gallaer (Florida Bar # 117729)
Arent Fox LLP
1301 Avenue of the Americas, Fl. 42
New York, NY 10019
Tel: (212) 484-3900

## INTRODUCTION

A core issue in this case concerns BMW of North America, LLC's ("BMWNA") and Bayerische Motoren Werke Aktiengesellschaft's ("BMW AG") practice of "punching"—pressuring dealers at the end of the month to designate certain vehicles as demonstrators or service loaners in order to artificially inflate BMW's retail sales, even though the vehicles are not actually sold to customers.  For over two and a half years, Plaintiffs diligently sought the production of documents concerning this program and the identity of the BMWNA executives responsible for its operation.  Plaintiffs made it known to BMWNA and its counsel that Plaintiffs sought documents demonstrating (i) who authorized the punching programs, (ii) under what circumstances, considerations, and schemes the punching programs were authorized, and (iii) for what purpose the punching programs were authorized.  Plaintiffs also let it be known that these materials appeared to be wholly absent from what was produced.  Through a series of dubious objections and patent obfuscations, BMWNA has shrugged at these efforts.  Although Plaintiffs have long suspected that BMWNA has been withholding relevant information, the full scope of BMWNA's discovery violations has only recently come into view.  And it is troubling.

On September 24, 2020, the U.S. Securities and Exchange Commission issued a cease and desist order (the "SEC Order") in which BMW agreed to an $18 million civil penalty for engaging in deceptive sales reporting practices.  *See generally* **Exhibit A** [SEC Order].  Of particular concern to the SEC was BMW's practice of reporting sales figures—artificially inflated by its punching program—to investors in support of its growth outlook, helping it to raise $18 billion in capital.  *Id*. at 8-9.  The SEC Order contains numerous direct quotes from documents produced by BMW to the SEC.  When Plaintiffs ran word searches against BMW's production in this case using the quoted material in the SEC Order, two points became abundantly clear: (1) BMWNA

has been in possession of crucial information, including statements by executives outlining the method and purpose of the punching program and the results of an internal investigation into the program that recommended its discontinuation; and (2) BMWNA failed to provide those materials and instead willfully chose to withhold the production of this responsive discovery, severely prejudicing Plaintiffs' ability to marshal evidence in support of their own claims and defend against BMWNA's counterclaim.

Because fact discovery has now closed, the appropriate remedy for BMWNA's serious misconduct is the imposition of sanctions.  Accordingly, Plaintiffs respectfully move this Court, pursuant to its inherent authority and Rule 37(c) of the Rules of Federal Procedure, for an order:

1. Designating certain facts relating to BMW's punching practices to be taken as established for the purposes of this action.  More specifically, Plaintiffs ask the Court to take as established all of their factual allegations relating to punching as set forth in Counts I, VIII, and IX of the Third Amended Complaint and in defense of the Counterclaim;

2. Precluding BMWNA from opposing Plaintiffs' punching claims set forth in Counts I, VIII, and IX of the Third Amended Complaint;

3. Dismissal of BMWNA's Counterclaim with Prejudice;

4. Requiring the immediate payment of all costs and attorney's fees incurred by Plaintiffs in connection with their review of BMWNA's document production, requests for production, meet and confers related to punching, all depositions that addressed punching or could have addressed punching had the responsive documents been produced in a timely manner, as well as costs and fees related to bringing this Motion; and

2

5. Such further and other relief as the Court deems necessary in the interests of justice, including requiring BMWNA to produce all documents referenced in the SEC Order, all other documents, statements, and submissions provided to the SEC, and all other relevant documents within two weeks, as well as reopening fact discovery as to Braman only, extending the discovery schedule for 90 days, and permitting Braman to take additional depositions of BMWNA witnesses related to the production to the SEC.

## BACKGROUND

**A.     BMW's punching program is a central issue in this action.**

The Third Amended Complaint ("TAC") alleges that BMWNA and BMW AG pressured Braman to purchase excess inventory and "punch" retail delivery reports ("RDRs") to reflect certain vehicles as sold, even though they remained sitting on Braman's lots.  *See* ECF No. 127 at ¶ 67.[1]  Although BMW used these "sales" to deceptively inflate its retail numbers, dealers like Braman were left to confront excess inventory, rising overhead costs, and the challenge of selling punched vehicles alongside existing new and used inventory.  *Id.* at ¶¶ 70-72.  If a dealer chose not to punch vehicles, as Braman eventually did, it would lose out on per-vehicle "bonus" money necessary to stay competitive in the market.  *Id.* at ¶ 92.

