## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **BRAMAN MOTORS, INC**., d/b/a **BRAMAN BMW,** for itself and in the name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its use and benefit, and<br><br>**PALM BEACH IMPORTS, INC.,** d/b/a **BRAMAN MOTORCARS,** for itself and in the name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its use and benefit, and<br><br>**The DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES** of the State of Florida, for the use and benefit of Braman Motors, Inc. and Palm Beach Imports, Inc.,<br><br>          Plaintiffs,<br><br>**v.**<br><br>**BMW OF NORTH AMERICA, LLC,** and **BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT,**<br><br>          Defendants. | **Case No. 17-cv-23360-DPG** |

## FOURTH AMENDED COMPLAINT

Plaintiffs Braman Motors, Inc., d/b/a Braman BMW ("Braman Miami"), and Palm Beach

Imports, Inc., d/b/a Braman BMW West Palm Beach ("Braman WPB") (collectively "Plaintiffs" or

"Braman"), bring this Complaint separately and together for themselves, and in the name of the

Florida Department of Highway Safety and Motor Vehicles ("FLHSMV" or "the Department") for

Braman's use and benefit (at various times, Braman, for itself and in the name of the Department

AFDOCS/21175065.3

for Braman's use and benefit, are referenced collectively herein as "Plaintiffs"), against Defendants BMW of North America, LLC ("BMW") and Bayerische Motoren Werke Aktiengesellschaft ("BMW AG" and together with BMW, the "Defendants") allege as follows:

## <u>INTRODUCTION</u>

1.     This is a case about how Defendants have unlawfully enhanced their control over their franchised dealer operations by fundamentally changing— unilaterally—their contractual relationship with dealers through their imposition of arbitrary, coercive, and unfair business practices that are intended to or have the effect of enhancing Defendants' profit while reducing dealer profit. Defendants' actions are part of an intentional unlawful strategy, taking place industrywide, to put more power in the hands of motor vehicle manufacturers to the detriment of the dealerships.

2.     Toward the end of 2015, the Defendants engaged in the unlawful practice of intentionally inflating their publicly-reported sales of new vehicles and dumping unwanted BMW vehicles on BMW's United States network of dealerships. Defendants' unlawful practices included economically pressuring dealerships like Braman to "punch" as sold in the retail delivery reports vehicles that in fact had not been sold to consumers.

3.     Seeking to exert unheard-of control and domination over its franchised dealers, as well as needing to dump its horde of surplus vehicles onto those dealers' lots, BMW unilaterally modified the franchise agreement with its dealerships, including Braman, and fundamentally altered the dealer/manufacturer relationship.

4.     ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

2

███████████████████████████████████████

███████████████████████████████████

███████████████████████████

5.      Braman brings this action against Defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, and for violation of Fla. Stat. §§ 320.60-320.70 (the "Florida Dealer Act").

6.      BMW AG cannot escape liability for BMW's wrongdoings, as BMW is its agent pursuant to Fla. Stat. § 320.6405.

7.      Where available, Braman seeks treble damages and attorneys' fees under state law for the Defendants' violations, and injunctive relief against the Defendants to put an end to their unlawful practices.

## PARTIES

8.      Plaintiff Braman Miami is a corporation organized and existing under the laws of the State of Florida, with a principal place of business in Miami, Florida. It is a licensed and authorized BMW "franchised motor vehicle dealer" as defined in the Florida Dealer Act.

9.      Plaintiff Braman WPB is a corporation organized and existing under the laws of the State of Florida, with a principal place of business in West Palm Beach, Florida. It is a licensed and authorized BMW "franchised motor vehicle dealer" as defined in the Florida Dealer Act.

10.     BMW is a Delaware limited liability company, with its principal place of business in Woodcliff Lake, New Jersey. Its sole member is BMW (US) Holding Corporation, a Delaware corporation with a principal place of business in Woodcliff Lake, New Jersey.

11.     BMW imports and/or purchases BMW vehicles from its German corporate parent, BMW AG, and its affiliate, BMW Manufacturing Co., LLC. BMW then sells these vehicles to

3

franchised BMW dealers throughout the United States, including Braman. BMW is an "importer," "distributor" and "licensee" under the Florida Dealer Act.

12.     BMW AG is a corporation organized and existing under the laws of Germany, with its principal place of business in Munich, Germany. In addition to liability for its own activity directed to dealers in Florida, BMW AG is liable for the actions of its subsidiary and agent, BMW, pursuant to the Florida Dealer Act § 320.6405.

<u>**JURISDICTION AND VENUE**</u>

13.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

14.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts giving rise to the claims occurred in this jurisdiction.

15.     BMW and BMW AG have subjected themselves to the personal jurisdiction of the courts of Florida by manufacturing and selling BMW vehicles in this state. *See* Fla. Stat. § 320.61(5).

16.     In particular, BMW AG has subjected itself to the personal jurisdiction of the courts of Florida by, *inter alia*: ██████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████

17. 

18.     The Florida Dealer Act authorizes Braman as a motor vehicle dealer to obtain injunctive relief against the Defendants as a licensee for violations of the Act. Under Fla. Stat. § 320.695:

> In addition to the remedies provided in this chapter, and notwithstanding the existence of any adequate remedy at law, the department [FLHSMV], or any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer, is authorized to make application to any circuit court of the state for the grant, upon a hearing and for cause shown, of a temporary or permanent injunction, or both, restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70, or from failing or refusing to comply with the requirements of this law . . . . Such injunction shall be issued without bond. A single act in violation of the provisions of ss.

320.60-320.70 shall be sufficient to authorize the issuance of an injunction.

## **FACTUAL ALLEGATIONS**

**A.      The Dealer Agreement**

19.      Plaintiffs are BMW franchisees and each are a party to a Dealer Agreement with BMW.

20.      The Dealer Agreement incorporates several other documents by reference, including a set of Standard Provisions.

21.      The Standard Provisions impose very limited affirmative obligations upon BMW, but include an obligation to help Braman's operations:

> BMW NA will assist Dealer in Dealer's BMW Operations through such means and upon such terms and conditions as BMW NA considers necessary and appropriate....

Standard Provisions at Paragraph 2(b).

22.      The Standard Provisions also require BMW to "sell and deliver BMW Products to Dealer in accordance with this Agreement and the ability of the Dealer to store, display, sell and service BMW Products." *Id*. at Paragraph 2(a).

23.      "BMW Products" are defined as "BMW Vehicles and Original BMW Parts." *Id*. at Paragraph 1(d). "BMW Vehicles" are defined as "new passenger cars manufactured by [BMW AG] or one of its manufacturing subsidiaries, sold by BMW NA, and bearing the trademarks of BMW." *Id*. at Paragraph 1(e) (emphasis added).

**B.      The Florida Dealer Act**

24.      In addition to the Dealer Agreement, the Defendants are also bound by the Florida Dealer Act, in which the Florida Legislature provided robust and broad protections to dealers against coercive and attempted coercive behavior by manufacturers.

