UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

BRAMAN MOTORS, INC., *et al.*

      *Plaintiffs,*

    v.

BMW OF NORTH AMERICA, LLC,

      *Defendant.*

Civil Action No. 17-cv-23360-DPG

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
<u>INCORPORATED MEMORANDUM OF LAW</u>**

Peter S. Baumberger
Michael F. Suarez
**KUBICKI DRAPER, P.A.**
9100 S. Dadeland Blvd., Suite 1800
Miami, Florida 33156
(305) 374-1212
psb@kubickidraper.com
mfs@kubickidraper.com

William N. Berkowitz*
John R. Skelton*
Brandon L. Bigelow*
Alison K. Eggers*
**SEYFARTH SHAW LLP**
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
(617) 946-4800
wberkowitz@seyfarth.com
jskelton@seyfarth.com
bbigelow@seyfarth.com
aeggers@seyfarth.com
* *admitted pro hac vice*

Date:  March 10, 2021

      *Counsel for BMW of North America, LLC*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF MATERIAL UNDISPUTED FACTS ................................... 2

      A.      Braman's Dealer Agreements give BMW the right to set the prices and terms of sale of its products. ......................................................................... 2

      B.      Under the AVP, BMW awarded cash rebates to dealers who achieved certain objectives, including averaging over $15 million to Braman annually from 2016-19........................................................................................................... 3

      C.      Braman was not coerced to make 2015 Fleet Conversions and suffered no harm. .4

      D.      BMW did not require Braman to achieve a "Dealer Effectiveness" threshold........5

III.    ARGUMENT .................................................................................................... 6

      A.      Summary Judgment Standard ................................................................6

      B.      Count I fails because Braman was not coerced to make Fleet Conversions and it suffered no harm. ..................................................................................7

      C.      Count II fails because there was no used vehicle quota in the Dealer Agreements.9

      D.      Counts III and IV fail because Braman suffered no material adverse effect. ........10

      E.      Count V and XI fail because BMW did not modify the Dealer Agreements. .......12

            1.      With respect to "trading margin," Braman's claims are time-barred. ...... 12

            2.      Changes to the AVP are not changes to the Dealer Agreements. ............. 13

      F.      Count VI fails because BMW does not recover its warranty costs from dealers. .14

      G.      Count VII fails because BMW did not restrict Braman's service pricing. ............15

      H.      Counts VIII and IX fail because BMW did not breach the Dealer Agreements and because Braman sustained no damages. ...........................................................15

            1.      There was no breach by coercion and Braman suffered no harm. ............ 16

            2.      Plaintiffs sustained no damages from any alleged failure to reasonably evaluate Braman's sales performance.................................................... 17

      I.      Count X fails because BMW did not "enforce" its Dealer Effectiveness metric and because Braman did not sustain any material adverse effect................................19

IV.     CONCLUSION................................................................................................. 19

      REQUEST FOR HEARING.................................................................................. 20

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*American Bankers Ins. Group, Inc. v. U.S.*,
   308 F. Supp. 2d 1360 (S.D. Fla. 2004), *rev'd on other grounds*, 408 F.3d 1328
   (11th Cir. 2005)................................................................................................................11

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...........................................................................................................6

*Asian Pacific Indus., Inc. v. Cal. New Motor Vehicle Bd.*,
   Case No. 34-2018-80002866 (Cal. Super. Ct. Jan. 14, 2019)..................................13

*Asset Management Holdings, LLC v. Assets Recovery Center Inv., LLC*,
   238 So.3d 908 (Fla. 2d DCA 2018) ..........................................................................17

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assoc.*,
   182 N.J. 210 864 A.2d 387 (2005)..............................................................................16

*Burger King Corp. v. Weaver*,
   169 F.3d 1310 (11th Cir. 1999) ...................................................................................17

*Cabriolet Porsche Audi, Inc. v. American Honda Motor Co., Inc.*,
   773 F.2d 1193 (11th Cir. 1985) .................................................................................7, 9

*Caro Associates II, LLC v. Best Buy Co.*,
   2012 WL 762304 (D.N.J. March 2, 2012) .................................................................18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................................................................6

*Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*,
   420 F.3d 1146 (11th Cir. 2005) ...................................................................................16

*Colonial Dodge v. Chrysler Corp.*,
   11 F. Supp. 2d 737 (D. Md. 1996), *aff'd*, 121 F.3d 697 (11th Cir. 1997) ................7

*Coyle v. Englander's*,
   199 N.J. Super. 212 (App. Div. 1985) ......................................................................15

*Davidson v. Grady*,
   105 F.2d 405 (5th Cir. 1939) .......................................................................................13

*Florida Ass'n of Professional Lobbyists, Inc. v. Division of Legislative
   Information Services of the Florida Office of Legislative Services*,
   431 F. Supp. 2d 1228 (N.D. Fla. 2006)......................................................................10

*Giacobbe v. QBE Specialty Ins. Co.*,
   2018 WL 4110924 (D.N.J. Aug. 28, 2018) ...............................................................18

*Globe Motor Co. v. Igadaleg*,
   225 N.J. 469, 139 A.3d 57 (2016).................................................................................17, 18

*Harmony Homes, Inc. v. U.S. on*
   *behalf of Small Bus. Admin.*, 936 F. Supp. 907, 914 (M.D. Fla. 1996), aff'd
   124 F.3d 1299 (11th Cir. 1997) ...................................................................................13

*Hospital Corp. of America v. Florida Med. Ctr., Inc.*,
   710 So.2d 573, 575 (Fla. 4th DCA 1998) ...................................................................17

*Long-Lewis Sterling W. Star of Bessemer v. Sterling Truck Corp.*,
   460 Fed. App'x 819 (11th Cir. 2012) ...........................................................................7

*Lussier Enterprises, Inc. v. Subaru of New England, Inc.*,
   393 F.3d 36 (1st Cir. 2004).........................................................................................7

*McConnell Wetenhall Citrus Properties v. Special Disability Trust Fund*,
   304 So. 2d 112 (Fla. 1974)..........................................................................................10

*Quantachrome Corp. v. Micromeritics Instrument Corp.*,
   189 F.R.D. 697 (S.D. Fla. 1999) .................................................................................8

*Recovery Racing, LLC v. Maserati North America, Inc.*,
   261 So.3d 600 (Fla. 4th Dist. 2019)............................................................................13