In Count I, Plaintiffs allege that BMWNA and BMW AG coerced or attempted to coerce Braman to punch vehicles in violation of the Florida Dealer Act, Florida Statutes §§ 320.64(5) and (6).  *Id.* at ¶¶ 88-91.  They further allege, in Count VIII, that this practice violated the terms of the

---

[1] Though the Court dismissed Plaintiffs' claims against BMW AG without prejudice for lack of personal jurisdiction, *see* ECF No. 154, Plaintiffs have moved for leave to amend and for jurisdictional discovery.  ECF No. 163.  Having obtained documents and deposition testimony supporting Plaintiffs' allegations that BMW AG directs, controls, and manages the operations of BWMNA, the proposed Fourth Amended Complaint seeks to re-allege Plaintiffs' claims against BMW AG, including those related to BMW's punching program.

Dealer Agreement which required BMWNA to "assist Dealer in Dealer's BMW Operations" and evaluate Braman's sales performance on the basis of "reasonable and equitable criteria." *Id*. at ¶¶ 149-151.  And in Count IX, Plaintiffs contend that that BMWNA's attempts to coerce Braman to punch vehicles breached the implied covenant of good faith and fair dealing in the Dealer Agreement. *Id*. at ¶ 157.

In its counterclaim, BMWNA contends that it is Braman who is in violation of the Dealer Agreement because it has failed to "achieve the best possible sales performance obtainable for BMW Vehicles."  ECF No. 128 at 22.  But the very metric BMWNA cites in support of this claim—a "Balanced Scorecard provided by BMW NA regularly to all dealers"—relies on internal sales data which are skewed by month-end punching.

As a result, Plaintiffs' claims in Counts I, VIII, and IX, and its defense to BMWNA's counterclaim, hinge on an understanding of the full extent of BMW's punching program, including knowledge of who directed or authorized the program, why it was implemented, its effect on dealers, and why it was ultimately discontinued.

**B.      Plaintiffs' have diligently sought discovery from BMWNA concerning the punching program.**

<u>Plaintiffs' first request for production</u>

On December 22, 2017, Plaintiffs served their first request for production to BMWNA seeking "[a]ll documents, communications, and studies related to dealers 'punching' RDRs for BMW vehicles at each month's end or any other time," including documents "by, from, and between BMW AG, BMW (US) Holding, and BMW relating to or concerning such month-end inventories and monetary incentives offered to BMW dealers to reduce BMW port and distribution center inventories by such month end purchases." *See* **Exhibit B** [Pls.' First Req. for Produc. of Docs. from BMWNA] at No. 24.  These documents would have enabled Plaintiffs to ascertain

BMWNA's motivation in implementing the punching program and the identity and communications of the executives who authorized it.

After asserting several broad boilerplate objections in its first two responses, BMWNA ultimately limited its objection to the production of any "competitively-sensitive information or data concerning other BMW dealers[.]" *See* **Exhibit C** [BMWNA's Third Am. Resp. to Pls.' First Req. for Produc. of Docs.] at No. 24. BMWNA specifically stated that it was withholding "documents and communications concerning individual payments made to other BMW dealers for 'punching'" as well as its communications with any other dealers. *Id*.

The documents BMWNA provided failed to disclose any evidence of the determinations made by executives to create, implement, or promote its punching program or describe how its application affected Plaintiffs' competitive standing among other dealers.

Plaintiffs' fourth request for production:

Plaintiffs reviewed BMWNA's production and found little evidence regarding the punching program. So, in their continuing effort to obtain this crucial evidence, Plaintiffs served a fourth request for production on January 17, 2020, specifically seeking "[d]ocuments sufficient to identify the person or persons responsible for devising or authorizing BMWNA's month-end incentive or 'punching' programs, and each such authorization for each such program for the period of 2012-2016." *See* **Exhibit D** [Pls.' Fourth Req. for Produc. of Docs from BMWNA] at No. 21. In addition, after the Wall Street Journal reported on December 24, 2019 that the SEC had opened an investigation into BMW's punching program, Plaintiffs requested "all documents provided to, communicating with, or discussing the SEC in connection with its investigation into BMW and its punching practices[.]" *See id.* at No. 50.