AFDOCS/21175065.3

25.     The remedial Dealer Act overrides the unfettered powers and discretion that manufacturers have given themselves in their franchise agreements by using what the Supreme Court of the United States has recognized as "disparity in bargaining power." *New Motor Vehicle Bd. Of California v. Orrin W. Fox Co.,* 439 U.S. 96, 100 (1978) (upholding California's Dealer Franchise Law against constitutional and statutory challenges). Its manifest purpose is to protect automobile dealers from abuse and overreaching by manufacturers. The Dealer Act states:

> It is the intent of the Legislature to protect the public health, safety, and welfare of the citizens of this state by regulating the licensing of motor vehicle dealers and manufacturers, maintaining competition, providing consumer protection and fair trade....

Fla. Stat. § 320.605.

26.     The Legislature has amended the Dealer Act often to address continuing abuses by manufacturers against dealers.

27.     The Dealer Act prohibits numerous one-sided and unjustified business practices by licensees. *See generally* Dealer Act Fla. Stat. § 320.64:

> A licensee is prohibited from committing the following acts:
>
> (5) The applicant or licensee has coerced or attempted to coerce any motor vehicle dealer into accepting delivery of any motor vehicle or vehicles or parts or accessories therefor or any other commodities which have not been ordered by the dealer.
>
> (6) The applicant or licensee has coerced or attempted to coerce any motor vehicle dealer to enter into any agreement with the licensee.
>
> (34) The applicant or licensee, after the effective date of this subsection, has included in any franchise agreement with a motor vehicle dealer a mandatory obligation or requirement of the motor vehicle dealer to purchase, sell, or lease, or offer for purchase, sale or lease, any quantity of used motor vehicles.
>
> (42) The applicant or licensee has established, implemented, or enforced criteria for measuring the sales or service performance of any of its franchised motor vehicle dealers in this state which have a material or adverse effect on any motor vehicle dealer and which:

(1) Are unfair, unreasonable, arbitrary, or inequitable; or
(2) Do not include all relevant and material local and regional criteria, data, and facts. Relevant and material criteria, data, or facts include, but are not limited to, those of motor vehicle dealerships of comparable size in comparable markets. If such performance measurement criteria are based, in whole or in part, on a survey, such survey must be based on a statistically significant and valid random sample.

28.     Further, under Fla. Stat. § 320.641, BMW is prohibited from modifying the franchise agreement without 90-days' notice and having a proper justification for any proposed change:

> *Fla. Stat. § 320.641. Discontinuations, cancellations, nonrenewals, modifications, and replacement of franchise agreements.*
>
> (1)(a) An applicant or licensee shall give written notice to the motor vehicle dealer and the department of the licensee's intention to discontinue, cancel, or fail to renew a franchise agreement or of the licensee's intention to modify a franchise or replace a franchise with a succeeding franchise, which modification or replacement will adversely alter the rights or obligations of a motor vehicle dealer under an existing franchise agreement or will substantially impair the sales, service obligations, or investment of the motor vehicle dealer, at least 90 days before the effective date thereof, together with the specific grounds for such action.
>
> (b) The failure by the licensee to comply with the 90-day notice period and procedure prescribed herein shall render voidable, at the option of the motor vehicle dealer, any discontinuation, cancellation, nonrenewal, modification, or replacement of any franchise agreement. Designation of a franchise agreement at a specific location as a "nondesignated point" shall be deemed an evasion of this section and constitutes an unfair cancellation.

29.     Under Fla. Stat. § 320.696, BMW is prohibited from recovering or attempting to recover any costs associated with providing retail compensation to Braman for warranty parts and labor sales, and is prohibited from attempting to influence the prices for which Braman sells parts or labor in retail customer repairs:

*Fla. Stat. § 320.696. Warranty Responsibility.*

(6) A licensee shall not recover or attempt to recover, directly or indirectly, any of its costs for compensating a motor vehicle dealer under this section.

(7) A licensee shall not require, influence, or attempt to influence a motor vehicle dealer to implement or change the prices for which it sells parts or labor in retail customer repairs. A licensee shall not implement or continue a policy, procedure, or program to any of its dealers in this state for compensation under this section which is inconsistent with this section.

30.     Finally, under Fla. Stat. § 320.6405, BMW AG, as BMW's agent, is bound by the

Florida Dealer Act and the Dealer Agreement, and is liable for any of the actions of BMW that

violate the Florida Dealer Act or the Dealer Agreement (emphasis added):

*Fla. Stat. § 320.6405. Franchise agreements; obligations of manufacturer and its agent.*

Any parent, subsidiary, or common entity of a manufacturer; distributor; importer; or other entity, which by contractual arrangement or otherwise pursuant to the direction of the manufacturer, engages in the distribution in this state of line-make motor vehicles manufactured or substantially manufactured by such manufacturer, shall be deemed to be the agent of the manufacturer for the purposes of any franchise agreement entered into between such agent and a motor vehicle dealer engaged in business in this state and shall be bound by the terms and provisions of such franchise agreement as if it were the principal. *A manufacturer of line-make motor vehicles which are offered for sale or lease in this state under any franchise agreement executed by an agent of such manufacturer is bound by the terms and provisions of such franchise agreement as if it and not the agent had executed the franchise agreement and, notwithstanding whether it is licensed pursuant to s. 320.61, said manufacturer shall be subject to all of the restrictions, limitations, remedies, and penalties of ss. 320.60-320.70 related to such franchise agreement, the performance thereof, or any cause of action pertaining thereto.* The agency relationship established in this section is not intended to apply to a person or entity that engages in the distribution of motor vehicles in this state under its own brand name which are substantially manufactured by another person or entity, provided the distributing person or entity is substantially engaged in the manufacture of other line-make motor vehicles and is licensed in this state as a manufacturer.

9

C.      **The Defendants' Intentional Unlawful Actions**

31.     The Defendants have acted unlawfully in multiple ways, as set forth below.

1.      **The Added Value Program (AVP)**

32.     For decades, Dealer Agreements, including Braman's, were structured around the trading margin of new vehicle sales—*i.e.*, the difference between the wholesale price set by BMW for dealer vehicle purchases and the Manufacturer's Suggested Retail Price ("MSRP") set by BMW for retail consumers. While Dealer Agreements permitted a licensee to determine and set the wholesale price of a new motor vehicle, these agreements generally were structured around a trading margin that used to be sufficient to support a dealer's new vehicle sales operations. Dealers, including Braman, relied upon these margins for profits in their sales operations. No longer.

33.     Defendants unilaterally and fundamentally changed the entire structure and arrangement of Braman's business by markedly reducing its former trading margins below levels sufficient to sustain its new vehicles sales business, and replacing these margins with "back-end," conditions-based "bonus" programs, including a program called the Added Value Program ("AVP").

34.     Such AVP modifications were imposed unilaterally over the years by Defendants without complying with Florida law, including failing to provide statutory notice under the Florida Dealer Act before implementing the modifications.

35.     Through the AVP, Braman can "earn" back its previous trading margin percentages only by hitting performance targets that Defendants unilaterally and arbitrarily sets, changes, and evaluates.