*Rudd v. State ex rel. Christian*,
   310 So. 2d 295 (Fla. 1975)..........................................................................................10

*United States v. Bonilla–Montenegro*,
   331 F.3d 1047, 1051 (9th Cir. 2003) ..........................................................................11

*Walker v. Darby*,
   911 F.2d 1573 (11th Cir. 1990) ..................................................................................6

*Wassau Underwriters Ins. Co. v. Danfoss, LLC*,
   310 F.R.D. 683 (S.D. Fla. 2015), aff'd, 310 F.R.D. 689 (S.D. Fla. 2015) ...............8

*Wilson v. Amerada Hess Corp.*,
   168 N.J. 236, 773 A.D. 1121 (N.J. 2001) ..................................................................17

*Winemiller v. Feddish*,
   568 So.2d 483 (Fla. 4th DCA 1990) ...........................................................................10

*Wistar v. Raymond James Financial Services, Inc.*,
   365 F. Supp. 3d 1266 (S.D. Fla. 2018) .......................................................................15

**Statutes**

15 U.S.C. §§ 1221-1226 ..................................................................................................7

Fla. Stat. § 95.11 ...........................................................................................................13

Fla. Stat. § 320.60 .........................................................................................................10

Fla. Stat. §§ 320.64 .................................................................................................. *passim*

Fla. Stat. § 320.641 .......................................................................................................12

Fla. Stat. § 320.696 .......................................................................................................14

Fla. Stat. § 320.697 .........................................................................................................9

**Other Authorities**

Fed. R. Civ. P. 56(a) .......................................................................................................6

Defendant BMW of North America, LLC ("BMW") moves for summary judgment on all plaintiffs' claims herein.

## I.       <u>INTRODUCTION</u>

The plaintiffs are two affiliated Florida corporations (collectively, "Braman") operating BMW motor vehicle dealerships in Miami and West Palm Beach under dealer agreements with Defendant BMW of North America, LLC ("BMW"). The majority of Braman's claims against BMW fall into three categories. ***First***, under Counts I, VIII, and IX of its Fourth Amended Complaint (Dkt No. 222, "4th Am. Compl."), Braman alleges that in 2015 it was coerced to move new BMW vehicles out of its inventory and into its fleet of employee, loaner, and demonstrator vehicles (the "2015 Fleet Conversions") – a practice Braman refers to as "punching." These claims fail as a matter of law because, based on the undisputed facts, there was no coercion and Braman has not identified any damages or harm sustained by either dealership as a result of this alleged "punching." Rather, Braman undertook the 2015 Fleet Conversions voluntarily, obtaining over $2.7 million in cash incentives from BMW to do so.

***Second,*** under Counts III and IV, Braman complains about BMW's "Added Value Program" ("AVP"), a collection of dealer incentive programs under which BMW paid Braman the maximum amount offered for achieving certain performance thresholds, averaging more than $15 million annually from 2016-19. Braman claims certain components of AVP were unreasonable, and therefore in violation of the Florida Dealer Act, Fla. Stat. §§ 320.60-320.70 ("FDA"). While BMW contests this, the dispute is immaterial because Braman cannot establish it was materially harmed by any component of AVP, an essential element of each of these

claims.[1] On the contrary, the undisputed facts show Braman was greatly benefited by the subject programs.

*Third*, under Counts V and XI, Braman claims its BMW franchise agreements were unilaterally "modified" by BMW in violation of the FDA – first by reducing Braman's "trading margin" some twenty years ago, and second, by making changes to the AVP in 2016-17.  These "modification" claims fail as a matter of law because no agreement was modified.[2]  Rather, BMW simply exercised its contractual rights under its franchise agreements to change product pricing and terms of sale (including rebates offered under the AVP).  In addition, Braman's complaint regarding the reduction of its "trading margin" twenty years ago is time-barred.

Plaintiffs' remaining claims for breach of its franchise agreements and violation of the FDA also fail as a matter of law, as discussed below.

## II.   SUMMARY OF MATERIAL UNDISPUTED FACTS

### A.   Braman's Dealer Agreements give BMW the right to set the prices and terms of sale of its products.

Braman Motors, Inc. ("Braman Miami") and Palm Beach Imports, Inc. ("Braman WPB") (collectively "Braman") are two affiliated BMW dealerships operating in Miami and West Palm Beach, Florida respectively under separate 1999 and 2005 franchise agreements (collectively, "Dealer Agreements").  BMW's Statement of Material Facts ("SMF"), ¶ 1.  Under the Dealer Agreements, BMW expressly reserved the sole right to determine pricing of all vehicles sold to

---

[1] *See* Fla. Stat. § 320.64(42)(a) (requiring proof of material adverse effect on dealer).

[2] Braman alleges that when BMW first introduced the AVP (in or about 2000), it simultaneously reduced the "trading margin" for all BMW dealers, and this was a unilateral change to the parties' franchise agreements.  The term "trading margin" does not appear in any agreement between Braman and BMW.  Braman defines the term as "the difference between the wholesale price set by BMW for dealer vehicle purchases and the Manufacturer's Suggested Retail Price ('MSRP') set by BMW for retail consumers."  4th Am. Compl. ¶ 32.

Braman and all other terms of sale, including "any and all rebates, refunds, credit allowances, discounts, and other payments or adjustments made by BMW." SMF, ¶ 3.

> **B.** **Under the AVP, BMW awarded cash rebates to dealers who achieved certain objectives, including averaging more than $15 million to Braman annually from 2016-19.**

In or about 2000, BMW established and thereafter maintained its "Added Value Program," the umbrella name for a collection of individual incentive programs it offers to all BMW dealers. The AVP awards cash rebates on a per vehicle basis ("Rebates") to those dealers who achieve specified metrics or perform designated tasks identified by BMW. SMF, ¶ 4.[3] Over the approximately twenty years during which AVP has been in place, its components and terms have changed in response to market conditions and dealer feedback, often annually, but occasionally more frequently. However, while looking to incentivize improved dealer performance or actions, BMW has consistently set the payout thresholds for each of the AVP components at levels which it believes will be relatively modest and easy for BMW dealers to achieve. Each year from 2016-19, more than ninety percent (90%) of all BMW dealers nationwide achieved all AVP metrics and received the maximum Rebates available under the AVP, including the Braman dealerships. In all respects, the AVP has been no different for Florida dealers, including Braman, than for all other U.S. BMW dealers. SMF, ¶ 5.