BMWNA objected on the grounds that the request for documents identifying the

individuals responsible for the punching program was duplicative of Request No. 24 in Plaintiff's first request for production, and stated that "it has already searched for and produced documents responsive to this request." *See* **Exhibit E** [BMWNA's Resp. to Pls.' Fourth Req. for Produc. of Docs.] at No. 21.  With respect to the SEC investigation, BMWNA withheld all documents claiming the request sought irrelevant and "highly confidential, competitively sensitive information about other BMW dealers across the entire BMW network." *See id.* at No. 50.  During a meet-and-confer regarding these requests, counsel for BMWNA represented that it believed Plaintiffs had everything regarding punching already, but that it would do a follow-up search to be sure.  No production followed.

Plaintiffs' interrogatories:

In a final attempt to obtain information regarding BMW's punching program, Plaintiffs served interrogatories on July 17, 2020, asking BMWNA to "[e]xplain in detail how [it] determined Punching incentives, including timing, dollar amounts, quantity and models of delivery, and identify the person or persons who created, invented, or authorized Punching incentives."  *See* **Exhibit F** [Pls.' First Set of Interrogs. to BMWNA] at No. 8.  On August 17, BMWNA responded that "the information sought can be obtained from some other source that is more convenient, such as through deposition testimony[.]" *See* **Exhibit G** [BMWNA's Resps. and Objs. to Pls.' Interrogs.] at No. 8. However, because BMWNA withheld material documents demonstrating who authorized and designed the punching programs, and with the discovery deadline expiring the same day, this avenue was not functionally available.

Fact discovery closed on August 17, 2020.

Thus, in neither documentary nor interrogatory form did BMWNA ever produce or identify the discoverable information Plaintiffs sought—information that, as discussed below, was readily

available and voluntarily provided to the SEC.

**C.      The SEC Order reveals the existence of crucial discovery withheld from Plaintiffs.**

On September 24, 2020—nearly six weeks after the close of fact discovery—the SEC issued its cease and desist order.  The findings contained therein were based on information BMW voluntarily provided.[2]  *See* Exhibit A at 1, n.1.  These findings reveal that BMWNA had in its possession numerous non-privileged and discoverable documents regarding internal discussions among company executives and the results of an internal audit team's investigation into the punching program.

For example, the SEC Order quotes one unnamed executive as stating in June 2015 that punching is "not sustainable" because "[t]he inventory buildup [for dealers] is problematic."  *Id*. at 5, ¶ 12.  The next month, that same executive observed that "[o]ur ability to bridge the gap with a month end action is significantly compromised given current demo levels."  *Id*.  Nonetheless, in November 2015, BMWNA management "issued instructions" to use the punching program to achieve a month-end target of 32,000 retail sales.  *Id*. at 6, ¶ 17.  By December of 2015, unnamed BMWNA executives are quoted as acknowledging that, without the use of its punching program, "we would end up" with "no growth" in 2015 retail sales when compared to 2014 sales.  *Id*. at 6, ¶ 18.

But, as the SEC order indicates, BMW's artificially inflated retail sales figures came at a cost.  BMWNA was flooded with complaints from dealers who described the punching program

---

[2] Indeed, in assigning weight to BMW's cooperation in the investigation, the SEC noted that "BMW gathered and made available a large volume of information in response to document, information, and data requests … [including] documents from sources outside BMW's corporate offices, such as BMW employees working from remote locations; and translations of key documents.  BMW also made multiple current and former employees available for interviews by the [SEC], and provided presentations and narrative submissions that highlighted critical facts."  *Id*. at 9-10.

as "late-inning monthly close shenanigans" and expressed their concerns over "false reporting." *Id.* at 5, ¶ 13.  Dealers also complained that BMWNA had set "unrealistic volume goals" that could not be "achieved through retail sales to BMW buyers."  *Id*.

BMW's internal audit team agreed, recommending as early as May 2015 that BMWNA limit "what percentage of overall retail sales could consist of demonstrators and service loaners." *Id.* at 8, ¶ 29.  However, both BMWNA and BMW AG failed to implement these changes.  In November 2015, the internal audit team determined that BMW had failed to take sufficient measures to avoid "unjustified retail reporting" and that dealer inventory of demonstrators had increased.  *Id.*  BMW's punching program did not finally end until April 2017.  *Id*. at 6, ¶ 20.