AFDOCS/21175065.3

36.     Thus, BMW claims to "incentivize" its dealers to perform certain actions and to hit certain metrics under the AVP by offering up to 5% of MSRP in "bonus" money for every new vehicle sold.

37.     The so-called "bonuses" are, in reality, not "bonuses" at all because, de facto, they are paid with the trading margin reduction that used to be the dealer's without any conditions attached.

38.     A dealer has no choice but to try to attain BMW's "bonuses" and, therefore, Defendants have effectively turned the "incentivized" conditions into a requirement of the franchise. The AVP is not a "voluntary" program at all, as BMW and its corporate puppeteer BMW AG would have its dealers and this Court believe. Rather, these new requirements have altered the core business structure and operations of a BMW dealer as well as the basic arrangement between BMW and its dealers, and thus constitute modifications of the franchise.

39.     For example, in or around January 2016, BMW published yet another new "Added Value Program Guide," which set forth each component the 2016 version of AVP and what Braman must do to receive the most money on each BMW it sells. BMW yet again modified and changed the "Added Value Program Guide" and its components in June 2017.

40.     BMW, at BMW AG's direction, implemented each of these changes unilaterally without complying with the Florida Dealer Act's specific notice requirements mandating manufacturers to provide notice to the Department of Highway Safety and Motor Vehicles and the dealers of any franchise modification at least ninety (90) days prior to its implementation, thereby obviating Braman's statutory right to protest each modification.

41.     Four of the AVP's components are at issue in this case: (i) the new vehicle payments that are tied to used BMW vehicle sales ("the TPO Component"), (ii) the BMW Genius condition

("the Genius Component"), (iii) a "service effectiveness" metric that penalizes dealers for factors that are beyond any control of the dealer ("the Service Effectiveness Component"), and (vi) a "dealer sales loyalty" metric that penalizes dealers for factors beyond any control of the dealer ("the Dealer Sales Loyalty Component").

42.     The overarching impact of the AVP has resulted in detrimental modifications of Braman's BMW franchise, jeopardized Braman's investments, profitability, and competitiveness while allowing Defendants to acquire effective control over dealer operations. (See, e.g., BMW Center Agr., "Purpose of Agreement" and "Modification of Agreement"; BMW Std. Prov., ¶¶ 1(r), 2(a), 2(b), 2(c), 3(a), 5(a), 5(b), 5(e), 6(a) and 8(a).)

43.     Put another way, a dealer who does not attain any so-called "bonus" is placed at a competitive disadvantage vis-à-vis competitor BMW dealers who attain the "bonus." This arrangement was neither contemplated nor agreed to by Braman or any other BMW dealers who signed Dealer Agreements. The Dealer Agreement is silent regarding this back-end "bonus" structure, imposed by BMW, at BMW AG's instruction, in lieu of traditional trading margins.

### i.     TPO Component (0.5% MSRP)

44.     On or about January 5, 2016, BMW unilaterally implemented a change to AVP, effective April 1, 2016 (only 87 days later), which tied a "bonus" payment equal to 0.5% MSRP on every new vehicle sold to the number of used BMW vehicles the dealer sold (Total Pre-Owned Component or "TPO") even though the franchise agreement is silent as to any specific number.

45.     If a dealer fails to sell the certain number of used BMW vehicles required by AVP, the dealer's potential profit (trading margin) on each new BMW vehicle purchased that quarter is lowered.

12

46.     The new TPO targets were unexplained by BMW, and it failed to give any insight as to how or why they were set or "the specific grounds for such action." Fla. Stat. 326.41(c)(3).

### ii.     BMW Genius Component (1.0% MSRP)

47.     On or about January 5, 2016, BMW also announced a change to AVP, effective April 1, 2016 (only 87 days later) tying a "bonus" payment equal to 1.0% MSRP on every new vehicle sold to a new requirement that the dealer employ a set number of BMW Geniuses. The Dealer Agreement is silent with respect to Geniuses.

48.     BMW mandates that the dealer hire BMW Geniuses to interact initially with both new and returning customers, but BMW Geniuses are neither trained nor authorized to continue interacting with those customers should the customer wish to purchase a vehicle or negotiate a deal. This is left to the sales staff, which theretofore had performed the BMW Geniuses' tasks as well.

49.     BMW unilaterally set the number of BMW Geniuses a dealer must employ in order to receive the 1% trading margin "bonus" payment.

50.     If a dealer fails to employ the requisite number of BMW Geniuses, and fails to attain the so-called "bonus," the cost for these employees, spread over the dealer's new vehicle inventory, effectively increases the cost to the dealership of each new vehicle.

51.     In other words, BMW is forcing dealers to hire employees they neither want nor need. It costs Braman Miami almost $350,000 and Braman WPB almost $250,000 per year to staff BMW Geniuses at each site, which includes the Geniuses' salary, any benefits they receive, and funding BMW-mandated training.

52. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

53. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

54. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

55.     BMW AG took further steps to control the rollout of Genius and its "Future Retail" program.

56. ████████████████████████████████████████████

███████████████

57. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████

58. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

59. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

14

60.   ███████████████████████████████████████████

███████████████████████

61.    As shown above, BMW AG provided direction, funding, and personnel to implement Genius.

### *iii.    Service Effectiveness Component (1.75% MSRP)*

62.    On June 10, 2017, BMW implemented a change to AVP, effective October 1, 2017, which tied a "bonus" payment equal to 1.75% MSRP on every new vehicle sold to a new and unusual method of tracking service customers in Braman's Primary Market Area ("PMA").

63.    In previous iterations of the AVP, BMW measured Braman's service business using a Customer Satisfaction Index ("CSI"), which was an aggregated score based upon customer surveys that inquired about Braman's quality of service work and customer care.

64.    BMW replaced this CSI metric with a new metric—Service Effectiveness—that is quantitative and completely divorced from how customers perceive the quality of service of their vehicles.

65.    Under the new Service Effectiveness metric, BMW scores Braman on a percentage calculated by the total number of active service customers plus "pump in" customers it has within its PMA divided by the total number of BMWs "in operation" in the PMA plus "pump in" customers.

$$\text{Service Effectiveness} = \frac{(\text{\# of Active Service Customers in PMA} + \text{\# of Pump in Customers})}{(\text{\# of Units in Operation in PMA} + \text{\# of Pump in Customers})}$$

66.    Among other things, this metric distorts local conditions that may cause higher than normal "pump outs"—i.e., customers who register their vehicles in a given PMA may choose to

AFDOCS/21175065.3

service their vehicle outside that PMA, for reasons unrelated to the dealer's quality of service, such as commuting patterns. The assumptions underlying BMW's Service Effectiveness metric unfairly penalizes dealers, including Braman, and effectively allows BMW to recover or attempt to recover directly and indirectly its mandated costs under its warranty obligations when a dealer fails to attain the so-called "bonus" in violation of Fla. Stat. § 320.696(6).

67.     The Service Effectiveness Component also penalizes Braman for customers whose BMWs may be functioning properly and who choose not to perform routine maintenance and/or who may not drive often, e.g. snowbirds, and allows BMW to recover directly and indirectly warranty reimbursement payments that BMW pays to Braman.