---

[3] Rebates are calculated as a percentage of MSRP for each individual vehicle. SMF, ¶ 4. In 2017 and 2018, AVP included four components: (1) BMW "Genius," (2) "Dealer Sales Loyalty" ("Sales Loyalty"), (3) "Service Effectiveness," and (4) "Total Pre-Owned," each of which is explained in detail in "AVP Guides" provided to dealers. The BMW Genius and Total Pre-Owned components were introduced in 2016, while the Sales Loyalty and Service Effectiveness components were introduced in 2017. SMF, ¶ 6. In 2019, the "Total Pre-Owned" component was replaced by two new components, "Training" and "Advertising Guidelines," which incentivized dealers to accomplish certain training and advertising metrics identified in the 2019 AVP Guide. *Id*. If BMW dealers achieve the thresholds specified under AVP, they receive the corresponding Rebates; if they do not achieve them, they do not receive Rebates, but there are no penalties or other negative consequences for such dealers. Achievement of AVP performance thresholds is not required or mandatory for any BMW dealer. SMF, ¶ 7.

During the four-year period of 2016-19, Braman received over $60 million in AVP payments from BMW, with the Miami dealership receiving approximately $27 million and Braman WPB receiving over $33 million.  SMF, ¶ 8.  For each year since and including 2016 and continuing to the present day, each of the Braman dealerships received maximum payments under each of the AVP components.   Indeed, neither Braman dealership claims that any otherwise eligible AVP payments have been withheld.  SMF, ¶ 9.  While Braman has proffered three financial expert witnesses in this case, none has opined that Braman sustained any damages or adverse effects from the AVP (on any individual component thereof), as there is no evidence of harm.  SMF, ¶¶ 31-35.[4]

### C.     Braman was not coerced to make 2015 Fleet Conversions and suffered no harm.

In addition to selling BMW vehicles to consumers, BMW dealers may also move BMW vehicles out of their new vehicle inventory and into their own fleets for their own use as employee vehicles, customer loaners or demonstrator vehicles ("Fleet Conversions").  When a dealer elects to do so, it must report such a Fleet Conversion to BMW.  SMF, ¶ 18.  From time to time, including in 2015, BMW provided dealers per-vehicle cash incentives for certain Fleet Conversions.  At all times, it was up to BMW dealers, including Braman, to decide whether or not they wished to make Fleet Conversions and receive any applicable incentives offered by

---

[4]  In response to Interrogatories calling on Braman to identify its damages, Braman claimed "its costs increased because of changes to the AVP program," and specifically claimed (i) increased costs from hiring and retaining BMW Geniuses, and (ii) "a percentage of the salaries of sales and service managers."  SMF, ¶ 10.  However, Braman did not incur any increased personnel costs for the AVP other than costs associated with hiring and retaining BMW Geniuses.  SMF, ¶¶ 12-17.  The hiring and retention of BMW Geniuses cost Braman Miami less than $350,000 per year and cost Braman WPB less than $250,000 per year.  SMF, ¶ 11.  The two dealerships received far in excess of those amounts from BMW in AVP-Genius payments alone.  SMF, ¶ 8.  Notably, Braman's expert did not examine AVP-related expenses incurred by either Braman Miami or Braman WPB.  SMF ¶ 33.  And, none of Braman's three experts opine or contend that Braman suffered any damages or adverse effects as a result of any AVP component.  SMF, ¶¶ 31-35.

BMW.  SMF, ¶ 19.  During 2015, Braman Miami accepted $1,551,500 in cash incentives from BMW for hundreds of Fleet Conversions, while Braman WPB accepted $1,170,000 in cash incentives from BMW for hundreds of Fleet Conversions.  Neither dealership ever offered to return those incentive payments to BMW or asked to reverse any of these many Fleet Conversions.  SMF, ¶ 20.  BMW never coerced either Braman dealership to make any Fleet Conversions.  SMF, ¶¶ 21-22.[5]

Moreover, Braman does not identify any damages or harm sustained by either dealership as a result of alleged "punching."  SMF, ¶¶ 34, 36-38.  Instead, Braman's expert opines only that one of the dealerships—Braman WPB—experienced a reduction in its "transactional margins."  But that expert has no opinion and did not determine whether that alleged reduction was offset by incentive payments received from BMW, and therefore does not opine as to whether Braman WPB was actually damaged or harmed as a result of "punching."  SMF, ¶¶ 37-38.

### D.    BMW did not require Braman to achieve a "Dealer Effectiveness" threshold.

Over ten years ago, BMW established and implemented a sales performance metric called "Dealer Effectiveness," which, in general terms, measures a dealer's market share for BMW vehicles in its Primary Market Area as compared with BMW's regional market share.[6]  The metric is one of several that BMW uses to track dealer sales performance, the results of which are shared with dealers.  Specifically, BMW includes the dealer's "score" on the Dealer Effectiveness metric, along with its scores on various other performance metrics, on each

---

[5]  Nor did BMW coerce either dealership to purchase any BMW vehicles.  SMF, ¶¶ 23-24. BMW offers vehicles to its dealers nationwide through the BMW Allocation System.  Under this System, dealers are allocated a certain number of vehicles each month, by model, from which they can (but are not required to) purchase from BMW.  In the exercise of its own discretion, Braman has declined to purchase many vehicles allocated to it by BMW.  SMF, ¶¶ 26-27.

[6]  BMW's U.S. operations are divided into four geographic "regions," corresponding to the Eastern, Southern, Central and Western United States.  SMF, ¶ 28, n.1.

dealer's "balanced score card," provided to every BMW dealer individually (and periodically updated).  BMW has never "enforced" its Dealer Effectiveness metric in Florida by requiring any BMW dealer, including Braman specifically, to achieve any particular level or score under this metric or by taking any punitive or adverse action against any such dealer (including Braman) for failing to do so.  SMF, ¶¶ 28-29.[7]

### III.   ARGUMENT

#### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing [substantive] law," and a dispute as to that fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine dispute of material fact for trial.  *Id.* at 323.  "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

---

[7]  Additional undisputed facts are set forth in the context of the Argument, below.