Setting aside the troubling nature of BMW's punching program in the securities context, the SEC Order establishes the existence of crucial responsive discovery that BMWNA willfully withheld from Plaintiffs.  Documents identifying the executives involved in the punching program and their communications were plainly available and known to BMWNA.  It simply decided not to produce them.

## MEMORANDUM OF LAW

### A.  Legal standards.

District courts have the inherent authority to impose sanctions "as a punishment for bad-faith behavior in the proceedings before them."  *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1304 (11th Cir. 2020) (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)).  The purpose of this power is both "to vindicate judicial authority … and to make the prevailing party whole."  *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). Invoking a court's inherent powers requires a determination that a party acted in bad faith.  *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009) ("The key to unlocking a court's inherent power is a finding of bad faith.").  A party acts in bad faith by

8

"delaying or disrupting the litigation or hampering enforcement of a court order." *Id*.  Such a finding is justified where a party has "abuse[d] the judicial process." *Purchasing Power*, 851 F.3d at 1223 (*citing Chambers*, 501 U.S. at 45).

Even without a finding of bad faith, Federal Rule of Civil Procedure 37(c) grants courts the authority to impose sanctions for a party's failure to disclose or supplement its discovery responses. *See BankAtlantic v. Blythe Eastern Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994) (Rule 37 sanctions, short of dismissal, do not require showing of willfulness or bad faith); *Coquina Invs. v. Rothstein*, No. 10-60786-Civ, 2012 WL 32022723, at *2 (S.D. Fla. Aug. 3, 2012) ("Rule 37(c) provides that a district court may impose sanctions for a party's failure to supplement its responses to discovery requests").  In addition to penalizing offending parties by requiring the payment of reasonable expenses, district courts may impose any of the sanctions contemplated under Rule 37(b)(2)(A), including designating facts to be taken as established and prohibiting the disobedient party from supporting or opposing certain claims or defenses.  *See* Fed. R. Civ. P. 37(c)(1)(C); *Coquina Invs.*, 2012 WL 32023723, at *2-3.  A court's discretion under Rule 37 is broad, and it may impose such sanctions as are necessary "to prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).

**B.     BMWNA's willful failure to provide the requested discovery warrants the imposition of sanctions under the Court's inherent authority.**

Plaintiffs' discovery requests were crystal clear—they sought information, in the form of documents, communications, or studies, regarding the administration of BMWNA's punching program; documents that would enable them to identify the BMWNA executives responsible for creating and authorizing the program; and copies of the documents BMWNA voluntarily provided to the SEC in connection with its investigation into the program.  BMWNA had such information

in its possession, yet willfully failed to produce it.  Because fact discovery is closed, BMWNA's conduct has severely prejudiced Plaintiffs' ability to use this information in support of their claims and in defense of BMWNA's counterclaim.[3]  *See Inmuno Vital, Inc. v. Telemundo Grp., Inc.*, 203 F.R.D. 561, 573 (S.D. Fla. 2001) (last-minute disclosure of document prejudiced plaintiff because it "significantly diminished" the plaintiff's ability to use the document effectively at trial).  Accordingly, sanctions under this Court's inherent authority are warranted.

Though a court's inherent power "must be exercised with restraint and discretion," *Chambers*, 501 U.S. at 44, it may be used "to fashion an appropriate sanction for conduct which abuses the judicial process." *Id*. at 44-45.  To "unlock" the court's inherent authority, it must determine that the offending party acted in bad faith.  *Eagle Hosp. Physicians*, 561 F.3d at 1306; *see also Purchasing Power*, 851 F.3d at 1224 ("[I]nherent powers sanctions require subjective bad faith.").  In the context of discovery violations, this requires a showing beyond "simple negligence, misunderstanding, or inability to comply[.]"  *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993).  Rather, the offending party's misconduct must demonstrate a willful failure to comply with its discovery obligations.  *See, e.g. Higgs*, 969 F.3d at 1304-07 (defendant's pattern of discovery violations, including withholding the identity of a key company witness, demonstrated bad faith litigation misconduct); *Serra Chevrolet, Inc. v. General Motors Corp.*, 446 F.3d 1137, 1150 (11th Cir. 2006) (defendant's repeated failure to produce documents related to corporate program establishing satellite auto dealerships "was due to contumacy rather than good faith misrepresentation.").