68.     Thus, under this Service Effectiveness component, Braman could be penalized for events over which it has little or no control.

69.     Finally, BMW changed a "gatekeeper/qualifier" to the Service Effectiveness Component to require Braman to obtain the email addresses from at least 85% of all service customers that come in for repairs and submit these emails to BMW in order to be eligible for the "bonus" margin tied to the Service Effectiveness Component. The Dealer Agreement is silent with respect to email collections.

70.     Even assuming Braman otherwise meets its Service Effectiveness target, BMW could nonetheless withhold the "bonus" margin if Braman fails to meet the 85% threshold by only obtaining 84.99% of service customer emails.

71.     Prior to this iteration of the AVP, BMW did not tie any "bonus" monies to obtaining emails from service customers. Only New and Certified Pre-Owned (CPO) customers counted toward attainment of BMW's goals for email capture; meaning, owners of new and recent model

16

year BMWs would have to provide their email addresses for Braman to qualify for a portion of the so-called "incentive" program.

72.    BMW's new and arbitrary email-capture metric is not an effective measurement of the consuming public's satisfaction with Braman's service.

73.    Additionally, during discovery in this action Braman uncovered BMW AG's involvement in creating and implementing Service Effectiveness.

74.    

75.

76.    As with Genius, BMW AG was directly involved with the implementation of Service Effectiveness directed BMW every step of the way.

### iv.    *Dealer Sales Loyalty Component (1.75% MSRP)*

77.    On or about June 10, 2017, BMW implemented a change to AVP, effective October 1, 2017, which tied a payment equal to 1.75% MSRP on every new vehicle sold to a new and unprecedented method of tracking returning sales customers in Braman's PMA.

78.    Under prior AVP iterations, BMW tracked the quality of Braman's sales experience through an aggregate score generated from customer surveys, known as the Sales Satisfaction Index ("SSI"). Achieving a certain SSI score earned Braman a so-called "bonus" under prior AVP iterations.

AFDOCS/21175065.3

79.     Now, BMW has created an unreasonable formula for determining how many returning customers Braman is getting, by using tracking tools that, among other things, raise privacy concerns. BMW refers to this new AVP component as "Dealer Sales Loyalty."

80.     Using the customer credit information of a third-party credit reporting company, Experian, and the correlation and analysis of data from the Florida Department of Highway Safety and Motor Vehicles, including registration information and customer addresses, BMW will be tracking whether *any* of Braman's previous BMW customers (over a period of many years) have returned to the market within the last year to purchase another BMW from Braman, or instead have purchased a BMW or any other brand of vehicle anywhere else.

81.     Besides the invasion of the customer's right to privacy, which is explicitly recognized in Florida in Article I, Section 23 of the Florida Constitution, the gathering of the information is bound to contain errors.

82.     BMW's own materials on the Sales Loyalty Component, for example, confirm that a customer that once purchased a BMW sports car, a Z4, will be deemed "disloyal" if that same customer leases a Ford F-150, a pickup truck, even though BMW does not offer any pickup trucks or comparable vehicles.

83.     Should Braman fail to meet BMW's arbitrary Sales Loyalty Component, Braman will not receive the associated "bonus" payment and, therefore, will suffer damage to its investments, competitiveness, and profitability.

84.     Here, again, Braman could be penalized for events over which Braman has no control.

85.     ██████████████████████████████████████████████████
██████████████████████████████████████████

AFDOCS/21175065.3



**2.     BMW's Self-Serving Practice of Pressuring Dealers to "Punch" Vehicles as Sold to Consumers**

90.     In or about 2015, due to thousands of new BMW vehicles piling up at its U.S. ports, BMW engaged in a nationwide practice of pressuring and attempting to coerce dealers to purchase BMW's excessive inventory and to report vehicles as sold (by "punching" a Retail Delivery Report, or "RDR"), when, in fact, those vehicles still sat unsold on dealers' lots.

91.     Punching RDRs of unsold vehicles creates logistical, legal, and financial problems for both consumers and dealers.

92.     Initially, Braman was unaware how BMW came up with its various categories for punched vehicles. During discovery, Braman learned that it was BMW AG that "delivered" a firm definition of punched vehicles and instructed BMW on how to categories each and every punched vehicle so they could track them.

93.     Many of these punched vehicles caused problems for dealers and consumers. BMW pressured dealers to purchase and punch more vehicles than the dealers need or can sell at retail in

19

order to artificially inflate BMW's reported sales numbers. Ultimately, the dealer had to dispose of the punched vehicles, alongside its new and used inventory.

94.    Dealers, therefore, faced a dilemma: on the one hand, unpunched vehicles bear a higher inventory cost because BMW gives dealers payments to punch inventory (sometimes $1000 or more per vehicle). But on the other hand, maintaining an excessive inventory increases floorplan financing and overhead, and may require dealerships to sell the vehicles at a loss in order to reduce inventory.

95.    BMW counts a punched vehicle as a "sale" immediately in its allocation system, and this enables BMW, in subsequent normal allocations, to sell more BMW models to dealers. This charade benefits BMW at the expense of dealers like Braman. In addition, BMW's evaluation of its dealers includes "punched" vehicles still in a dealer's inventory; this is not a reasonable or accurate reflection of a dealer's actual sales performance.

96.    In or about the end of 2015, Braman, which by then had an excessive inventory, stopped punching unsold vehicles, and BMW penalized Braman by depriving it of substantial "bonus" money for its refusal to comply with BMW's attempted coercing and self-serving, falsely-reporting scheme.

**3.    BMW's Dealer Effectiveness Metric**

97.    BMW assigns each dealer a geographic territory called a Primary Market Area ("PMA"). PMAs are comprised of census tracts defined by the U.S. Census Bureau. Census tracts are typically assigned to the closest dealer, with certain exceptions to account for road networks and natural barriers (such as rivers and lakes).

98.    Whenever a new motor vehicle is purchased or leased, that vehicle is registered with the state at the customer's address. This registration data is compiled by census tract and

used by manufacturers like BMW for a variety of purposes, including measuring sales performance.

99.     As part of the sales performance evaluation process, manufacturers also divide the universe of motor vehicles into individual vehicle class segments (*e.g.,* mid-sized sedans, small SUVs, etc.), and luxury and non-luxury brands (BMW, Mercedes, Audi on one hand and GM, Ford, Chrysler on the other, etc.).