**B.**    **Count I fails because Braman was not coerced to make Fleet Conversions and it suffered no harm.**

Under Count I, Braman claims that in 2015 BMW coerced or attempted to coerce it to report Fleet Conversions (or in Braman's vernacular, "punch RDRs") in violation of Fla. Stat. §§ 320.64(5) and (6).[8]  In order to prevail on this claim, Braman must proffer evidence from which a reasonable fact-finder could find that BMW coerced or attempted to coerce Braman to make or report Fleet Conversions.  As regards the commercial relationship between automakers and their dealers, acts of "coercion" are prohibited under federal law, 15 U.S.C. §§ 1221-1226, and the laws of many states, including Florida.  The term "coercion" has the same meaning under Florida law as it does under federal law.  *Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co., Inc.,* 773 F.2d 1193, 1209-11 (11th Cir. 1985).  *See also Lussier Enters., Inc. v. Subaru of New England, Inc.,* 393 F.3d 36, 47-48 (1st Cir. 2004) ("courts have consistently held that 'coercion' under state dealer statutes holds the same meaning as under the ADDCA [namely, a wrongful demand and threat of sanctions]").  In this context, "coercion" means (1) a wrongful demand combined with (2) a threat of sanctions if the demand is not carried out.  *Cabriolet,* 773 F.2d at 1210; *Long-Lewis Sterling W. Star of Bessemer v. Sterling Truck Corp.,* 460 Fed. App'x 819, 820 (11th Cir. 2012).  Notably, "[e]very circuit court of appeals that has addressed the issue [of coercion] has held that coercion or intimidation must include a wrongful demand accompanied by the threat of sanctions for noncompliance."  *Colonial Dodge v. Chrysler Corp.*, 11 F. Supp. 2d 737, 743 (D. Md. 1996), *aff'd,* 121 F.3d 697 (11th Cir. 1997).  *See* Fifth Circuit Pattern Jury

---

[8]  Fla. Stat. §§ 320.64(5) and (6) provide that it is unlawful for a manufacturer to:  (5) . . . coerce[ ] or attempt[ ] to coerce any motor vehicle dealer into accepting delivery of any motor vehicle or vehicles or parts or accessories therefor or any other commodities which have not been ordered by the dealer [or]  (6) . . . coerce[ ] or attempt[ ] to coerce any motor vehicle dealer to enter into any agreement with the [manufacturer or distributor].  Braman's claim is limited to 2015.  *See* 4th Am. Compl. ¶ 90 ("In or about 2015 . . . BMW engaged in a nationwide practice of . . . 'punching'. . . . ") and ¶ 96 ("In or about the end of 2015, Braman . . . stopped punching. . . .").

Instruction (Civil 2020), ¶ 13.1.[9]  Mere "recommendation, endorsement, exposition, persuasion, urging or argument" are *not* "coercion" under the FDA or federal law.  *Cabriolet,* 773 F.2d at 1210.

Here, there was no coercion or attempted coercion as a matter of undisputed fact. BMW's Area Manager Carol Strickland, responsible for Braman's business relationship since 2014, avows, "At no time during my tenure as Area Manager did BMW ever demand that either Braman Miami or Braman WPB make or report any Fleet Conversions; nor has either dealership ever been penalized - or threatened with any penalty or adverse action - for electing not to do so."  SMF, ¶¶ 29.  Braman's own personnel are unaware of any coercion (*i.e*., a wrongful demand plus threat of sanctions for non-compliance) by BMW.  SMF, ¶¶ 21-22.  Braman Miami's sales manager of nineteen years testified that the dealership "always ha[d] a choice" as to whether to make Fleet Conversions, and was unaware of any "sort of punishment or negative consequences for the dealership" should it fail to do so.  SMF, ¶ 21 (Deposition of Guillermo Peraza, 47:11-54:13).  The plaintiffs' Rule 30(b)(6) designee on the topic of coercion testified he was unaware of any punitive action against either Braman dealership for any alleged failure to undertake Fleet Conversions.   SMF, ¶¶ 21-22 (Deposition of Alex Shack, 111:7-113:13).[10]

---

[9]  Available at https://www.lb5.uscourts.gov/viewer/?/juryinstructions/fifth/2020civil.pdf.

[10]  Alex Shack was designated by both plaintiffs to testify to "[a]ny instance in which BMW threatened to impose sanctions on Braman or deprive Braman of benefits to which it was contractually entitled if Braman failed or refused to report vehicles as having been sold by submitting a [RDR] during 2015…."  Shack Deposition, 16:23-17:11, 22:4-7; Eggers Decl., Exs. K-L (Topic 8).  Shack is the Chief Operating Officer of Braman Automotive Group, the entity that oversees the operations of the plaintiff dealerships.  Shack Deposition, 9:6-12:24.  A corporate representative designated to testify at a Rule 30(b)(6) deposition must be prepared to provide complete and knowledgeable answers on behalf of the company.  *Quantachrome Corp. v. Micromeritics Instrument Corp*., 189 F.R.D. 697, 699 (S.D. Fla. 1999); *Wassau Underwriters Ins. Co. v. Danfoss, LLC,* 310 F.R.D. 683, 685 (S.D. Fla. 2015), aff'd, 310 F.R.D. 689 (S.D. Fla. 2015).

Other Braman witnesses (Stephen Grossman and Lisa Solodar) were similarly unaware of any coercion.  SMF, ¶ 22.

Rather than coerce Braman to do anything, BMW offered and Braman accepted over $2.7 million in incentive payments for Braman to undertake hundreds of Fleet Conversions in 2015 alone – which Braman undisputedly and repeatedly pocketed, kept, and never offered to return. SMF, ¶ 20.  Had Braman decided not to convert vehicles, it would not have received these cash payments – but that is hardly coercive; it was a series of opportunities of which Braman chose to take advantage.  *See Cabriolet Porsche Audi,* 773 F.2d at 1210 ("We find nothing coercive in presenting to a car dealer an opportunity to reap substantial profits. . . .").[11]

Even if Braman could show that BMW coerced it to punch vehicles, which it cannot, Braman has not suffered any pecuniary loss.  SMF, ¶¶ 34-38.  Under the FDA, a dealer may only sue for damages if it "has suffered pecuniary loss or . . . has been otherwise adversely affected because of a violation."  Fla. Stat. § 320.697.  It is Braman's burden to establish that "punching" caused it injury.  Because it has not done so, Count I fails as a matter of law for this reason alone. *See Cabriolet*, 773 F.2d at 1214 (holding that even if the FDA applied, claims should have been dismissed because "no pecuniary injury was suffered" by the dealer).