---

[3] While this motion addresses information that has come to light through the SEC Order, Plaintiffs do not know the full extent of what has been withheld by BMWNA or the full extent of the prejudice caused by BMWNA's discovery violations.  For example, as this Court is well-aware, these documents and other witnesses referenced by them may cast Plaintiffs' claims against BMW AG and its motion for jurisdictional discovery in an entirely different light.  *See* ECF No. 163.

Tested against these standards, BMWNA's discovery violations rise to the level of bad faith. There can be no question that Plaintiffs' claims in Count I, VII, and IX put the issue of BMW's punching program—and its effect on Plaintiffs' sales performance and competitive standing—squarely at issue. And BMWNA's counterclaim, which accuses Plaintiffs of performing "poorly" in comparison to other dealers based on internal sales data tainted by BMW's coercive punching scheme, only highlights the significance of the punching program to this litigation. The punching program significantly altered the landscape of "true" sales by competitive BMW dealers, and rendered any evaluation of performance between them meaningless.

Although BMWNA should have realized that Plaintiffs' first request for production was aimed at securing discoverable material regarding punching, any doubt about the relevance and permissible scope of the discovery requests disappeared entirely by January 2020. At that point, Plaintiffs' fourth request for production made it unmistakably clear that they were seeking, at a minimum, documents sufficient to identify the executives responsible for the program and the punching-related materials BMWNA had voluntarily turned over to the SEC—documents which were both highly probative and fully discoverable.

But instead of providing the requested discovery, BMWNA chose to run out the clock, withholding responsive documents from Plaintiffs even as it undertook herculean efforts to provide the same material to the SEC. *See supra* at n.2. Indeed, the SEC Order is littered with phrases relating to punching that were quoted directly from the documents BMWNA had provided. A simple word search of BMWNA's production to Plaintiffs confirms that the following phrases— all of which are quoted in the SEC Order, attributed to BMWNA executives or the internal audit team, and concern the effect of the punching program on retail sales—are missing entirely:

- "month end actions is not sustainable"
- "inventory buildup is problematic"

11

- "our ability to bridge the gap with a month end action is significantly compromised given current demo levels"

- "retail aspiration in the 2nd half of 2015 could only be met by increasing demonstrator volume"

- "lower the potential to report new retails"

- "causing additional demonstrator programs and perpetuating the issue"

- "kicking the can down the road?"

- "has played a bigger contribution in sales performance since 2013, while consumer retails have declined"

- "Would hate to miss any chance of still staying ahead by a few hundred or thousand units"

- "try to get as much in terms of loaners"

- "gives us a little insurance"

- "fine tune monthly retail figures"

- "most efficient instrument to meet sales targets"

- "unjustified retail reporting"

- "reporting inaccuracies lead to an inappropriate assessment of sales performance"

- "may result in unsustainable marketing and sales business practices"

The failure to produce one or two documents containing this information may constitute a good faith mistake. But the wholesale failure to produce any discovery containing the above information, even as BWMNA simultaneously provided it to the SEC, leads to the inescapable conclusion that BMWNA has acted in bad faith.

On this point, the Eleventh Circuit's decision in *Serra Chevrolet* is instructive. There an auto dealer sued General Motors ("GM"), alleging its decision to terminate the dealer's satellite dealership agreement violated the Automobile Dealer Day in Court Act. *Serra Chevrolet*, 446 F.3d at 1141.[4] In support of this claim, the dealer sought discovery regarding the purpose, scope,

---

[4] A satellite dealership agreement provides for an additional location enabling a dealer to serve a large geographic area more effectively. *Id*. at 1140.

and identity of GM executives responsible for the satellite dealership program; a list of all dealers who participated; and all studies or other documents referencing the program as implemented by GM. *Id*. at 1142. In a subsequent order, the district court instructed GM to provide the discovery, stressing that "[i]f it has to do with the satellite program, and it's a document, then you need to produce it." *Id*. GM failed to do so, and the district court proceeded to sanction it under its inherent contempt authority. *Id*. at 1149.