100.    Utilizing this registration and segmentation data, BMW measures a dealer's sales performance by a metric called Dealer Effectiveness. Dealer Effectiveness is a fraction, expressed as a percentage, where the numerator is all of a dealer's retail sales, wherever made, and the denominator is the dealer's "expected" sales – as dictated according to BMW's unreasonable and inequitable criteria and assumptions:

$$\text{Dealer Effectiveness} = \frac{\textbf{A c t u a l \ S a l e s}}{\textbf{"Expected" Sales}} \ \text{X 100}$$

101.    "Expected" Sales, the Dealer Effectiveness denominator, is calculated by applying BMW's regional market share, in each luxury vehicle segment, to all of the competitive retail motor vehicle registrations in the dealer's PMA:

**"Expected" Sales = BMW's Regional Market Share in x Segment            Segment Registrations in PMA**

**(repeated for each luxury vehicle segment in which BMW competes)**

102.    Dealer Effectiveness purports to adjust for the individual consumer preferences of vehicle type (small cars vs. large SUVs, etc.), but no other factors. But Dealer Effectiveness does not, for example, take into account whether there is a brand preference within a given area that the dealer has to overcome.

103.    Moreover, the definitions, assumptions, criteria, and targets that undergird BMW's

AFDOCS/21175065.3

Dealer Effectiveness metric compare disparate dealers in an arbitrary and inequitable manner. For example, BMW's Dealer Effectiveness compares Braman Miami (a high-volume, single location dealership in downtown Miami) to dealers in Tallahassee and Gainesville, Sarasota and Jacksonville, Florida, as well as dealers in Montgomery, Alabama, and Savannah, Georgia. Dealers across the state and southern region face different markets, different clienteles, and different local challenges. BMW's Dealer Effectiveness ignores those local market differences.

104. As a result, BMW's Dealer Effectiveness does not take into account all relevant and material criteria, data, and facts as a measure of Braman's actual sales performance.

**D.     Defendants' Actions Violate The Florida Dealer Act and the Dealer Agreements**

105. Upon information and belief, as well as based upon their first-hand experience and dealings with BMW personnel over decades, BMW dealers, including Braman Miami and Braman WPB, know and have been informed by BMW personnel that many of the decisions and actions described above have been taken in concert with, and often at the direction of, personnel and officials of BMW AG.

106. Through discovery, Braman confirmed the foregoing. The examples provided herein are the tip of the iceberg of BMW AG's involvement with BMW and their violation of the Florida Dealer Act.

**E.     BMW Continues to Change AVP**

107. Since Plaintiffs commenced this action, BMW announced a new set of changes for 2019 on October 1, 2018.

108. The 2019 AVP Program continues many of the objectionable provisions of the prior iterations of the AVP Program, and BMW's issuance of the 2019 AVP Program reaffirms that BMW believes it can change these so-called incentive programs on its whim, at any time. What

22

BMW deems to be reasonable thresholds, requirements, and criteria in past iterations of the AVP have been changed in a very short period of time and replaced, eliminated, or modified with new thresholds, requirements, and criteria—with no notice to Braman and no opportunity for Braman to contest or challenge these changes to the fundamental franchise relationship.

109.   Each change to the AVP Program is an unlawful modification of the franchise and has been implemented by BMW, at BMW AG's direction, without required notice and without good cause.

**COUNT I**
**Violation of the Florida Dealer Act, Fla. Stat. §§ 320.64(5) and (6)**
**BMW's Practice of Punching RDRs for Vehicles Not Sold to Consumers**
**(Against all Defendants)**

110.   Plaintiffs repeat and reallege paragraphs 1-85 as if fully set forth herein.

111.   This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. §§ 320.64(5) and (6).

112.   BMW has coerced or attempted to coerce Braman to punch RDRs for new vehicles that have not been sold to consumers in order to artificially and deceptively inflate BMW's sales numbers that it publicizes each month.

113.   Unless Braman yielded to this coercion or attempted coercion Braman would not stay competitive, profit from its sales operations, and its investment would have been impaired.

114.   Failure by Braman to punch RDRs and hit the sales objectives dictated by BMW results in a higher overall inventory cost for Braman as well other negative repercussions imposed by BMW. Braman, therefore, is faced with the choice of losing per-vehicle "bonus" money, being put at a competitive disadvantage, or falsely punching the RDRs of vehicles Braman has not sold and which increases the cost of Braman's inventory.

AFDOCS/21175065.3

115.   BMW's conduct constitutes coercion or attempted coercion by BMW in violation of Fla. Stat. § 320.64(5) and (6).

116.   BMW AG knew full well of BMW's conduct, and even instructed it on how to categorize punched vehicles so the Defendants could keep better track of them.

117.   Plaintiffs have been damaged (1) by the additional costs of the punched vehicles remaining in Braman's inventory leading to excessive overhead while Braman acceded to Defendants' unlawful practices; and (2) by the loss of per-vehicle "bonus" money necessary to stay competitive, profit from its operations, or not impair its investments.

118.   BMW, in concert with BMW AG, has also coerced or attempted to coerce Braman into accepting additional inventory it does not want and for which it makes no economic sense to purchase, in order to meet the artificial and economically unreasonable sales targets of both new and used vehicles that Defendants have set.

119.   Braman has been and will continue to be damaged by Defendants' coercive or attempted coercive behavior in an amount to be determined at trial.

120.   Besides its own liability under the Florida Dealer Act, BMW AG is jointly and severally liable for the unlawful actions of BMW, their affiliate and subsidiary, respectively.

WHEREFORE, Braman demands entry of judgment against BMW and BMW AG: (1) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, against BMW's coercive or attempted coercive conduct, prohibiting BMW and BMW AG from continuing to coerce or attempt to coerce Braman into purchasing unwanted vehicles through either fraudulent punching schemes or economically unreasonable sales targets for new and used vehicles; (2) for damages, including

24

treble damages, attorneys' fees and costs; and, (3) for such other relief this Court deems just and equitable.

## COUNT II
### Violation of the Florida Dealer Act, Fla. Stat. § 320.64(34)
### Total Pre-Owned Component – 0.5% MSRP
### (Against all Defendants)

121.   Plaintiffs repeat and reallege paragraphs 1-85 as if fully set forth herein.

122.   This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.64(34).

123.   BMW has effectively created a "mandatory requirement or obligation" upon Braman to sell a certain number of used BMW vehicles by adding TPO to the AVP.

124.   This constitutes an unlawful used vehicle sales requirement in violation of Fla. Stat. § 320.64(34).

125.   Braman has been and will continue to be damaged by BMW's unlawful behavior in an amount to be determined at trial.

126.   BMW AG is jointly and severally liable for the unlawful actions of BMW, its subsidiary. On information and belief, like its direct involvement in Genius, Future Retail, Service Effectiveness and facility standards, BMW AG was involved in BMW's unlawful schemes and directed it to do them.

127.   WHEREFORE, Braman demands entry of judgment against BMW and BMW AG: (1) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, requiring BMW, and BMW AG to restore the previous status quo through an order: (i) voiding the TPO "Bonus" program as an unlawful requirement that Braman sell any quantity of used vehicles, and, (ii) preventing BMW and BMW AG from reinstituting any used vehicle purchase, sale or lease

25

requirement in any form, including future bonus, incentive, or holdback programs; and, (2) for damages, including treble damages, attorneys' fees and costs; and, (3) for such other relief this Court deems just and equitable.