**C.    Count II fails because there was no used vehicle quota in the Dealer Agreements.**

Under Count II, Braman claims BMW violated Fla. Stat. § 320.64(34), which prohibits manufacturers from "includ[ing] in any franchise agreement with a motor vehicle dealer a mandatory obligation or requirement of the motor vehicle dealer to purchase, sell, or lease, or offer for purchase, sale, or lease, any quantity of used motor vehicles."  In short, the law

---

[11]  BMW expects Braman to raise an immaterial issue of fact by claiming that BMW incentivized Fleet Conversions in order to inflate its publicly reported sales.  However, BMW's motives are irrelevant to whether Braman was subjected to unlawful coercion under Florida law.  If Braman was not coerced – and it was not as a matter of law – there was no violation of the FDA.

prohibits including a used vehicle quota in its franchise agreements.[12] That did not occur here as a matter of undisputed fact.

The Dealer Agreements do not include any "mandatory obligation or requirement" that Braman "purchase, sell, or lease, or offer for purchase, sale, or lease, any quantity of used motor vehicles." *See id*. Nor has any such obligation been "included" in the Dealer Agreements at any time since 1999. SMF, ¶ 2. Any suggestion that the AVP somehow violates the law fails because there has never been any "mandatory obligation or requirement" that Braman purchase or sell "any quantity of used motor vehicles." Rather, through the AVP, BMW merely offered cash Rebates to Braman if it achieved certain sales levels for used vehicles, which it did. Count II fails as a matter of law.

### D. Counts III and IV fail because Braman suffered no material adverse effect.

In Counts III and IV, Braman claims that the Sales Loyalty and Service Effectiveness components of the AVP which were introduced in 2017 are unreasonable in various ways and therefore violate Fla. Stat. § 320.64(42)(a), which declares it unlawful for a manufacturer to have:

> established, implemented, or enforced criteria for measuring the sales or service performance of any of its franchised motor vehicle dealers in this state *which have a material or adverse effect on any motor vehicle dealer* and which: 1. Are unfair, unreasonable, arbitrary, or inequitable; or 2. Do not include all relevant and material local and regional criteria, data, and facts….

Fla. Stat. § 320.64(42)(a) (emphasis added).[13]

---

[12] "Franchise Agreement" means "a contract, franchise, new motor vehicle franchise, sales and service agreement, or *dealer agreement* or any other terminology used to describe the contractual relationship between a manufacturer, factory branch, distributor, or importer, and a motor vehicle dealer, pursuant to which the motor vehicle dealer is authorized to transact business pertaining to motor vehicles of a particular line-make." Fla. Stat. § 320.60(1) (emphasis added).

[13] Fla. Stat. § 320.64(42)(a) regulates sales performance criteria "which have a material *or* adverse effect on any motor vehicle dealer. . . ." (emphasis added). Although the word "or" is

BMW disputes Braman's claim that the AVP criteria were unreasonable in any way, but that dispute is immaterial because Braman suffered no adverse effect from BMW's introduction and maintenance of these AVP components.  On the contrary, both Braman dealerships were greatly enriched.  The two Braman dealerships received over $26 million under these two AVP components alone from 2017 through 2019.  SMF, ¶ 8.  And, Braman admits they received the maximum Rebates available under these (and all other) components of AVP.  SMF, ¶ 9.  Although the plaintiffs have retained three financial expert witnesses – two accountants and an economist – to testify on their behalf, none of them has opined that either plaintiff sustained any adverse effect from any part of the AVP.  SMF, ¶¶ 31-35.

---

ordinarily interpreted disjunctively, courts applying Florida law may interpret "or" in the *conjunctive* where necessary to prevent an absurd or nonsensical result.  *See, e.g., McConnell Wetenhall Citrus Props. v. Special Disability Trust Fund*, 304 So. 2d 112, 114-115 (Fla. 1974) (interpreting "or" in the conjunctive sense to effectuate meaning of statute); *Rudd v. State ex rel. Christian,* 310 So. 2d 295, 298 (Fla. 1975) (construing "or" in conjunctive sense "when a construction based on the strict letter of the statute would lead to an unintended result and would defeat the evident purpose of the legislation"); *Winemiller v. Feddish,* 568 So.2d 483, 484 (Fla. 4th DCA 1990) (construing "and" as an "or" holding that "a literal interpretation of the language of a statute need not be given when to do so would lead to unreasonable conclusions or defeat legislative intent."); *Florida Ass'n of Prof'l Lobbyists, Inc. v. Div. of Legislative Info. Servs. of the Florida Office of Legislative Servs.,* 431 F. Supp. 2d 1228, 1234 (N.D. Fla. 2006) ("A statute written in the conjunctive must be construed as it is plainly written unless doing so yields absurd results or is contrary to legislative intent."); *Am. Bankers Ins. Group, Inc. v. U.S.*, 308 F. Supp. 2d 1360, 1365 (S.D. Fla. 2004), *rev'd on other grounds*, 408 F.3d 1328 (11th Cir. 2005) ("[I]t is equally clear that 'a statute's use of disjunctive or conjunctive language is not always determinative. Rather, we must strive to give effect to the plain, common-sense meaning of the enactment without resorting to an interpretation that def[ies] common sense.'"), *citing United States v. Bonilla–Montenegro*, 331 F.3d 1047, 1051 (9th Cir. 2003)).

Here, a conjunctive interpretation of "or" is plainly necessary to avoid an absurd result.  If read in the disjunctive, the word "material" would relate solely to dealers who are *positively* (non-adversely) affected by sales performance criteria.  Specifically, dealers *materially and positively* affected by criteria would have a cause of action under the statute, while dealers who are positively – *but immaterially* – affected would not have a cause of action.  This is plainly an absurd result – one which requires the phrase "material or adverse effect" to be construed in the conjunctive sense.  Doing so would be consistent with the obvious legislative intent to allow a cause of action solely to dealers materially aggrieved by unreasonable performance criteria.