Though the Eleventh Circuit determined that the specific sanctions imposed—$700,000 in fines and the striking of GM's affirmative defenses—lacked a sufficient nexus to GM's misconduct, it upheld the district court's decision to sanction GM under its inherent contempt authority. The court observed that GM's excuse for failing to provide discovery related to the satellite dealership program—the burdensome process of manually searching its dealer files—was an act of "contumacy" rather than a good-faith justification. *Id*. at 1150.

Similarly, BMWNA has provided no good-faith justification for its failure to provide the requested information regarding its punching program. The notion that such documents are irrelevant, as BMWNA has repeatedly asserted, is belied by the very claims at issue. And the idea that the documents it provided to the SEC are somehow confidential or privileged is legally unsupported. *See, e.g.*, *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & Shareholder Derivative Litig.*, 270 F. Supp. 3d 1332, 1339 (S.D. Fla. 2017) ("[A] party may not voluntarily waive the attorney-client or work product privileges for its own benefit in dealings with a third-party government agency, then hide behind the privilege in subsequent civil litigation."); *Westinghouse Electric Corp. v. Republic of the Philippines*, 951 F.2d 1414 (3d Cir. 1991) (companies' voluntary disclosure of documents to the SEC and Department of Justice waived attorney client privilege and work product doctrine as against all other adversaries).

But for the SEC Order, Plaintiffs would have gone to trial without the benefit of crucial information regarding BMW's punching program. Such gamesmanship "is at war with the spirit of openness and fair play the discovery rules embrace." *Higgs*, 969 F.3d at 1305 (*citing United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) (the purpose of discovery is to "make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.")).

BMWNA has engaged in willful, bad faith litigation misconduct and should be accordingly sanctioned under the Court's inherent authority.

**C.      Sanctions are also appropriate under Rule 37(c)(1).**

Even if the Court were to determine that BMWNA's misconduct does not rise to the level of bad faith, it still possesses broad discretion to fashion an appropriate sanction under Rule 37. *See Carlucci v. Piper Aircraft Corp., Inc.*, 775 F.2d 1440, 1453 (11th Cir. 1995) ("The magnitude of sanctions awarded is bounded under Rule 37 only by that which is 'reasonable' in light of the circumstances."). BMWNA's blatant failure to supplement its discovery responses—even as it willingly provided the same information to the SEC—justifies sanctions directing that (1) Plaintiffs' factual allegations regarding punching be taken as established; (2) BMWNA be precluded from opposing Plaintiffs' punching claims; (3) BMWNA's Counterclaim be dismissed with prejudice; and (4) BMWNA pay the reasonable costs and attorney's fees involving in seeking the requested discovery and bringing this motion. The Court should accordingly so order.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e)," that party may be ordered to pay reasonable expenses caused by the failure, the jury may be told of the party's failure, or the court may impose any of the sanctions provided for in Rule 37(b)(2)(A)(i)-(vi). *See* Fed. R. Civ. Pro. 37(c)(1). Permissible sanctions under Rule 37(b)(2)

include "directing that … designated facts be taken as established for purposes of the action;" "prohibiting the disobedient party from supporting or opposing designated claims or defenses;" and ordering the offending party to "pay the reasonable expenses, including attorney's fees, caused by the failure[.]".

Based on the findings contained in the SEC Order, it is apparent that BMWNA possessed and turned over documents that identified the executives responsible for the punching program; detailed the methodology and motivations underlying the program; and described the substance of an internal investigation that called for ending the program's authorization.  These are the very type of documents sought in Plaintiffs' requests for production.  *See* **Exhibit B** at No. 24 (requesting "[a]ll documents, communications, and studies related to dealers 'punching' RDRs for BMW vehicles"); **Exhibit D** at No. 21 (seeking "[d]ocuments sufficient to identify the person or persons responsible for devising or authorizing BMWNA's month-end incentive or 'punching' programs, and each such authorization for each such program").

Given the timing of the SEC investigation—first publicly reported in December 2019 and concluded in September 2020—BMWNA was under an obligation to supplement its discovery responses and provide the documents which clearly rendered its prior responses incomplete.  *See* Fed. R. Civ. Pro. 26(e)(A) (requiring a party to supplement a disclosure or response "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties[.]").  BWMNA failed to do so.