## COUNT III
### Violation of the Florida Dealer Act, Fla. Stat. § 320.64(42)(a)
### Sales Loyalty Component – 1.75% MSRP
### (Against all Defendants)

128.   Plaintiffs repeat and reallege paragraphs 1-85 as if fully set forth herein.

129.   This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.64(42)(a) for implementing criteria for measuring Plaintiffs' sales performance that has a material or adverse effect on Plaintiffs and is unfair, unreasonable, arbitrary or inequitable.

130.   Sales Loyalty is criteria established, implemented or enforced by BMW to measure Plaintiffs' sales performance.

131.   Failing to obtain 1.75% of AVP's trading margin has a material and adverse effect on Plaintiffs by, among other things, making them less price-competitive versus other dealers and losing trading margin.

132.   Sales Loyalty is unfair, unreasonable, arbitrary or inequitable namely because, among other things, its inputs (Loyal Events and Return to Market Events) are almost entirely outside of Plaintiffs' control.

133.   Sales Loyalty is also unfair, unreasonable, arbitrary, or inequitable because it ignores other factors that are sound indicators of sales performance.

134.   BMW's Sales Loyalty is an unfair, unreasonable, arbitrary or inequitable sales performance standard.

AFDOCS/21175065.3

135.   Braman has been and will continue to be damaged by BMW's unlawful behavior in an amount to be determined at trial.

136.   BMW AG is jointly and severally liable for the unlawful actions of BMW, their affiliate and subsidiary, respectively. On information and belief, like its direct involvement in Genius, Future Retail, Service Effectiveness and facility standards, BMW AG was involved in BMW's unlawful schemes and directed it to do them.

WHEREFORE, Braman demands entry of a judgment against BMW and BMW AG: (1) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, requiring BMW and BMW AG to restore the previous status quo through an order: (i) voiding the Sales Loyalty Component as an unlawful invasion of Consumer's right to privacy and an unfair, unreasonable, and arbitrary requirement, and, (ii) preventing BMW and BMW AG from reinstituting any such programs; (2) for damages, including treble damages, attorneys' fees and costs; and, (3) for such other relief this Court deems just and equitable.

**COUNT IV**
**Violation of the Florida Dealer Act, Fla. Stat. § 320.64(42)(a)**
**Service Effectiveness Component – 1.75% MSRP**
**(Against all Defendants)**

137.   Plaintiffs repeat and reallege paragraphs 1-85 as if fully set forth herein.

138.   This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.64(42)(a) for implementing criteria for measuring Plaintiffs' service performance that has a material or adverse effect on Plaintiffs and is unfair, unreasonable, arbitrary or inequitable.

139.   Service Effectiveness is a criteria established, implemented or enforced by BMW to measure Plaintiffs' service performance.

27

140.   Falling below Plaintiffs' Service Effectiveness benchmarks has a material and adverse effect on Plaintiffs by, among other things, making them less price-competitive versus other dealers.

141.   Service Effectiveness is unfair, unreasonable, arbitrary or inequitable namely because, among other things, it completely ignores actual customer satisfaction in favor of metrics BMW has created from whole cloth.

142.   The Service Effectiveness metric also penalizes dealers like Braman for events that are not within the dealer's control.

143.   BMW's Service Effectiveness lowers Braman's margin on new vehicles if they do not meet BMW's unfair, unreasonable, arbitrary or inequitable service performance standards.

144.   Braman has been and will continue to be damaged by BMW's unlawful behavior in an amount to be determined at trial.

145.   BMW AG is jointly and severally liable for the unlawful actions of BMW, their affiliate and subsidiary, respectively.

146.   BMW AG is also liable for its own violation of the Florida Dealer Act by forcing BMW to implement Service Effectiveness and controlling its implementation.

WHEREFORE, Braman demands entry of a judgment against BMW and BMW AG: (1) for damages, including treble damages, attorneys' fees and costs; (2) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman; and, (3) for such other relief this Court deems just and equitable.

AFDOCS/21175065.3

**COUNT V**
**Violation of the Florida Dealer Act, Fla. Stat. § 320.641**
**Unlawful Modifications of the Dealer Agreement**
**(Against all Defendants)**

147.   Plaintiffs repeat and reallege paragraphs 1-85 as if fully set forth herein.

148.   This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.641.

149.   Nothing in the Dealer Agreement or the Standard Provisions notifies Plaintiffs that BMW intended to fundamentally alter the margins on new vehicles by reducing said margins in favor of so-called incentives or "bonuses" tied to used BMW vehicle sales.

150.   Nothing in the Dealer Agreement or the Standard Provisions thereto would let Plaintiffs know that BMW intended to fundamentally alter Plaintiffs' trading margins on new vehicles or operating costs by forcing them to create an additional layer of employees to handle customers' questions and do little else.

151.   Nothing in the Dealer Agreement or the Standard Provisions thereto notifies Plaintiffs or requires Plaintiffs to compete with other brand manufacturers in vehicle segments that BMW does not offer.

152.   BMW's unnecessary and unreasonable changes to the Dealer Agreement, which penalize Plaintiffs on new vehicle pricing, competitiveness, and margins hurt Braman's bottom line and ability to compete, and will result in lost sales, lost service business, lost profits, and impairment of Braman's investments.

153.   Each of these components—the TPO Component, the BMW Genius Component, the Service Effectiveness Component, and the Sales Loyalty Component—is an unlawful modification of the Dealer Agreement separately, and/or together the four components constitute

an unlawful modification of the Dealer Agreement; individually and/or collectively the components constitute a violation(s) of § 320.641.

154.   Braman has been and will continue to be damaged by BMW's unlawful behavior in an amount to be determined at trial.

155.   BMW AG is jointly and severally liable for the unlawful actions of BMW, their affiliate and subsidiary, respectively.

156.   As shown herein, BMW AG has directed BMW in the implementation of these unlawful modifications including, inter alia, the rollout of Genius, Service Effectiveness and other AVP components, setting objectives under these programs, and providing resources in the form of personnel and money to implement these unlawful modifications.

WHEREFORE, Braman demands entry of a judgment against BMW and BMW AG: (1) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, requiring BMW to restore the previous status quo through an order: (i) voiding the Added Value Program as an unlawful modification; (ii) requiring BMW to reinstitute any unconditional margin, payment, bonus, and structure enjoyed by Braman before the time BMW made any reduction of trading margin; and, (iii) preventing BMW from modifying Braman's dealer agreement further without complying with Fla. Stat. § 320.641; (2) for damages, including treble damages, attorneys' fees and costs; and, (3) for such other relief this Court deems just and equitable.

## COUNT VI
### Violation of the Florida Dealer Act, Fla. Stat. § 320.696(6)
### Unlawful Recovery of Warranty Reimbursement Costs
### (Against all Defendants)

157.   Plaintiffs repeat and reallege paragraphs 1-85 as if fully set forth herein.

158.   This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.696(6).

159.   Under the Florida Dealer Act, BMW is required to reimburse Braman an amount for warranty, labor, and parts sales equal to Braman's customer pay charges for labor and parts used in non-warranty repairs. *See* Fla. Stat. §§ 320.696(1), (2), (3) and (4).