11

Finally, it is undisputed that Braman incurred no identifiable, incremental expenses to achieve the AVP thresholds; rather, it simply continued to employ the same sales and service practices it had used prior to their introduction.  SMF, ¶¶ 12-15.  When asked, "Do you do those things *because of the AVP* or do you do those things as a matter of course in your business *anyway*?" Braman Miami's General Sales Manager testified, "We do those things *because for us it's best practices*, and that's obviously made a difference with our personnel, with our customers and our clientele."  Peraza Dep., 24:15-20 (emphasis added).

In short, rather than causing any "adverse" effects, the AVP components that Braman challenges yielded an enormous financial windfall for the plaintiffs.  As noted above, when asked to identify its damages from the AVP (and other claims), Braman answered that "its costs increased because of changes to the AVP program."  *See supra* note 4.  Even if Braman could proffer some evidence of expenses it incurred to receive the more than $26 million paid by BMW, which it cannot, that would be insufficient to withstand summary judgment.  Rather, in order to establish that it was materially adversely affected by these AVP criteria, Braman would have to proffer evidence from which a reasonable fact-finder could conclude that its expenses were greater than its receipts from BMW, and that those expenses were attributable to something unlawful in the programs (as distinguished from the dealer's business judgment about how best to achieve the specified program targets).  This Braman cannot do, and BMW is therefore entitled to summary judgment on Counts III and IV.

> ### E.    Count V and XI fail because BMW did not modify the Dealer Agreements.
>
> #### 1.    With respect to "trading margin," Braman's claims are time-barred.

Braman claims that BMW's introduction of the AVP altered its "trading margin" and therefore constitutes an unlawful modification under Fla. Stat. § 320.641.  4th Am. Compl.,

¶ 33.[14]  However, because the AVP was introduced in or about 2000 (seventeen years before Braman filed its complaint), any such claim could only have been brought many years earlier. Accordingly, since the statute of limitations for a statutory claim is four years (*see* Fla. Stat. § 95.11(3)(f)), Braman's statutory claims for unlawful modification are time-barred and otherwise barred by laches.  *See* Fla. Stat. § 95.11(6); *Davidson v. Grady*, 105 F.2d 405, 408 (5th Cir. 1939) (dismissing claim holding that "the delay is far beyond that fixed by an applicable statute of limitation, by so much the more will the defense of laches be sustained"); *Harmony Homes, Inc. v. U.S. on behalf of Small Bus. Admin.*, 936 F. Supp. 907, 914 (M.D. Fla. 1996), aff'd 124 F.3d 1299 (11th Cir. 1997) (dismissing claim holding that "Florida Statute § 95.11(6) provides that laches automatically bar any action that would be barred by the statute of limitations.").

### 2.  Changes to the AVP are not changes to the Dealer Agreements.

Braman's claims independently fail as a matter of law because a change to an incentive program, such as AVP, does not modify the Dealer Agreements.  *Recovery Racing, LLC v. Maserati N. Am., Inc.,* 261 So.3d 600, 604 (Fla. 4th Dist. 2019).  In *Recovery Racing*, the Florida District Court of Appeal held that Maserati's 2017 incentive program did not modify the existing franchise agreement between Maserati and the dealers because "[n]othing in the existing franchise agreement addresses the details of the 2017 program—nothing about . . . a guaranteed trading margin, nothing about incentive payments . . . [and the] provisions [of the incentive program] fit within the ambit of Maserati's discretion to establish policies and practices as set

---

[14]  Fla. Stat. § 320.641(1)(a) provides, in relevant part, that a manufacturer or distributor must provide 90 days written notice of its intent to "modify a franchise . . . which modification . . . will adversely alter the rights or obligations of a motor vehicle dealer under an existing franchise agreement or will substantially impair the sales, service obligations, or investment of the motor vehicle dealer. . . ."

forth in that agreement." 261 So.3d at 604.[15] Likewise here, the Dealer Agreements expressly reserved to BMW the right to change the pricing and terms of sale of BMW products – including product "rebates" and "discounts." SMF, ¶ 3. The implementation and modification of the AVP and its components are an exercise of that clear right – *not* a change to any provision of the Dealer Agreements.

> ### F.   Count VI fails because BMW does not recover its warranty costs from dealers.

Braman claims in Count VI that the AVP violates Fla. Stat. § 320.696(6), which makes it unlawful for a manufacturer or distributor to "recover or attempt to recover, directly or indirectly, any of its [warranty reimbursement] costs for compensating a motor vehicle dealer under this section." This provision prevents manufacturers from collecting money from dealers as an offset to its statutory obligation to reimburse dealers for performing warranty repairs. It has nothing to do with incentive programs such as the AVP. Indeed, it is undisputed that BMW has never collected any money from Braman (or other dealers) for participation in the AVP or otherwise to offset or cover warranty or other reimbursements. SMF, ¶ 7. Rather, as noted above, BMW paid Braman over $60 million under the AVP from 2016 through 2019. SMF, ¶ 8. Accordingly, this claim fails as a matter of law because there is no evidence showing any connection between the AVP and BMW's warranty expense costs.

---

[15] As the court in *Recovery Racing* observed, "[s]elling motor vehicles is not like selling corn flakes and milk. The industry is sensitive to external factors—competitors, interest rates, gasoline prices, and tariffs, to name a few—and the existing franchise agreement gives manufacturers the flexibility to quickly respond to changes in the marketplace without having to pass through a gauntlet of administrative proceedings." 261 So.3d at 604. *See also Asian Pacific Indus., Inc. v. Cal. New Motor Vehicle Bd.,* Case No. 34-2018-80002866, at *9 (Cal. Super. Ct. Jan. 14, 2019) (copy submitted as Exhibit A hereto) (change to incentive program does not constitute franchise modification under comparable California franchise law).

**G.      Count VII fails because BMW did not restrict Braman's service pricing.**

Braman claims in Count VII that BMW violated Fla. Stat. § 320.696(7), which makes it unlawful for a manufacturer to "require, influence, or attempt to influence a motor vehicle dealer to implement or change the prices for which it sells parts or labor in retail customer repairs." This claim fails because BMW never required Braman to change its prices for parts or labor in retail customer repairs. SMF, ¶ 25. Braman has alleged no facts nor proffered any evidence that BMW required or urged Braman to reduce its customer service prices. To survive summary judgment, Braman must do more than allege that BMW somehow violated this provision; it must proffer evidence that BMW unlawfully required or influenced Braman to change its prices and Braman was thereby harmed. Because no such evidence exists, this claim fails as a matter of law.