The sanctions Plaintiffs seek are appropriate based on the nature of BMWNA's misconduct.  *See, e.g., Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (party's failure to produce requested documents justified a Rule 37 sanction of taking facts as

established to support a finding of personal jurisdiction); *De Saro v. United States*, 305 F. Supp. 2d 1330 (S.D. Fla 2004) (party's discovery violation justified an adverse inference establishing a critical fact in the action); *Oklahoma Federated Gold and Numismatics, Inc. v. Blodgett*, 24 F.3d 135 (10th Cir. 1994) (defendant's failure to respond to interrogatories and production requests warranted preclusion of defense).

Indeed, these sanctions are in keeping with the very purposes Rule 37 sanctions are designed to serve. *See Carlucci*, 775 F.2d at 1453 (sanctions should: "1) compensate[e] the court and other parties for the added expense caused by the abusive conduct; 2) compel[] discovery; 3) deter[] others from engaging in similar conduct; and 4) penaliz[e] the guilty party or attorney."). Accordingly, Plaintiffs' requested sanctions should be awarded.

### D.  BMWNA cannot hide behind a 2018 agreement on custodians or Plaintiffs' supposed failure to compel documents it did not know existed.

BMWNA has indicated that it intends to defend its bad faith by relying on an agreement that counsel for BMWNA and counsel for Plaintiffs reached in 2018, near the beginning of the case, regarding search terms and custodians. This technical defense, if anything, further demonstrates BMWNA's bad faith.

BMWNA's decision-making process regarding custodians was never revealed to Plaintiffs, and Plaintiffs had no choice but to rely on BMWNA to identify the appropriate custodians for the range of issues and matters presented by this case. In 2018, based on BMWNA's representations as to the proper universe of custodians, Plaintiffs agreed to a set of custodians and search terms, with the understanding that should they be inadequate, Plaintiffs reserved the right to ask for additional documents not covered by the agreement. This agreement was the starting point of the discovery process, not the end of it. *See U & I Corp. v. Advanced Med. Design, Inc.*, 251 F.R.D.

667, 676 (M.D. Fla. 2008) ("it is not the court's role, nor that of opposing counsel, to drag a party kicking and screaming through the discovery process.").

When it became clear that the agreed upon process had not resulted in the production of documents regarding punching, Plaintiffs in January 2020 communicated to BMWNA at a meet-and-confer that the sought documents were absent and specifically requested the missing information.  Importantly, at the <u>exact same time</u>, BMWNA was also responding to a subpoena from the SEC requesting documents on the same subject matter.

This Motion is not about an inadvertent failure to produce a couple of mostly irrelevant documents on a tangential issue.  Nor is it about a handful of relevant documents that fell through the cracks.  This is about BMWNA's failure to produce a trove of materials incredibly damaging to BMWNA's case at a time that (i) BMWNA <u>was aware</u> those materials existed, (ii) BMWNA had produced or was in the process of producing those materials to a government investigator, and (iii) Plaintiffs were repeatedly demanding that those materials be produced because they were missing.  With the requested materials in hand, BMWNA would not have been entitled to rely on a years-old agreement about ineffective custodians and search terms at the outset of discovery. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d. 1335, 1348-49 (N.D. Ga. 2012) (ordering sanctions where some 60,000 documents had been produced to the DOJ after discovery had closed).

*In re Delta* is instructive. There, counsel for Delta asserted on multiple occasions that "it had produced every document responsive to Plaintiffs' discovery requests that it had in its possession." *Id.* at 1349.  After discovery closed, it was discovered that Delta had produced some 60,000 documents to the DOJ as part of a governmental investigation that it had not produced to Plaintiffs.  *Id.* at 1341. Delta's explanation was that the new documents "were collected and

produced by a different law firm," which meant that the documents "were not readily available to Delta's counsel in this case." *Id.* The Court found that sanctions were warranted notwithstanding that, unlike here, it appeared the missing documents did not contain any "smoking gun" evidence. *Id.* at 1349-1351.

BWMNA knew it possessed crucial "smoking gun" documents relating to punching. When Plaintiffs requested those documents, BMWNA withheld them; but when the SEC later requested those documents, BMWNA promptly produced them to the SEC. Unlike *In re Delta*, the documents here go to the heart of Plaintiffs' claims and BMWNA's counterclaim and establish a conspiracy amongst BMWNA executives and BMW AG to artificially and deceptively inflate their sales numbers to promote their capital position.