160.   Under Fla. Stat. § 320.696(6), BMW is prohibited from recovering or attempting to recover, directly or indirectly, any of its costs for compensating Braman for performing BMW's warranty reimbursement obligations.

161.   BMW's AVP program, including its Service Effectiveness Component, directly and indirectly recovers and/or attempts to recover BMW's costs for compensating Braman for performing BMW's warranty obligations.

162.   BMW's conduct violates Fla. Stat. § 320.696(6).

163.   Braman has been and will continue to be damaged by BMW's unlawful behavior in an amount to be determined at trial.

164.   BMW AG is jointly and severally liable for the unlawful actions of BMW, their affiliate and subsidiary, respectively.

165.   BMW AG is also liable alone for its violation of the Florida Dealer Act. Through its mandates tied to AVP generally and Service Effectiveness particularly, BMW AG participated in the unlawful recovery of warranty reimbursement.

WHEREFORE, Braman demands entry of a judgment against BMW and BMW AG: (1) for damages, including treble damages, attorneys' fees and costs; (2) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, requiring BMW to reimburse Braman an

amount for warranty, labor, and parts sales equal to Braman's customer pay charges for labor and parts used in non-warranty repairs; and, (3) for such other relief this Court deems just and equitable.

### COUNT VII
### Violation of the Florida Dealer Act, Fla. Stat. § 320.696(7)
### Unlawfully Influencing Braman's Charges for Non-Warranty Repairs
### (Against all Defendants)

166.    Plaintiffs repeat and reallege paragraphs 1-85 as if fully set forth herein.

167.    This is an action for damages and injunctive relief pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.696(7).

168.    Under Fla. Stat. § 320.696(7), a manufacturer:

> shall not require, influence or attempt to influence a motor vehicle dealer to implement or change the prices for which it sells parts or labor in retail customer repairs. A [manufacturer] shall not implement or continue a policy, procedure, or program to any of its dealers in this state for compensation under this section which is inconsistent with this section.

169.    Through Service Effectiveness, BMW has implemented a plan that unlawfully "requires, influences, or attempts to influence" Braman to change the rates at which it sells retail parts and labor sales. BMW's plan, as applied to Braman, would drive down BMW's reimbursement costs for Braman's warranty, labor, and parts.

170.    BMW's AVP including its Service Effectiveness Component, therefore, requires, influences, or attempts to require or influence Braman to lower the prices for which it sells parts and labor for retail customer repairs.

171.    The provisions of BMW's Service Effectiveness Component of AVP are "inconsistent with" § 320.696 and violated § 320.696(7).

32

172.   Braman has been and will continue to be damaged by BMW's unlawful behavior in an amount to be determined at trial.

173.   BMW AG is jointly and severally liable for the unlawful actions of BMW, their affiliate and subsidiary, respectively.

174.   BMW AG is also liable alone for its violation of the Florida Dealer Act. Through its mandates tied to AVP generally and Service Effectiveness particularly, BMW AG participated in the unlawful influencing of the rates Braman charges for non-warranty repairs.

WHEREFORE, Braman demands entry of a judgment against BMW and BMW AG: (1) for damages, including treble damages, attorneys' fees and costs; (2) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, requiring BMW to eliminate the Service Effectiveness program and reimburse Braman the retail rates on warranty labor and parts sales; and, (3) for such other relief this Court deems just and equitable.

## COUNT VIII
## Breach of Dealer Agreement
### (Against BMW NA)

175.   Plaintiffs repeat and reallege paragraphs 1-85 as if fully set forth herein.

176.   This is an action for damages under the common law for BMW's breach of the Dealer Agreement.

177.   Plaintiffs have fully performed their obligations under the Dealer Agreement and are not in breach thereof.

178.   Under the Standard Provisions, which have been expressly incorporated into and made a part of the Dealer Agreement, BMW expressly agreed to:

> assist Dealer in Dealer's BMW Operations through such means and upon such terms and conditions as BMW NA considers necessary and appropriate.

Section 2(b).

179.   BMW further expressly agreed to evaluate Braman's sales performance "on the basis of such reasonable and equitable criteria as may be determined from time to time by BMW NA." Section 5(b). The Florida Dealer Act supersedes any provisions of the Dealer Agreement that conflict or are inconsistent with the statutory provisions.

180.   BMW has breached express provisions of the Dealer Agreement (See, e.g., BMW Center Agr., "Purpose of Agreement" and "Modification of Agreement"; BMW Std. Prov., ¶¶ 1(r), 2(a), 2(b), 2(c), 3(a), 5(a), 5(b), 5(e), 6(a) and 8(a)) and Fla. Stat. §§ 320.64(5), (6), and (42) by, among other things: (1) coercing or attempting to coerce Braman to punch RDRs prior to the actual retail sale of the BMW vehicle; and, (2) evaluating Braman on sales and service performance criteria that is unfair, unreasonable, arbitrary, inequitable, or does not include all relevant and material, local and regional criteria, data, and facts.

181.   Braman has been and will continue to be damaged by BMW's unlawful behavior in an amount to be determined at trial.

WHEREFORE, Plaintiffs demands entry of a judgment against BMW and BMW AG for damages, costs, and for such other relief this Court deems just and equitable.

### COUNT IX
### Breach of Implied Covenant of Good Faith and Fair Dealing
#### (Against BMW NA)

182.   Plaintiffs repeat and reallege paragraphs 1-85, and paragraphs 146-152 as if fully set forth herein.

183.   This is an action for damages under the common law for BMW's breach of the implied covenant of good faith and fair dealing.

34

184.   Plaintiffs have fully performed their obligations under the Dealer Agreement and are not in breach thereof.

185.   Under the Standard Provisions, which have been expressly incorporated into and made a part of the Dealer Agreement, BMW expressly agreed to:

> assist Dealer in Dealer's BMW Operations through such means and upon such terms and conditions as BMW NA considers necessary and appropriate.

Section 2(b).

186.   BMW has breached the implied covenant of good faith and fair dealing in the Dealer Agreement by, among other things: (1) requiring Braman to hire an unnecessary amount of employees; (2) requiring Braman to sell a specific quantity of used BMW vehicles; (3) forcing Braman to increase the quantity of service customers by any means necessary to obtain a trading margin that Braman used to receive without condition; (4) penalizing Braman for failing to compete against other motor vehicle line-makes in vehicle segments that BMW does not offer; (5) coercing and attempting to coerce Braman to punch RDRs prior to actual sale; (6) reducing the dealer's unconditional trading margin over many years and substituting in its place a continuing series of conditions and requirements that shift costs and risks onto the dealer; and (7) establishing AVP and other policies, procedures, and practices designed to change, for the benefit of BMW, the structure of the manufacturer-dealer arrangement to wrest control of fundamental aspects of retail BMW dealer operations.

187.   Braman has been and will continue to be damaged by BMW's breach of the implied covenant of good faith and fair dealing in the Dealer Agreement.

WHEREFORE, Plaintiffs demands entry of a judgment against BMW and BMW AG for damages, costs, and for such other relief this Court deems just and equitable.