**H.      Counts VIII and IX fail because BMW did not breach the Dealer Agreements and because Braman sustained no damages.**

Counts VIII and IX allege breach of express and implied provisions of the Dealer Agreements, respectively. Braman claims BMW breached the Dealer Agreements by (1) coercing Braman to make Fleet Conversions, and (2) using the "Dealer Effectiveness" criteria to evaluate Braman's sales performance. 4th Am. Compl., ¶¶ 180, 186. To succeed on a breach of contract claim, Braman must prove a valid contract, a material breach, and damages. *See Wistar v. Raymond James Fin. Servs., Inc.,* 365 F. Supp. 3d 1266, 1269 (S.D. Fla. 2018) (applying Florida law); *Coyle v. Englander's*, 199 N.J. Super. 212, 223 (App. Div. 1985) (applying New Jersey law).[16]

---

[16]   There are two Dealer Agreements between BMW and each of the plaintiffs – a 1999 Agreement governing passenger cars (Pedenski Decl., Exs, A-B, E) and a 2005 Agreement governing "sports activity vehicles." (Pedenski Decl., Exs. C-D, F). The 1999 Agreement does not specify a governing law, while the 2005 Dealer Agreement (¶18(o)) states that it is to be governed by New Jersey law (where BMW is headquartered). The Court need not determine

### 1.    There was no breach by coercion and Braman suffered no harm.

Plaintiffs' claim that BMW breached the Dealer Agreements by coercing Braman to undertake or report Fleet Conversions is contrary to the undisputed facts.  SMF, ¶¶ 21-22.  As discussed above, Braman's witnesses, including its Rule 30(b)(6) representative on the topic of coercion, could not identify any instance in which Braman was coerced to make or report Fleet Conversions by BMW.  *Id.* (Deposition of Alex Shack, 111:7-113:13).  Thus, even assuming there was an express prohibition of "coercion" in the Dealer Agreements (which there is not), there was no coercion here, and therefore, no breach.[17]  Nor was there any violation of the implied covenant of good faith, since the act claimed to have been a breach of the covenant – coercion – never occurred, and there is no evidence to suggest that plaintiffs were otherwise denied the reasonably expected benefits of their Dealer Agreements.  *Centurian Air Cargo,* 420 F.3d at 1151 (under Florida law, implied covenant is intended to "protect the parties' reasonable contractual expectations"); *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assoc.,* 182 N.J. 210, 225 864 A.2d 387 (2005) (under New Jersey law, the implied covenant plaintiff "must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.").  Moreover, even if Braman had evidence that BMW coerced it to punch vehicles, which it does not, Braman suffered no harm as a result of its alleged punching. SMF, ¶¶ 34, 36-38.

---

which law applies as between Florida and New Jersey, as there is no difference between the two that is material to the resolution of Braman's breach of contract claims, as discussed herein.

[17]  Likewise, "a claim for breach of the implied covenant cannot be maintained under Florida law in the absence of a breach of the express term of a contract."  *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.,* 420 F.3d 1146, 1152 (11th Cir. 2005).

### 2. Plaintiffs sustained no damages from any alleged failure to reasonably evaluate Braman's sales performance.

For its second claimed breach of contract, Braman points to Section 5(b) of the Dealer Agreements, which states, "Dealer will obtain the best possible sales performance obtainable for BMW Vehicles" and "[s]uch sales performance shall be evaluated on the basis of such reasonable and equitable criteria as may be determined from time to time by BMW NA." Braman alleges that BMW's "Dealer Effectiveness" metric is unreasonable because it "does not take into account all relevant and material criteria, data and facts" in measuring Braman's performance. 4th Am. Compl., ¶ 104.

While BMW disputes plaintiffs' claim that the Dealer Effectiveness metric is unreasonable, the Court need not resolve this dispute because Braman can proffer no evidence of having been damaged by any use of the metric, an essential element of its breach of contract claim under both Florida and New Jersey law.[18] It is undisputed that BMW took no punitive action against either Braman dealership as a result of any Dealer Effectiveness measurement, and none of Braman's three financial experts identified any damages sustained by Braman from any alleged unfair evaluation under the Dealer Effectiveness metric. SMF, ¶¶ 28-29, 31-35. On BMW's use of the Dealer Effectiveness metric, Braman's 30(b)(6) representative, Braman Automotive Chief Operating Officer Alex Shack, acknowledged that BMW never required Braman to achieve any particular performance threshold under the Dealer Effectiveness metric and that he had no objection to its use by BMW. SMF, ¶ 29.[19] Consistent with this testimony,

---

[18] *See, e.g., Asset Mgmt. Holdings, LLC v. Assets Recovery Center Inv., LLC,* 238 So.3d 908, 912-13 (Fla. 2d DCA 2018) ("Under Florida law, damages are an essential element of an action for breach of contract"); *Globe Motor Co. v. Igadaleg,* 225 N.J. 469, 482, 139 A.3d 57 (2016) ("Our [New Jersey] law imposes on a plaintiff the burden to prove . . . that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s].").

[19] In their Fourth Amended Complaint (¶ 186), plaintiffs allege in conclusory fashion that alleged shortcomings in the AVP and BMW's 2000 reduction in the "trading margin" each

and that of Braman's expert witnesses, Braman identified no damages resulting from BMW's use of the Dealer Effectiveness metric in response to BMW's Interrogatories calling for same.  SMF, ¶ 10.

It is axiomatic that Plaintiffs' claim for breach of contract must be supported by proof of causation and quantifiable damages.  *Asset Mgmt. Holdings,* 238 So.3d at 912-13 ("Under Florida law, damages are an essential element of an action for breach of contract" and where "[t]he plaintiff entities failed to introduce evidence essential to their burden of proving lost profits on their breach-of-contract claim," the court directed the trial court to dismiss the claim); *Globe Motor,* 225 N.J. at 482 ("Our [New Jersey] law imposes on a plaintiff the burden to prove . . . that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]"); *Caro Associates II, LLC v. Best Buy Co.,* 2012 WL 762304, *6 (D.N.J. March 2, 2012) (because "[p]roof of damages is essential to a breach of contract claim," and plaintiff "fail[ed] to make a showing sufficient to establish the existence of an element essential to [its] case," then "Best Buy is entitled to summary judgment on this claim."); *Giacobbe v. QBE Specialty Ins. Co.,* 2018 WL 4110924, *2 (D.N.J. Aug. 28, 2018) ("Plaintiffs still had an obligation at summary judgment to offer enough proof from which a jury could determine a measure of damages . . . their failure to do so rendered summary judgment for the Defendant not