Finally, BMWNA cannot hide behind the fact that Plaintiffs have not previously moved to compel the punching-related discovery. For one thing, sanctions under a court's inherent authority do not depend on the existence of a motion to compel brought under Rule 37. *See In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) ("[T]he inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct, for these rules are not substitutes for the inherent power.") (*quoting Chambers*, 501 U.S. at 49) (internal quotation marks omitted). More importantly, Plaintiffs cannot be required to compel documents when BMWNA has falsely represented their very existence and relevance throughout fact discovery. *See, e.g.*, *In re Amtrak "Sunset Limited" Train Crash Bayou Canot, AL on September 22, 1993*, 135 F.Supp.2d 1251, 1260 (S.D. Ala. 2001) ("A party is entitled to rely on an opposing party's written responses to interrogatory answers … [and] not be penalized for accepting [those answers] as true[.]"); *Johnson v. Del Monte Fresh Produce Co.*, No. 09-22425-CIV, 2010 WL 3717337 (S.D. Fla. Sep. 17, 2010) ("Defendants were entitled to rely on the representations … made by Plaintiff's Counsel regarding

the production of discovery responses."); *see also* Fed. R. Civ. P. 26(g) advisory committee's note to 1983 amendment (observing that Rule 26(g)'s signature requirement "certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand.").

In sum, neither the 2018 agreement on custodians nor Plaintiffs' purported failure to compel documents that BMWNA claimed did not exist can excuse the discovery abuses in this case. Accordingly, the highest available sanctions are warranted.

## **CONCLUSION**

Given the egregious nature of BMWNA's discovery violations, the Court should accordingly sanction it by issuing an order:

1. Designating facts relating to BMW's punching practices to be taken as established for the purposes of this action. More specifically, Plaintiffs ask the Court to take as established all of their factual allegations relating to punching as set forth in Counts I, VIII, and IX of the Third Amended Complaint and in defense of the Counterclaim;

2. Precluding BMWNA from opposing Plaintiffs' punching claims set forth in Counts I, VIII, and IX of the Third Amended Complaint;

3. Dismissal of BMWNA's Counterclaim with Prejudice;

4. Requiring the immediate payment of all costs and attorney's fees incurred by Plaintiffs' in connection with reviewing BMWNA's document production, conducting meet and confers related to punching, conducting depositions that addressed punching or could have addressed punching had the responsive documents been produced in a timely manner, and bringing this Motion, as well as costs and fees related to bringing this Motion; and

5. Such further and other relief as the Court deems necessary in the interests of justice, including requiring BMWNA to produce all documents referenced in the SEC Order, all other documents, statements, and submissions provided to the SEC, and all other relevant documents within two weeks, as well as reopening fact discovery as to Braman only, extending the discovery schedule for 90 days, and permitting Braman to take additional depositions of BMWNA witnesses related to the production to the SEC.

## **CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(3)**

Plaintiffs certify pursuant to Local Rule 7.1(a)(3) they have conferred by phone with counsel for BMWNA in an effort to resolve the disputes list above, but have been unable to do so.

Dated: October 30, 2020

Respectfully submitted,

COLSON HICKS EIDSON, P.A.
255 Alhambra Circle
Coral Gables, FL 33134
Tel: (305) 476-7000

By:    *Roberto Martínez*
Roberto Martínez
Florida Bar No. 305596
bob@colson.com
Stephanie A. Casey
Florida Bar No. 97483
scasey@colson.com

Of Counsel:

Russell P. McRory (*Pro Hac Vice*)
Michael P. McMahan (*Pro Hac Vice*)
Charles A. Gallaer (Florida Bar # 117729)
Arent Fox LLP
1301 Avenue of the Americas, Fl. 42
New York, NY 10019
Tel: (212) 484-3900
Fax: (212) 484-3990
russell.mcrory@arentfox.com
michael.mcmahan@arentfox.com
charles.gallaer@arentfox.com

David S. Leibowitz (Florida Bar # 529788)
General Counsel
Brian J. Shack (Florida Bar # 107068)
Assistant General Counsel
Braman Management Association
2060 Biscayne Blvd, Second Floor
Miami, FL 33137
davidl@bramanmanagement.com
bshack@bramanmanagement.com

## CERTIFICATE OF SERVICE

I certify that on October 30, 2020, I filed the foregoing document through CM/ECF with the United States District Court for the Southern District of Florida and that notice will be provided to parties of record and the Court through CM/ECF.

*Roberto Martinez*
Roberto Martinez