AFDOCS/21175065.3

**COUNT X**
**Violation of the Florida Dealer Act, Fla. Stat. § 320.64(42)(a)**
**(Against all Defendants)**

188.     Plaintiffs repeat and reallege paragraphs 1-85 as if fully set forth herein.

189.     This is an action for an injunction pursuant to Fla. Stat. § 320.695 for BMW's violation of Fla. Stat. § 320.64(42)(a).

190.     Under Fla. Stat. § 320.64(42)(a), a manufacturer is prohibited from establishing, implementing, or enforcing criteria for measuring the sales or service performance of any of its franchised motor vehicle dealers which have a "material or adverse effect on any motor vehicle dealer" and which "are unfair, unreasonable, arbitrary, or inequitable," or "do not include all the relevant and material criteria, data, or facts," which "include, but are not limited to, those of motor vehicle dealerships of comparable size in comparable markets." Moreover, if "such performance measurement criteria are based, in whole or in part, on a survey, such survey must be based on a statistically significant and valid random sample."

191.     BMW has established, implemented, and through AVP and its Counterclaim sought to enforce an unlawful measure of sales performance known generically as sales effectives and specifically called "Dealer Effectiveness" by BMW.

192.     Establishment, implementation and enforcement of BMW's Dealer Effectiveness sales performance metric adversely affects Plaintiffs.

193.     Dealer Effectiveness compares a dealer's actual sales to the sales "expected" by BMW for that dealer to meet regional market share but adjusted only for the popularity of individual vehicle segments and as determined solely by BMW.

194.     Dealer Effectiveness is an outdated and discredited sales performance metric of the type that was outlawed by the highest court in the State of New York in *Beck Chevrolet Co. Inc. v.*

*General Motors LLC*, 27 N.Y.3d 379 (N.Y. 2016), because it was found to be unfair, unreasonable, and arbitrary on the ground that it did not account for local market conditions and consumer preferences other than segment popularity.

195.   In 2017, the Florida Legislature amended the Florida Dealer Act, adding Fla. Stat. 320.64(42)(a) which, like *Beck*, outlawed sales performance standards like Dealer Effectiveness that "do not include all the relevant and material criteria, data, or facts."

196.   BMW's Dealer Effectiveness metric does not include all relevant and material criteria, data, or facts, and does not fairly compare Plaintiffs to dealerships of comparable size in comparable markets. Rather, it only adjusts for segment popularity and no other market conditions or consumer preferences.

197.   BMW's Dealer Effectiveness metric is unlawful and unenforceable under Florida law.

198.   Plaintiffs, therefore, seek a permanent injunction barring BMW from implementing and enforcing its Dealer Effectiveness performance metric in violation of the Florida Dealer Act.

199.   BMW AG is jointly and severally liable for the unlawful actions of BMW, their affiliate and subsidiary, respectively.

WHEREFORE, Plaintiffs demands entry of a permanent injunction against BMW and BMW AG preventing them from implementing and enforcing the Dealer Effectiveness performance metric as a measure of sales performance, awarding attorneys' fees and costs, and for such other relief this Court deems just and equitable.

**COUNT XI**
**Violation of the Florida Dealer Act, Fla. Stat. § 320.641**
**Unlawful Modifications of the Dealer Agreement**
**(Against all Defendants)**

200.   Plaintiffs repeat and reallege paragraphs 1-85 as if fully set forth herein.

201.    This is an action for damages pursuant to Fla. Stat. § 320.697 for BMW's violation of Fla. Stat. § 320.641.

202.    Nothing in the Dealer Agreement or the Standard Provisions notifies Plaintiffs that BMW intended to fundamentally alter the margins on new vehicles by reducing said margins in favor of so-called incentives or "bonuses" tied to ever-shifting criteria that BMW feels empowered to change on its unilateral whim.

203.    BMW's unnecessary and unreasonable changes to the Dealer Agreement, which penalize Plaintiffs on new vehicle pricing, competitiveness, and margins hurt Braman's bottom line and ability to compete, and will result in lost sales, lost service business, lost profits, and impairment of Braman's investments.

204.    Every change to the AVP Program is an unlawful modification of the Dealer Agreement, constituting a violation of § 320.641. BMW has changed the AVP Program at least once during the pendency of this case, including the 2019 AVP Program, and BMW may change it again tomorrow. Each such change or modification is a symptom of the fundamental change or modification that was never properly made: taking away stable car pricing in favor of individualized, so-called "bonus" elements that BMW has sole authority to unilaterally change and evaluate.

205.    By this pleading, Braman is putting BMW on notice that any future change to the AVP Program constitutes, separately and taken together, unlawful modification(s) of Braman's Dealer Agreement, and as such, any future change or modification is also challenged by this Count.

206.    Braman has been and will continue to be damaged by BMW's unlawful behavior in an amount to be determined at trial.

AFDOCS/21175065.3

207.   BMW AG is jointly and severally liable for the unlawful actions of BMW, its indirect wholly-owned subsidiary.

208.   BMW AG is also liable alone for its violation of the Florida Dealer Act. Through its mandates tied to AVP and implemented through BMW, BMW AG forced the unlawful modification of Braman's Dealer Agreement.

WHEREFORE, Braman demands entry of a judgment against BMW and BMW AG: (1) for a preliminary and permanent injunction on behalf of the Department of Highway Safety and Motor Vehicles and the State of Florida, for the use and benefit of Braman, requiring BMW to restore the previous status quo through an order: (i) voiding the Added Value Program as an unlawful modification; (ii) requiring BMW to reinstitute any unconditional margin, payment, bonus, and structure enjoyed by Braman before the time BMW made any reduction of trading margin; and, (iii) preventing BMW from modifying Braman's dealer agreement further without complying with Fla. Stat. § 320.641; (2) for damages, including treble damages, attorneys' fees and costs; and, (3) for such other relief this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demands trial by jury in this action of all issues so triable.

Dated: February 17, 2021

Respectfully submitted,

**COLSON HICKS EIDSON, P.A**
255 Alhambra Circle
Coral Gables, FL 33134
Tel: (305) 476-7000

By: *Roberto Martinez*

Roberto Martinez
Florida Bar # 305596
bob@colson.com
Curtis Miner
Florida Bar # 885681
curt@colson.com

*Attorneys for Plaintiffs*


Of Counsel:

Russell P. McRory (*pro hac vice*)
Michael P. McMahan (*pro hac vice*)
Charles A. Gallaer (Florida Bar # 117729)
Arent Fox LLP
1301 Avenue of the Americas, Fl. 42
New York, NY 10019 Tel: (212)
484-3942 Fax: (212) 484-3990
russell.mcrory@arentfox.com
michael.mcmahan@arentfox.com
charles.gallaer@arentfox.com


Taniel E. Anderson (*Pro Hac Vice*)
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
taniel.anderson@arentfox.com



David S. Leibowitz
General Counsel
Brian J. Shack
Assistant General Counsel
Braman Management Association
2060 Biscayne Blvd, Second Floor
Miami, FL 33137
davidl@bramanmanagement.com
bshack@bramanmanagement.com