breached the implied covenant.  However, as discussed above: (i) the trading-margin claim is time-barred; (ii) BMW expressly reserved the right to change its prices and terms of sale, including rebates, in its sole discretion (which express provision controls over the implied covenant; *see Burger King Corp. v. Weaver,* 169 F.3d 1310, 1316 (11th Cir. 1999), *citing Hosp. Corp. of Am. v. Florida Med. Ctr., Inc.,* 710 So.2d 573, 575 (Fla. 4th DCA 1998); *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 244, 773 A.D. 1121 (N.J. 2001)); and (iii) Braman was not damaged by these programs which provided millions of dollars in incremental revenue annually for Braman.  *See* Section III.D, above.  Finally, even if plaintiffs could proffer evidence of increased expenses incurred in order to achieve AVP thresholds, which they cannot, recovery of such expenses is barred under the Dealer Agreements which state that "BMW NA will not be liable for any expenditure made or incurred by Dealer in connection with Dealer's performance of its obligations pursuant to the Agreement."  SMF, ¶ 3.

only appropriate but required."). Because plaintiffs have failed to proffer evidence sufficient to establish damages attributable to BMW's use of the Dealer Effectiveness metric, BMW is entitled to summary judgment on Braman's claims for breach of contract.

### I.    Count X fails because BMW did not "enforce" its Dealer Effectiveness metric and because Braman did not sustain any material adverse effect.

Under Count X, Braman seeks to enjoin continued use by BMW of the Dealer Effectiveness metric to measure Braman's sales performance under Fla. Stat. § 320.64(42)(a), the same statute discussed above with respect to Counts III and IV (AVP). This provision of the FDA, effective June 26, 2017, prohibits the "establishment," "implementation" or "enforcement" of criteria to measure sales performance that, among other things, has a "material or adverse effect" on the dealer. It is undisputed that BMW established and implemented the Dealer Effectiveness criteria more than ten years ago - long before the adoption of this provision. SMF, ¶ 28.

Accordingly, in order to prevail on this claim, plaintiffs must establish that after June 26, 2017: (i) BMW "enforced" its Dealer Effectiveness criteria against Braman, and (ii) such enforcement resulted in material adverse effects on the Braman dealerships. (*See supra* n.13). Braman cannot establish either of these two elements of its claim. First, as discussed above, BMW has never "enforced" its Dealer Effectiveness metric in Florida, either by requiring Braman to achieve any particular level or score under this metric, or by taking any punitive action against it for failing to do so. SMF, ¶¶ 27-28. Second, as discussed in Section III.D above, Braman has sustained no material adverse effects from BMW's mere tracking of its performance under this metric. Notably, none of Braman's three financial experts opine that Braman suffered damages or harm as a result of the Dealer Effectiveness metric. SMF, ¶¶ 34-35. Accordingly, for each of these reasons, BMW is entitled to summary judgment on Count X.

19

## IV.   <u>CONCLUSION</u>

Since filing this case in 2017, Braman has known it was never coerced to make Fleet Conversions, *i.e.*, to "punch."  In truth, Braman held out its hand for, received, and kept hundreds of thousands of dollars in "punching" incentives every year.  Nonetheless, by falsely claiming coercion, Braman sought to create negative publicity for BMW – which publicity it apparently believed could be leveraged into a lucrative settlement.  Similarly with AVP, Braman knew full well it was receiving tens of millions of dollars from the very programs it claims are unlawful.  Yet, Braman hoped that by attacking these nationwide programs publicly, it could augment the public relations harm to BMW – harm it apparently thought BMW might pay handsomely to avoid.  BMW is entitled to summary judgment on these and all other claims against it because Braman simply cannot proffer evidence to show it was coerced, or any actual evidence of financial loss from programs that, as a matter of undisputed fact, paid it tens of millions of dollars.

### <u>REQUEST FOR HEARING</u>

BMW hereby requests oral argument and a hearing concerning its motion for summary judgment.  BMW believes that, given the number of claims asserted by plaintiffs in their Fourth Amended Complaint, oral argument would be beneficial to the Court in ruling upon this motion.  BMW estimates that one hour should be sufficient time for a hearing on this motion.

DATED:  March 10, 2021                    Respectfully submitted,

                                          BMW OF NORTH AMERICA, LLC


                                          */s/ Michael F. Suarez*
                                          Peter S. Baumberger
                                          Michael F. Suarez
                                          **KUBICKI DRAPER, P.A.**
                                          9100 S. Dadeland Blvd., Suite 1800
                                          Miami, Florida 33156
                                          (305) 374-1212
                                          psb@kubickidraper.com
                                          mfs@kubickidraper.com

                                          William N. Berkowitz*
                                          John R. Skelton*
                                          Brandon L. Bigelow*
                                          Alison K. Eggers*
                                          **SEYFARTH SHAW LLP**
                                          Two Seaport Lane, Suite 300
                                          Boston, Massachusetts 02210
                                          (617) 946-4800
                                          wberkowitz@seyfarth.com
                                          jskelton@seyfarth.com
                                          bbigelow@seyfarth.com
                                          aeggers@seyfarth.com
                                          * *admitted pro hac vice*

                                          *Counsel for BMW of North America, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 10, 2021, I filed the foregoing document through CM/ECF with the United States District Court for the Southern District of Florida and that notice will be provided to parties of record and the Court through CM/ECF.

/ s / *Michael Suarez*
Peter S. Baumberger
Michael F. Suarez
**KUBICKI DRAPER, P.A.**
9100 S. Dadeland Blvd., Suite 1800
Miami, Florida 33156
(305) 374-1212
psb@kubickidraper.com
mfs@kubickidraper.com

*Of Counsel:*

William N. Berkowitz*
John R. Skelton*
Brandon L. Bigelow*
Alison K. Eggers*
**SEYFARTH SHAW LLP**
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
(617) 946-4800
wberkowitz@seyfarth.com
jskelton@seyfarth.com
bbigelow@seyfarth.com
aeggers@seyfarth.com
* *admitted pro hac vice*

*Counsel for BMW of North America, LLC*

Dated:  March 10, 2021

22